United States District Court
Southern District of Texas
FILED

APR 0 1 2004

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| ORELIA ESQUIVEL, et al. | { | |
| | { | CIVIL ACTION NO. B-03-104 |
| V. | { | |
| | { | |
| | { | |
| THE CITY OF HARLINGEN | { | |

## DEFENDANT CITY OF HARLINGEN'S MOTION FOR SUMMARY JUDGMENT

TOM LOCKHART
State Bar No. 12473500
Federal ID No. 2257
ROGER W. HUGHES
State Bar No. 10229500
Federal ID No. 5950
**ADAMS & GRAHAM, L.L.P.**
P. O. Drawer 1429
Harlingen, TX 78551-1429
956/428-7495; FAX: 956/428-2954
RHughes@adamsgraham.com

Attorneys for Defendant CITY OF HARLINGEN

# TABLE OF CONTENTS

Page:

I. THE NATURE AND STAGE OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. ISSUES TO BE RESOLVED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III. SUMMARY JUDGMENT EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

IV. FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.    Plaintiffs' Alleged Federal Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.    The Circle K Robbery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    C.    The Arrest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    D.    The Detention . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

V. Arguments and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    A.    Summary Judgment Standard of Review and Procedure . . . . . . . . . . . . . 10

    B.    Section 1983 Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        1.    Arrest Without Probable Cause . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        2.    Claims Concerning the Detention and Questioning of Plaintiffs . . 13

        3.    Excessive Force . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    C.    HPD Officers Had Probable Cause to Arrest Plaintiffs . . . . . . . . . . . . . . 16

        1.    Probable Cause to Arrest Orelia Esquivel . . . . . . . . . . . . . . . . . . . 16

        2.    Probable Cause to Arrest Jesus Esquivel, Jr. . . . . . . . . . . . . . . . . . 17

    D.    No Evidence of Due Process Violations Concerning the Detention or
        Questioning of Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        1.    Orelia Esquivel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

       2.    <u>Jesus Esquivel, Jr.</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

E.    No Evidence of Excessive Force . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

F.    Section 1983 Claims Do Not Permit Exemplary Damages
      Against the City . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

# TABLE OF AUTHORITIES

<u>Page:</u>

<u>Cites:</u>

*Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*Atwater v. City of Lago Vista,* 532 U.S. 318 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Baker v. McCollan,* 443 U.S. 137 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 13, 15

*Bell v. Wolfish,* 441 U.S. 520 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Bender v. Brumley,* 1 F.3d 171 (5th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Blackwell v. Barton,* 34 F.3d 298 (5th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Brinegar v. United States*, 338 U.S. 160 (1949) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Brown v. Grabowski,* 922 F.2d 1097 (3rd Cir. 1990),
    *cert. denied,* 501 U.S. 1218 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*City of Newport v. Fact Concerts, Inc.,*
    453 U.S. 247 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*County of Sacramento v. Lewis,* 523 U.S. 833 (1998) . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*Cupit v. Jones,* 835 F2d 82 (5th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*D.R. v. Middlebucks Area Voc. Tech. School,* 972 F.2d 1364
    (3rd Cir. 1992), *cert. denied,* 506 U.S. 1079 (1993) . . . . . . . . . . . . . . . . . . . . . . . . 20

*Daniels v. Williams,* 474 U.S. 327 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Fantroy v. State,* 474 S.W.2d 490
    (Tex. Crim. App. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Fields v. City of S. Houston,* 922 F.2d 1183
    (5th Cir.1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Gerzin v. State,* 447 S.W.2d 925 (Tex. Crim. App. 1969) . . . . . . . . . . . . . . . . . . . . . . . 18

*Gladden v. Roach,* 864 F.2d 1196 (5th Cir.1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Glenn v. City of Tyler,* 242 F.3d 307 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Graham v. Connor,* 490 U.S. 396 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 18

*Hare v. City of Corinth,* 74 F.3d 633
    (5th Cir. 1996) (en banc) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Hudson v. McMillan,* 503 U.S. 1 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Hunter v. Bryant,* 502 U.S. 224 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Ikerd v. Blair,* 101 F.3d 430 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Illinois v. Gates,* 462 U.S. 213 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*International Ass'n of Machinists and Aerospace Workers*
    *No. 2504 v. International Mfg. Co.,*
    812 F.2d 219 (5th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Lefall v. Dallas I.S.D.,* 28 F.3d 521 (5th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Martin v. Thomas,* 973 F.2d 449 (5th Cir.1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*McFadden v. Lucas,* 713 F.2d 143 (5th Cir. 1983),
    *cert. denied,* 464 U.S. 998 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Mendenhall v. Riser,* 213 F.3d 226 (5th Cir.2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*Pierson v. Ray,* 386 U.S. 547 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Reese v. Anderson,* 926 F.2d 494 (5th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Robertson v. Plano City of Texas,* 70 F.3d 21
    (5th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*S.S. v. McMullin,* 225 F.3d 960 (8th Cir. 2000)(en banc),
    *cert. denied,* 532 U.S. 904 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*Sanchez v. Swyden,* 139 F.3d 464 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15

*Slaughter v. Allstate Ins. Co.,* 803 F.2d 857
    (5th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Speaks v. Trikora Lloyd P.T.,* 838 F.2d 1436
    (5th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Spicer v. Collins,* 9 F.Supp.2d 673 (S.D.Tex. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Sutton v. Utah State School for Deaf and Blind,*
    173 F.3d 1226 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Thompson v. State,* 697 S.W.2d 413 (Tex. Crim. App. 1985)
    (en banc) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Edwards,* 577 F.2d 883
    (5th Cir.1978) (en banc) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Lee,* 962 F.2d 430 (5th Cir.1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Levine,* 80 F.3d 129 (5th Cir.1996) . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Preston,* 608 F.2d 626 (5th Cir.1979) . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Shaw,* 701 F.2d 367 (5th Cir.1983) . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Vance v. Nunnery,* 137 F.3d 270 (5th Cir.1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Wagner v. Bay City,* 227 F.3d 316 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Webber v. State,* 757 S.W.2d 51 (Tex. App.–Houston
    [14th Dist.] 1988, rev. ref'd) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Williams v State,* 461 S.W.2d 614
    (Tex. Crim. App. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Williams v. Bramer,* 180 F.3d 699 (5th Cir. 1999),
    *reh. denied at* 186 F.3d 633(5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Wyatt v. Cole,* 994 F.2d 1113 (5th Cir. 1993),
    *cert. denied,* 510 U.S. 971 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Federal Rules of Civil Procedure:

Rule 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Federal Statutes:

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11


Texas Penal Code Annotated:

§7.01 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

§7.02(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16


Texas Family Code:

§51.095(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

§52.02(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

§52.02(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## DEFENDANT CITY OF HARLINGEN'S MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW, Defendant CITY OF HARLINGEN (also called "City of Harlingen Police Department") and files **DEFENDANT CITY OF HARLINGEN'S MOTION FOR SUMMARY JUDGMENT** and would show the Court as follows:

### I. THE NATURE AND STAGE OF THE CASE

Plaintiffs sued the City of Harlingen ("City") and SSP Partners ("Circle K") for the arrest and detention of Orelia Esquivel and Jesus Equivel, Jr., under (1) 42 U.S.C. §1983, and (2) state law tort claims under the Texas Tort Claims Act, Texas Civil Practice and Remedies Code chapter 101. Plaintiffs Third Amended Complaint ("Complaint"), Dkt # 24, ¶¶ IV(D), V. The district court dismissed the state law claims against the City, leaving only federal claims under section 1983. Dkt# 19.

The magistrate judge directed the parties to do sufficient discovery for the City to make and Plaintiffs to respond to a motion for summary judgment on the remaining federal claims. Dkt # 26. The Plaintiffs dismissed their claims against co-defendant Circle K. Dkt. #34. The City moves for summary judgement that Plaintiffs take nothing on all or any of their remaining claims.

### II. ISSUES TO BE RESOLVED

The City is entitled to summary judgment. There are no material fact questions on the material issues and it is entitled to a judgment that Plaintiffs take nothing on the federal law claims. The grounds/issues for summary judgment are:

1

1.      The City's police officers had probable cause to arrest Plaintiffs.

2.      The City's officers were not deliberately indifferent to Plaintiffs' safety or security nor did they act with deliberate indifference towards Plaintiffs with reference to questioning them or to the conditions or length of detention.

3.      The City's officers' actions with respect to the conditions/length of detention or questioning of Plaintiffs were not conscience shocking.

4.      The City's police officers did not use excessive or unreasonable force to arrest or detain Plaintiffs and Plaintiffs suffered no injury.

5.      Plaintiffs are not entitled to punitive damages.

### III. SUMMARY JUDGMENT EVIDENCE

The Summary Judgment Evidence in support of this motion is as follows:

| Exhibit | Document |
|---------|----------|
| 1. | Excerpts from Orelia Esquivel's deposition |
| 2. | Excerpts from Jesus Esquivel, Jr.'s deposition |
| 3. | Excerpts from Officer Arturo Salinas' deposition |
| 4. | Excerpts from Officer Arturo Moreno's deposition |
| 5. | Excerpts from Officer Ruben Contreras' deposition |
| 6. | Excerpts from Officer David Means' deposition |
| 7. | Excerpts from Thomas Hushen's deposition |
| 8. | Statement of Julio Gonzalez |
| 9. | Statement of Norma Park |

## IV.  FACTUAL BACKGROUND

On July 17, 2003, City policy officers arrested Orelia Esquivel and her son, Jesus

Esquivel, Jr., in connection with an alleged robbery at a Circle K convenience store in

Harlingen.  Based on information from the store's video tape, an eyewitness, and Jesus' res

gestae statements to the officers, they had reason to believe the perpetrator  was Plaintiffs'

relative (Luis Ovalle), that he had fled in the Esquivel vehicle, and they had assisted him.

A Mr. Joseph Galipp actually stole the money from the Circle K after exhibiting a gun to its

clerk.  The next morning, new evidence uncovered by City detectives showed the perpetrator

was Galipp and not Ovalle; Plaintiffs were released the same day.

### A.    Plaintiffs' Alleged Federal Claims

Plaintiffs allege that they were arrested without probable cause for a crime they did

not commit in violation of 42 U.S.C. §1983.  Complaint, ¶IV(D), Dkt # 24.  Jesus Esquivel

alleges that he was improperly questioned and not promptly taken to a juvenile detention

facility.  Complaint, ¶IV(C), Dkt # 24.  Orelia Esquivel alleges that she was threatened with

fines, jail time, etc., if she did not confess, causing her emotional distress.  Complaint,

¶¶IV(D, E), V,  Dkt # 24.

### B.    The Circle K Robbery

The events occurred on Saturday, June 17, 2003, in Harlingen, Texas.  Plaintiffs

Orelia and Jesus Esquivel (her 16 year old son) were at their home in Harlingen.  Exhs. 1 p.

19; 2, p. 7.  Mrs. Esquivel was asleep; at about 10:00 p.m., Jesus Jr. woke her up to take him

out to eat as he was hungry. Exh. 2, p. 7.

They first drove to a nearby Circle K store on 705 South Commerce Street in the

family car (a white Ford Explorer) to buy gas first because it was nearly empty. Exh. 1, pp. 20-21. They stopped at one of the pumps in front. Exh. 1, pp. 20-21.

Jesus Jr. left the car to enter to the Circle K; on his way in, he saw Luis Ovalle, his uncle, seated in a pick-up truck parked in front of the store. Exh. 2, pp. 8-9, 10. Jesus Jr. went into the store and ordered $5 worth of gas and a soda. Exh. 2, p. 9. The person who would later rob the Circle K stood behind him in line; he looked suspicious to Jesus Jr. Exh. 2, p. 13. The clerk told him his mother was parked at a pump that did not work. Exh. 2, p. 9.

Jesus Jr. left the store, told his mother to move the vehicle to another pump, pumped the gas, and then went back to the store. Exhs. 1 p. 21; 2, p. 12. As he entered the door he saw his uncle's vehicle start to drive off. Exh. 2, p. 12. Jesus Jr. admitted he made a gesture like a wave when he entered the Circle K which was captured by the store camera, but he meant it as a signal to his uncle. Exh. 2, p. 27. He again got in line and again he just happened to be in line in front of the person who would later rob the store. Exh. 2, pp. 12-13. Jesus Jr. got his soda and change and left the store. Exh. 2, p. 10.

After Jesus Jr. left, the next person in line asked the clerk for cigarettes, then lifted his shirt to exhibit a handgun in his belt and demanded money. Exh. 8. The clerk gave him money from the register and he left through the front door to the store. Exh. 8. The clerk reported the robbery to the Harlingen Police Department ("HPD") at 10:23 p.m. Norma Park was seated in a vehicle in front of the store, waiting for a friend to exit; later she would claim she saw the robbery and the robber left the store and got in a white Ford Explorer which sped off. Exh. 9.

## C.   The Arrest

HPD Officer Arturo Moreno went to the store about 10:25 p.m. Exh. 4, p. 11-12. He interviewed the clerk who gave him the details of the robbery. Exh. 4, p. 12. He then interviewed Ms. Park who told him the robber left the store and got into a white Ford Explore; she gave him a license tag number that matched the Esquivel vehicle. Exh. 4, p. 13. Officer Moreno radioed in the vehicle description and license number. Exhs. 3, p. 18; 4, pp. 12-13.

During this time, Plaintiffs drove to a Jack-in-the-Box and bought three hamburgers at the drive-through lane. Exhs. 1 p. 23-24; 2, p. 14. The third burger was for Jesus Jr's grandfather who was at their home; the grandfather had not asked for this, but Jesus Jr. thought he would get one for him anyway. Exh. 2, pp. 14-15. The drive-through clerk would later tell police the Esquivel vehicle had three people, one woman and two males. Exh. 7, pp. 24-35.

HPD Officer Jorge Salinas was on patrol duty on Fillmore Street; he heard the call about a white Ford Explore with the license tag number being involved in a robbery. Exh. 3, p. 18. He spotted the Esquivel vehicle headed towards him on Fillmore street; Mrs. Esquivel saw the police vehicle headed towards her. Exh. 1, p. 25; Exh. 3, p. 18. Officer Salinas saw that her vehicle matched the description. Exh. 3, p. 18. He turned onto a side street, did a "U" turn and got back onto Fillmore in the lane behind the Esquivel vehicle. Exh. 3, p. 25. During the "U" turn on the side street, he lost visual contact with the Esquivel vehicle. Exh. 3, p. 21. Mrs. Esquivel and her son saw the police vehicle do the "U" turn and begin to follow them. Exh. 1, p. 25; 2, p. 16.

Officer Salinas tailed the Esquivel vehicle for a few blocks until back-up units arrived. Exh. 1, pp. 25; 2, pp. 19, 22-23. It was prudent to wait for back-up before stopping the vehicle, because this was an armed robbery situation. Exh. 3, p. 19.

He then signaled for the vehicle to stop. Exh. 3, pp. 23. The Esquivel vehicle took no evasive action and began to pull over. Exh. 3, p. 23. Mrs. Esquivel saw the lights but did not know why she was being pulled over. Exhs. 1 p. 25; 2, p. 16-17. Her windows were up and the officers were shouting something at her. Exhs. 1 p. 26; 2, p. 17. Officer Salinas saw she did not understand English and changed to Spanish. Exh. 3, p. 19. Her son then told her the officers wanted her to get out; they both left the vehicle. Exh. 2, p. 17.

The officers immediately separated them. Exhs. 1 p. 28; 2, p. 18-19; 3, p. 26. Officer Salinas told Mrs. Esquivel there had been a robbery at the Circle K and someone saw the perpetrator get in her vehicle. Exhs. 1, p. 28-29; 3, p. 27-28. Mrs. Esquivel admitted being at the Circle K but denied anyone got in the vehicle or that she was involved. Exhs. 1 p. 28-29; 2, p. 27-28.

HPD Officers Hushen and Fechner questioned Jesus Jr. Exhs. 2, pp. 22-23; 7, pp. 16-17, 21. Officer Hushen said Jesus Jr. told him that his uncle, Luis Ovalle, had done the robbery. Exh. 7, pp. 16-17. Jesus Jr. does not recall what he said about his uncle. Exh. 2, pp. 22-23. The officers noted that Mrs. Esquivel and son were telling different stories and told them so. Exhs. 1, 29; 2, p. 23; 3, p. 28-29.

Officer Hushen then went to the Circle K and met with Officer Moreno. Exh. 4, p. 14; 7, pp. 14, 21. They interviewed Ms. Parke while she sat in a vehicle parked in front of the store. Exh. 7, p. 22-23. She was positive that she saw the perpetrator get in a white Ford

Explorer with a tag number matching the Esquivel vehicle. Exh. 4, p. 19; 7, pp. 22-23. During the robbery, she had been in the front seat of the car parked in front of the store; the officers thought that gave her an excellent vantage point to see everything. Exhs. 4, p. 19-20; 7, p. 23. The next day, Ms. Park would admit she drank three beers that night and was feeling "buzzed" at the time of the robbery. Exh. 9. She did not tell this to Officers Moreno or Hushen; they noticed no signs of intoxication. Exhs. 4, p. 22; 7, p. 23.

Officers Hushen and Moreno then viewed the Circle K security tape of the robbery. Exhs. 4, p. 15; 7, p. 23. They say Jesus Jr. standing next to the perpetrator and assumed he was Luis Ovalle. Exhs. 4, p. 18-19; 7, p. 23.

Officer Hushen then radioed Officer Salinas to arrest Plaintiffs. Exhs. 3, 29, 30-31; 7, p. 14, 23. Officer Salinas told Mrs. Esquivel that this would have to be cleared up at the police station and handcuffed her. Exh. 1, pp. 29; 3, pp. 42-43. During this time, none of the officers threatened her with violence, shouted at her, or spoke rudely or with profanity. Exh. 1, p. 30. She was just handcuffed and taken to the police station. Exh. 1, p. 30.

Jesus Jr. was directed to sit on the ground so he could be handcuffed. Exh. 2, pp. 19-20. The officer put a hand on his shoulder as he was sitting down. Exh. 2, pp. 20-21. However, he was not forced or pushed down. Exh. 2, pp. 20-21. He felt the handcuffs were too tight, but they left no bruise and did not cause any numbness. Exh. 2, p. 25. He never asked the officers to remove or loosen the cuffs. Exh. 2, p. 31.

Officer Hushen then spoke to the Jack-in-the-Box drive-through clerk who recalled the Esquivel's purchase and confirmed the white Ford Explorer had three passengers. Exh. 7, p. 24-25.

**D.    The Detention**

Plaintiffs were taken to the HPD station and booked without incident and booked about 11:30 p.m. Exh. 1, pp. 33-35; Exh. 2, p. 27. Mrs. Esquivel was placed in a cell. Exh. 1, p. 35.

Jesus Esquivel was detained in an office. Exh. 2, p. 25. He claims that HPD officers questioned him. First, because he had red eyes, they asked him if he was high on something. Exh. 2, pp. 28-29. They encouraged him to tell the truth about what happened, that it might make his mother's detention shorter or his longer. Exh. 2, pp. 27-28. They did not raise their voices or threatened to physically harm him or his mother. Exh. 2, pp. 28, 32. They did not curse or use profanity. Exh. 2, pp. 26, 32. About 3:00 a.m. officers took him to the juvenile detention facility in San Benito. Exh. 2, p. 30-31.

About 8:00 a.m., the detectives came on duty. Exh. 5, p. 8; Exh. 6, p. 7. Detective David Means noted the Circle K robbery, determined that it was high priority, and assigned investigation to Detective Contreras. Exh. 6, p. 7.

Det. Contreras then interviewed Mrs. Esquivel in his office. Exhs. 1, p. 6; 5, p. 9. She signed a bi-lingual Miranda waiver form. Exh. 1, pp. 39-41; 5, p. 9. Both agree the interview lasted about 15 minutes. Exh. 1, p. 42; 5, pp. 9, 13. Mrs. Esquivel claims that Det. Contreras told her she was guilty, she could go to jail for 90 years, pay a fine, and be deported[1]. Exh. 1, pp. 38, 41-42. She admits that Det. Contreras did not threaten any physical violence, did not raise his voice, or use profanity to her. Exh. 1, pp. 35, 42-43.

Det. Contreras recalled that Mrs. Esquivel was nervous and evasive, as if she had

---

[1] Mrs. Esquivel is a citizen of Mexico. Exh. 1, p. 5.

something to conceal. Exh. 5, p. 10.

There was a crowd in the HPD station lobby that appeared to be Esquivel family and friends. Exh. 5, pp. 14-15. Det. Contreras asked the group questions about the location of Luis Ovalle; initially, he got evasive answers as if no one knew him. Exh. 5, pp. 14-16. He received a called from a Mercedes police officer who was also an Esquivel relative; he advised Det. Contreras that Luis Ovalle was involved in the robbery and his relative lived on Pierce Street in Harlingen who wished to talk to the police. Exh. 5, p. 15-16. A phone call to that residence revealed that Luis Ovalle was going to the police station to turn himself in. Exh. 5, p. 16-17. Det. Contreras then returned to the lobby to question the group; after more evasive answers, someone said he was across the street at the bail bondsman's offices. Exh. 5, pp. 16-17.

Det. Contreras went to that officer and found several individuals there. At first, no one admitted to being Luis Ovalle, then two persons said they were Luis Ovalle. Exh. 5, p. 17. The older person identified himself as the Luis Ovalle, but Det. Contreras did not arrest him because he had no arrest warrant. Exh. 5, pp. 17-19.

Det. Contreras then contacted the Mercedes officer to come to the HPD to view the Circle K video to positively identify Luis Ovalle as the perpetrator. Exh. 5, p. 19. When they reviewed the tape, it was apparent Mr. Ovalle was not the man with the gun. Exh. 5, p. 20. Based on this, Det. Means authorized the release of Mrs. Esquivel sometime between noon and 1:00 p.m. Exh. 1, p. 23; 5, pp. 21, 38-40; 6, p. 6. About 2:00 p.m., she picked up her son at the juvenile detention facility. Exh. 1, p. 44.

Later that day, the Circle K clerk and Ms. Park identified Joe Galipp as the robber.

9

Exhs. 6, pp. 17-8; 9. Mr. Galipp had robbed another Circle K store about 3:30 a.m. that day.

## V. Arguments and Authorities

### A.    Summary Judgment Standard of Review and Procedure

Federal Rule of Civil Procedure 56(c) provides that a summary judgment shall be rendered if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). By its very terms, the rule permits summary judgment even if the parties disagree as to some facts. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1986). Summary judgment is precluded under Rule 56(c) only when the facts in dispute might affect the outcome of the suit under governing law and the dispute is genuine. *Id.* at 248. Should it appear that there is no genuine issue of material fact that the moving party is entitled to judgment as a matter of law, the district court should grant summary judgment. *Speaks v. Trikora Lloyd P.T.*, 838 F.2d 1436, 1438-39 (5th Cir. 1988).

The movant need not disprove the non-moving party's claims in order to secure a summary judgment. Summary judgment is proper whenever the movant demonstrates "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Slaughter v. Allstate Ins. Co.*, 803 F.2d 857, 860 (5th Cir. 1986). Thus, Cameron County, Texas is entitled to summary judgment when the Plaintiff "fails to make a showing sufficient to establish the existence of an element essential to the Plaintiff's case, and on which [the Plaintiff], will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (the burden is not on the moving party to produce evidence showing the absence of genuine issue of material fact). *See also Reese v. Anderson*, 926 F.2d 494, 498 (5th Cir. 1991); *International*

*Ass'n of Machinists and Aerospace Workers No. 2504 v. International Mfg. Co.*, 812 F.2d 219, 222 (5th Cir. 1987) ("[M]ere conclusory allegations are not competent summary judgment evidence, and they are therefore insufficient to defeat or support a motion for summary judgment"); *Anderson*, 477 U.S. at 249-50 (holding that "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. . . If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.").

**B.    Section 1983 Liability**

42 U.S.C. § 1983 is not itself a source of substantive rights. *Graham v. Connor*, 490 U.S. 396, 393 (1989). The first inquiry is to isolate the precise provision of the federal Constitution that is allegedly infringed. *Graham*, 490 U.S. at 394.

1.    <u>Arrest Without Probable Cause</u>

A claim of "false arrest" (i.e., claim of arrest without probable cause) falls under the Fourth Amendment. *Blackwell v. Barton,* 34 F.3d 298, 302 (5th Cir. 1994).

An arrest or detention may be unlawful if it is accomplished without due process of law as required by the United States Constitution. See *Baker v. McCollan*, 443 U.S. 137, 144-45 (1979). Police officers are thus required under the Fourth Amendment to make a determination of probable cause before performing a custodial arrest. *See Martin v. Thomas*, 973 F.2d 449, 453 (5th Cir.1992); *Fields v. City of S. Houston*, 922 F.2d 1183, 1189 (5th Cir.1991). An officer has probable cause to arrest if, at the time of the arrest, he had knowledge that would warrant a prudent person's belief that the person arrested had already committed or was committing a crime. See *Gladden v. Roach*, 864 F.2d 1196, 1199 (5th

Cir.1989).

"Probable cause to arrest exists 'where "the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed." *United States v. Lee*, 962 F.2d 430, 435 (5th Cir.1992) (quoting *United States v. Preston*, 608 F.2d 626, 632 (5th Cir.1979)). "Probable cause must be judged not with the logic of cold steel, but with a common sense view to the realities of everyday life." *Id.* at 435 (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)). "The existence of probable cause is not determined by reference to a precise formula. Instead, probable cause is present 'when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *Vance v. Nunnery*, 137 F.3d 270, 276 (5th Cir.1998) (quoting *United States v. Levine*, 80 F.3d 129, 132 (5th Cir.1996)). The court is to examine the totality of the circumstances to determine whether probable cause existed. *Mendenhall v. Riser*, 213 F.3d 226, 231 (5th Cir.2000). "'[P]robable cause is a fluid concept--turning on the assessment of probabilities in particular factual contexts--not readily, or even usefully, reduced to a neat set of legal rules." ' *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)).

"It is not necessary that the arresting officer himself have personal knowledge of all of the facts." *Lee*, 962 F.2d at 435. Rather, "probable cause can rest upon the collective knowledge of the police ... when there is some degree of communication between [them]." *Id.* (citation and internal quotation marks omitted). "[P]robable cause is the 'sum total of

layers of information and the synthesis of what police have heard, what they know, and what they observed as trained officers." ' *United States v. Shaw*, 701 F.2d 367, 376 (5th Cir.1983) (quoting *United States v. Edwards*, 577 F.2d 883, 895 (5th Cir.1978) (en banc)). Probable cause is not to be determined by weighing "[e]ach individual layer of information" but by considering "the 'laminated total' of the facts available[.]" *Id.* "Whether [an] arrest [is] constitutionally valid depends in turn upon whether, at the moment the arrest was made, the officers had probable cause to make it--whether at that moment the facts and circumstance within their knowledge and of which they had reasonable trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Mendenhall*, 213 F.3d at 231 (emphasis deleted) (quoting *Hunter v. Bryant*, 502 U.S. 224, 228 (1991)).

"[A] peace officer who arrests someone with probable cause is not liable for false arrest simply because the innocence of the suspect is later proved." *Pierson v. Ray*, 386 U.S. 547, 555 (1967). The Constitution does not guarantee an error free investigation or that only the guilty will be arrested. *Baker*, 443 U.S. at 145-46; *Sanchez v. Swyden*, 139 F.3d 464, 468 (5th Cir. 1998).

2.    Claims Concerning the Detention and Questioning of Plaintiffs

These claims fall solely under the 14th Amendment's Due Process Clause.

The Esquivels were pretrial detainees, not convicts. The Eighth Amendment applies only to convicted prisoners. *Bell v. Wolfish*, 441 U.S. 520, 523 (1979). "We highlight the distinction between pretrial detainees and convicted prisoners because the due process clause of the Fourteenth Amendment accords pretrial detainees rights not enjoined by convicted

13

inmates under the Eighth Amendment protection against cruel and unusual punishment."
*Cupit v. Jones,* 835 F2d 82, 84 (5th Cir. 1987). The constitutional rights of pre-trial detainees
flow from procedural and substantive due process. *Hare v. City of Corinth,* 74 F.3d 633,
639 (5th Cir. 1996) (en banc). Thus, the Due Process Clause controls claims by pre-trial
detainees concerning the failure to protect and conditions of detention. *Id.* at 643. When the
claim is based on an official's episodic act or omission, then plaintiff must prove that the
official acted with deliberate indifference. *Id.* at 647-48. This is a subjective standard, one
more stringent than gross negligence. *Id.* at 648-50. The jail official must have subjective
knowledge of a substantial risk of serious harm but responded with deliberate indifference
to that risk. *Id.* at 650; *Wagner v. Bay City,* 227 F.3d 316, 324 (5th Cir. 2000).

The City urges that any Due Process claim alleged here falls under Substantive Due
Process rather than Procedural Due Process. In *Hare,* the Fifth Circuit did not specifically
say whether the duty falls under substantive versus procedural due process, but several times
it said the right flows from the "rights to basic needs such as medical care and safety"
because of the State's affirmative action to deprive the detainee of his ability to care for
himself. *Hare,* 74 F.3d at 639, 643, 647. Therefore, it would appear that for this case, the
right sounds under Substantive Due Process.

A Substantive Due Process claim has a threshold requirement that the acts must shock
the conscience. *County of Sacramento v. Lewis,* 523 U.S. 833, 849 (1998); *S.S. v. McMullin,*
225 F.3d 960, 964 (8th Cir. 2000)(en banc), *cert. denied,* 532 U.S. 904 (2001). *Sutton v.
Utah State School for Deaf and Blind,* 173 F.3d 1226, 1238 (10th Cir. 1999); *see also Lefall
v. Dallas I.S.D.,* 28 F.3d 521, 531 (5th Cir. 1994)(predicting that "shock the conscience"

14

standard would apply to any "state created danger" exception to *DeShaney*). This standard requires conduct that is an abuse of governmental power or is so brutal and offensive that it cannot comport with traditional ideas of fair play and decency. *Lewis,* 523 U.S. at 846, 847. Deliberate indifference may shock the conscience depending on the level of indifference and opportunity for calm deliberation prior to action. *Id.* at 850. However, negligence is not enough. *Daniels v. Williams,* 474 U.S. 327, 332 (1986); *S.S.,* 225 F.3d at 964. Gross negligence and recklessness do not meet even the test for "shock the conscience." *S.S.,* 225 F.3d at 964.

In cases where a person was detained on a facially bad arrest warrant or the officers arrested the wrong individual require proof of more than negligence. *Baker,* 443 U.S. at 143-146; *Sanchez,* 139 F.3d at 468-69. To sustain a Due Process claim, detainees must prove more than the police possessed exculpatory information or negligently investigated claims of innocence. *Id.* Brief periods of delay while investigating the original basis to arrest do not offend Due Process. *Baker,* 443 U.S. at 143-146 (3 days); *Sanchez,* 139 F.3d at 468-69 (26 hours).

### 3.    Excessive Force

It is not clear Plaintiffs are making an "excessive force" claim. However, they do complain about their treatment during arrest and detention. Out of an abundance of caution, the City will show why it fails to exist. A claim that excessive force was used to arrest or seize the claimant falls under the Fourth Amendment.

A claim for excessive force in violation of the Constitution requires (1) an injury (2) which resulted directly and only from the use of force that was clearly excessive to the need

15

and (3) the force used was objectively unreasonable. *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999), *reh. denied at* 186 F.3d 633(5th Cir. 1999).  The plaintiff must suffer some injury, one that is more than *de minimus*. *Hudson v. McMillan*, 503 U.S. 1, 9-10 (1992); *Williams*, 180 F.3d at 703.  Whether an injury caused by excessive force is more than *de minimus* must be judged by the context in which that force is deployed. *Williams*, 180 F.3d at 704; *Ikerd v. Blair*, 101 F.3d 430, 434 (5th Cir. 1996).

## C.    HPD Officers Had Probable Cause to Arrest Plaintiffs

Texas law eliminates the distinction between principals and accessories to crimes; each party can be charged with committing the offense. TEX. PENAL CODE ANN. §7.01 (Vernon 2003).  A person is criminally liable with the principal if he encourages, directs, aids, or attempts to aid another to commit the offense with the intent to promote or assist the commission. TEX. PENAL CODE ANN. §7.02(a)(2) (Vernon 2003). The issue is then whether the officers had probable cause to believe Plaintiffs were liable for the conduct of the perpetrator.

### 1.    Probable Cause to Arrest Orelia Esquivel

At the time of the arrest, HPD officers had information that Mrs. Esquivel was at the Circle at the time of the robbery, a witness saw the perpetrator enter her vehicle, her vehicle sped off, and her son gave a different account of the facts than did she.  Ms. Park's information was credible because she was an eyewitness and she provided a description and license tag number for the getaway vehicle that was found in the vicinity shortly after the robbery.

Mere evidence that Mrs. Esquivel drove the vehicle in which the perpetrator fled the

robbery scene would be sufficient to convict her under Penal Code section 7.01. *Thompson v. State,* 697 S.W.2d 413, 417 (Tex. Crim. App. 1985)(en banc); *Webber v. State,* 757 S.W.2d 51, 53-54 (Tex. App.–Houston [14th Dist.] 1988, rev. ref'd). Therefore, the officers had probable cause to arrest.

### 2.    Probable Cause to Arrest Jesus Esquivel, Jr.

At the time HPD officers arrested Jesus Jr., they had evidence that he was in the store with perpetrator, Jesus Jr. made a gesture as he entered the store a second time, Jesus Jr. seemed to know the perpetrator, Jesus Jr. got in line in front of him twice, Jesus Jr. left the store just before the robbery occurred, and then he left in the same vehicle as the perpetrator. Jesus Jr. gassed up the vehicle while the perpetrator remained inside; after putting gas in the vehicle he re-entered the store making sign. Later, he told officers who robbed the store; if he exited the building before the perpetrator acted, he likely would not know this unless he was involved. Also, his story conflicted with his mother's, indicating that both were trying to cover for the perpetrator, who probably left the vehicle before Officer Salinas spotted it or while Salinas did his "U" turn on the side street.

Evidence not much stronger has been sufficient to convict under Penal Code section 7.01 or as an accessory. *See e.g. Fantroy v. State,* 474 S.W.2d 490, 492 (Tex. Crim. App. 1971)(evidence that defendant exited the store with the robber, got into the getaway vehicle with him, was arrested in the car, and his fingerprint was on the money bag, held sufficient to convict as an accessory); *Williams v State,* 461 S.W.2d 614, 615-16 (Tex. Crim. App. 1971)(evidence that defendant entered the store first as if he were looking for someone, was in store near the counter at the time of the robbery, exited the vehicle as the robber, and the

robber was arrested a week later in the defendant's vehicle, held sufficient to convict);
*Gerzin v. State,* 447 S.W.2d 925, 926 (Tex. Crim. App. 1969)(evidence that defendant went
in store to make purchase while robber stood outside examining store, then left to sit in
getaway vehicle during robbery and then left as a passenger in that vehicle while robber
drove it, held sufficient to convict). Therefore, this was sufficient probable cause to conclude
that Jesus Jr. was an accessory by acting as a "look out" and gassing up the getaway vehicle.

**D.      No Evidence of Due Process Violations Concerning the Detention or Questioning
          of Plaintiffs**

     1.    <u>Orelia Esquivel</u>

Mrs. Esquivel does not complain she was physically injured or that any HPD officer
threatened her with physical harm. Therefore, he complaints concerning the conditions of
her arrest and detention appear to be that she was handcuffed, she was jailed and that Officer
Contreras told her she could go to jail, be fined, be deported, etc.

First, she has no Fourth Amendment claim for simply being handcuffed or jailed.
*Atwater v. City of Lago Vista,* 532 U.S. 318, 354-55 (2001)(no 4th Amendment claim for
arresting, handcuffing, booking, and jailing plaintiff for offense of driving without seatbelts
which was punishable only by a fine, if there was probable cause to arrest). The Fourth
Amendment prohibits "unreasonable searches and seizures;" the standard is reasonableness.
*Id.* at 326, 347; *Graham,* 490 U.S. at 395. If the facts in *Atwater* do offend reasonableness,
they will not offend Due Process which requires the higher standard of deliberate
indifference.

Second, Officer Contreras' questioning fails to offend Due Process, even accepting

only her side of the conversation. Mere verbal abuse does not present an actionable section 1983 claim; mere threatening language and gestures by custodian officers do not amount to a Constitutional violation. *Bender v. Brumley,* 1 F.3d 171, 274 n.1 (5th Cir. 1993); *McFadden v. Lucas,* 713 F.2d 143, 146 (5th Cir. 1983), *cert. denied,* 464 U.S. 998 (1983); *Spicer v. Collins,* 9 F.Supp.2d 673, 683 (S.D.Tex. 1998).

There is no evidence of deliberate indifference or "conscience shocking" behavior by the arresting or custodial officers. Officers Hushen and Salinas honestly believed she was involved. Dets. Means and Contreras thought there was probable cause, and released her shortly after Det. Contreras' investigation showed the perpetrator was not Luis Ovalle. No one dragged their heels considering that most of this investigation occurred over a 12 hour period and involved nearly half a dozen police officers. The continuing investigation corroborated the officers' original conclusions until Det. Contreras met Mr. Ovalle and the subsequent viewing of the Circle K tape showed Ovalle was not the perpetrator.

2.    Jesus Esquivel, Jr.

The same arguments apply to Jesus Esquivel, Jr. First, the handcuffing and detention do not offend Due Process. There is no evidence that either posed a substantial risk of severe harm; he did claim any injury from the cuffing. Second, verbal abuse does not state a section 1983 claim. See above; see also *Robertson v. Plano City of Texas,* 70 F.3d 21, 25 (5th Cir. 1995)(officers questioned 16 year old burglary suspect admonished him that it was a felony that carried fine and jail time, even though adult penalty did not apply to juveniles; held, no Due Process violation). Third, none of the officers' actions rise to the level of deliberate indifference or conscience shocking behavior.

19

Jesus Jr.'s claim appears to be an alleged violation of Texas statutes concerning the detention and interrogation of minors. Texas Family Code section 52.02(a) required that a person taking a minor into custody shall, without unnecessary delay, release the minor to a parent or guardian, or deliver the minor to a detention facility. TEX. FAMILY CODE ANN. §52.02(a)(1, 3) (Vernon Supp. 2004). Texas Family Code section 51.095 provides that a minor's statement is not admissible into evidence unless it is in writing and made after a magistrate has given the minor certain statutory warnings. TEX. FAMILY CODE ANN. §51.095(a)(1) (Vernon 2002). Without conceding that HPD officers violated these statutes[2], these statutes are irrelevant to whether the HPD officers violated Due Process.

Section 1983 vindicates federal rights, not state law; section 1983 affords no remedy for violating state laws or regulations. *Wyatt v. Cole,* 994 F.2d 1113, 1117-18 (5th Cir. 1993), *cert. denied,* 510 U.S. 971 (1993). Even if the alleged conduct violates state law, that is insufficient to make out a section 1983 claim. *See e.g. D.R. v. Middlebucks Area Voc. Tech. School,* 972 F.2d 1364, 1375 (3rd Cir. 1992), *cert. denied,* 506 U.S. 1079 (1993)(school officials failure to comply with state law requiring reports of sexual abuse on students irrelevant to section 1983 claim for failure to protect); *Brown v. Grabowski,* 922 F.2d 1097, 1113-14 (3rd Cir. 1990), *cert. denied,* 501 U.S. 1218 (1991)(violation of state domestic relations statute irrelevant to issue of whether officials conduct violated Constitution).

---

[2] Family Code sections 51.025(b, d) permit local detention for up to six hours in order to complete processing. Jesus Esquivel was taken to the juvenile detention facility within 6 hours of arrest. Exh. 2, p. 30-31. Section 51.095 sets standards only for admissibility of statements; it does not prohibit asking the minor questions that may not be admissible. Section 51.095(a)(2, 3) also makes admissible oral statements that are *res gestae* or concern facts that are independently corroborated.

**E.    No Evidence of Excessive Force**

Again, it is not clear that Plaintiff claim that excessive force was used to arrest them.

Rather it appears their claims go to the conditions of their detention, which are Due Process

claims rather than Fourth Amendment "excessive force" claims.  See above at pp. 18-19.

In any case, Orelia Esquivel did not suffer any injury from the arrest, even from the

handcuffing.  Jesus Esquivel Jr. claims the cuffs were tight, but this alleged injury does not

rise above *de minimus*.  *Compare Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir.

2001)(temporary wrist swelling from tight handcuffs was insufficient).

**F.    Section 1983 Claims Do Not Permit Exemplary Damages Against the City**

Plaintiffs allege a claim for punitive/exemplary damages.  Complaint, ¶ VII; Dkt # 24.

There is no liability under section 1983 for punitive damages against governmental entities.

*City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981).

WHEREFORE, PREMISES CONSIDERED, Defendant City of Harlingen prays the

Court grant summary judgement that Plaintiffs (or any of them) take nothing on all or any

of their remaining claims, and for any other relief to which it is entitled.

Respectfully Submitted,

By:    _____
       TOM LOCKHART
       State Bar No. 12473500
       Federal ID No. 2257
       ROGER W. HUGHES
       State Bar No. 10229500
       Federal ID No. 5950

**ADAMS & GRAHAM, L.L.P.**
P. O. Drawer 1429
Harlingen, TX 78551-1429
956/428-7495; FAX: 956/428-2954
RHughes@adamsgraham.com

Attorneys for Defendant CITY OF HARLINGEN

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above and foregoing document was forwarded on this the 1st day of April, 2004, to the following counsel of record and interested parties:

Attorney of Record for Plaintiffs Orelia Esquivel, et al.:

Mr. Rubén R. Peña                                          *CM/RRR 7003 0500 0002 3843 8973*
**LAW OFFICES OF RUBÉN R. PEÑA, P.C.**
P. O. Box 530160
Harlingen, TX 78551-0160

_____
ROGER W. HUGHES

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| ORELIA ESQUIVEL, )( | |
| INDIVIDUALLY AND A/N/F )( | |
| JESUS ESQUIVEL, JR. )( | |
| Plaintiffs )( | |
| )( | |
| VS. )( | CIVIL ACTION NO. B-03-104 |
| )( | |
| SSP PARTNERS & CITY OF )( | |
| HARLINGEN POLICE DEPARTMENT )( | |
| Defendants )( | |

---

ORAL AND VIDEOTAPED DEPOSITION OF
ORELIA ESQUIVEL
MARCH 8, 2004

---

ORAL AND VIDEOTAPED DEPOSITION OF ORELIA ESQUIVEL,
produced as a witness at the instance of the DEFENDANT CITY
OF HARLINGEN POLICE DEPARTMENT, taken in the above styled and
numbered cause on MARCH 8, 2004, reported by MAUREEN
STINGLEY, Certified Court Reporter No. 691, in and for the
State of Texas, at the offices of ADAMS & GRAHAM, L.L.P., 222
East Van Buren, Harlingen, Texas, pursuant to the Federal
Rules of Civil Procedures and any provisions stated on the
record or attached therein.

# ORIGINAL

2

APPEARANCES

    COUNSEL FOR PLAINTIFFS:

        RUBEN PENA
        LAW OFFICE OF RUBEN R. PENA, P.C.
        222 West Harrison Street
        Harlingen, Texas  78550

    COUNSEL FOR DEFENDANT CITY OF HARLINGEN POLICE
    DEPARTMENT:

        ROGER W. HUGHES
        ADAMS & GRAHAM, L.L.P.
        222 East Van Buren Street
        West Tower
        Harlingen, Texas  78550

    ALSO PRESENT:

        Jesus Mario Esquivel, Jr.
        Joe Mendoza, Videographer
        Adela Moreno, Interpreter

INDEX

|  | PAGE |
|---|---|
| Appearances ....................................... | 2 |
| ORELIA ESQUIVEL | |
| Examination by Mr. Hughes ........................ | 3 |
| Errata Sheet/Signature Page ...................... | 55 |
| Reporter's Certificate ........................... | 56 |

EXHIBITS

| EXHIBIT NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| 1 | Miranda Warning Waiver executed by Witness at Harlingen Police Department on May 18, 2003 ........................... | 40 |

3

ORELIA ESQUIVEL,

having been duly sworn, testified through the duly sworn

interpreter as follows:

EXAMINATION

BY MR. HUGHES:

Q.   Okay.  Ma'am, could you state your full name,

please?

A.   Orelia Esquivel.

Q.   Do you understand that I am the attorney for the

City of Harlingen?

A.   Uh-huh, yes.

Q.   And we're here taking your testimony in the lawsuit

you filed against my client.  Do you understand that?

A.   Yes.

Q.   Now, we're speaking to each other through a

translator.

A.   Yes.

Q.   And another thing, you understand that the lady over

here on -- I guess on your right is a court reporter who is

taking down my questions and your answers?

A.   Yes.

Q.   And because she can only write down words, I would

ask that you speak in words rather than use uh-huh or huh-uh

because the court reporter will not know what you mean.  Do

you understand?

5

| | | |
|---|---|---|
| 10:35 | 1 | being taken down word for word? |
| 10:35 | 2 | A.  Yes. |
| 10:35 | 3 | Q.  And you understand that after today, they will be |
| 10:35 | 4 | written up in the form of a booklet for you to review and |
| 10:35 | 5 | make any corrections.  Do you understand that? |
| 10:35 | 6 | A.  Yes. |
| 10:35 | 7 | Q.  Therefore, if today you don't understand one of my |
| 10:35 | 8 | questions, please ask before you give an answer. |
| 10:35 | 9 | A.  Yes. |
| 10:35 | 10 | Q.  And if for any -- and you understand if for any |
| 10:35 | 11 | reason when you're reviewing your answers later when they are |
| 10:35 | 12 | written up in a book, you can make corrections.  Do you |
| 10:35 | 13 | understand that? |
| 10:35 | 14 | A.  Yes. |
| 10:35 | 15 | Q.  Okay.  Where were you born? |
| 10:35 | 16 | A.  Cadereyta, Nuevo Leon. |
| 10:35 | 17 | Q.  And what was your date of birth? |
| 10:35 | 18 | A.  November 6th, 1968. |
| 10:35 | 19 | Q.  And where did you attend school, ma'am? |
| 10:35 | 20 | A.  At a ranch there in Mexico.  It belongs to Los |
| 10:35 | 21 | Ramones. |
| 10:35 | 22 | Q.  Okay, how far did you go in school, ma'am? |
| 10:35 | 23 | A.  6th. |
| 10:35 | 24 | Q.  And are you married? |
| 10:35 | 25 | A.  Yes. |

8

| 10:35 | 1 | Q. And who lived there -- did anyone live there with |
| 10:35 | 2 | you besides your husband and your children? |
| 10:35 | 3 | A. No. |
| 10:35 | 4 | Q. And before that, where did you live? |
| 10:35 | 5 | A. On Filmore. |
| 10:35 | 6 | Q. And how long did you live on Filmore? |
| 10:35 | 7 | A. I was there for about four years there. |
| 10:35 | 8 | Q. And who lived with you on Filmore besides your |
| 10:35 | 9 | husband and your children? |
| 10:35 | 10 | A. Only us. |
| 10:35 | 11 | Q. Who is Luis Ovalle? |
| 10:35 | 12 | A. He's my brother-in-law. |
| 10:35 | 13 | Q. Where does he live? |
| 10:35 | 14 | A. He lives by 3rd -- on 3rd -- I live on 4th, right? |
| 10:35 | 15 | He lives on 3rd. |
| 10:35 | 16 | Q. Do you know the number for his house? |
| 10:35 | 17 | A. No, I don't remember. |
| 10:35 | 18 | Q. Okay, where do you currently work, ma'am?  Pardon |
| 10:35 | 19 | me.  Do you have a job outside the household? |
| 10:35 | 20 | A. I only work. |
| 10:35 | 21 | Q. Okay.  Where is that, ma'am? |
| 10:35 | 22 | A. Here close to my house. |
| 10:35 | 23 | Q. And what is it you do? |
| 10:35 | 24 | A. Cleaning there. |
| 10:35 | 25 | Q. Who do you work for? |

19

| | | |
|---|---|---|
| 10:55 | 1 | Q.   Yes. |
| 10:55 | 2 | A.   Yes. |
| 10:55 | 3 | Q.   And what church do you go to? |
| 10:56 | 4 | A.   The Church of the Complete -- Evangelio Completo, |
| 10:56 | 5 | here in Harlingen. |
| 10:56 | 6 | Q.   How long have you attended that church? |
| 10:56 | 7 | A.   I have been going for about five years. |
| 10:56 | 8 | Q.   And when you have free time, what do you do for |
| 10:56 | 9 | recreation? |
| 10:56 | 10 | A.   There at my house, working at my house, cleaning. |
| 10:56 | 11 | Q.   Okay.  When the housework and the chores around the |
| 10:56 | 12 | house are done, what do you do to -- for recreation, to |
| 10:56 | 13 | entertain yourself? |
| 10:56 | 14 | A.   Well, I read my Bible and I pray; that is all. |
| 10:57 | 15 | Q.   Okay.  Now I want you to think back to the day -- |
| 10:57 | 16 | about this incident at the Circle K. |
| 10:57 | 17 | A.   Yes. |
| 10:57 | 18 | Q.   Whose car were you driving? |
| 10:57 | 19 | A.   The Explorer, white, '93. |
| 10:57 | 20 | Q.   Who owns that? |
| 10:57 | 21 | A.   Jesus Mario Esquivel, my husband. |
| 10:57 | 22 | Q.   That's your husband?  Your husband owns the |
| 10:57 | 23 | Explorer? |
| 10:57 | 24 | A.   Yes. |
| 10:57 | 25 | Q.   And why were you out driving that evening? |

| | | |
|---|---|---|
| 10:57 | 1 | A.   Because we went to get hamburgers, but first I went |
| 10:58 | 2 | to the Circle K to put some gas because the truck did not |
| 10:58 | 3 | have gasoline. |
| 10:58 | 4 | Q.   Okay.  So you left for the Circle K store from your |
| 10:58 | 5 | home? |
| 10:58 | 6 | A.   Yes, from my house to the Circle K. |
| 10:58 | 7 | Q.   And do you recall what time you left your house? |
| 10:58 | 8 | A.   It was right after 10:00 at night. |
| 10:58 | 9 | Q.   And who was at your house when you left? |
| 10:58 | 10 | A.   My father-in-law and my children. |
| 10:58 | 11 | Q.   Okay.  And who was in the car when you left? |
| 10:59 | 12 | A.   My son, Jesus Mario Esquivel. |
| 10:59 | 13 | Q.   Okay.  And you -- no one else? |
| 10:59 | 14 | A.   No. |
| 10:59 | 15 | Q.   And where did you stop first? |
| 10:59 | 16 | A.   Like I said, after we got some gas, we went to |
| 10:59 | 17 | Circle K -- I mean from Circle K, we went to the Jack in the |
| 10:59 | 18 | Box. |
| 10:59 | 19 | Q.   Okay.  So you went directly from your house to the |
| 10:59 | 20 | Circle K store? |
| 10:59 | 21 | A.   Yes. |
| 10:59 | 22 | Q.   What -- why did you choose that Circle K to buy gas? |
| 10:59 | 23 | A.   Because the HEB is closed where my husband goes to |
| 10:59 | 24 | get gas -- it was closed. |
| 11:00 | 25 | Q.   Okay.  And how close to empty was your tank, gas |

| | | |
|---|---|---|
| 11:00 | 1 | tank? |
| 11:00 | 2 | A. It didn't have anything. |
| 11:00 | 3 | Q. And so when you -- this particular Circle K store, |
| 11:00 | 4 | when you stopped at the Circle K, where did you stop? |
| 11:00 | 5 | A. We parked -- I parked -- when I am coming through |
| 11:00 | 6 | Commerce on this side, I turned because my son went -- he |
| 11:00 | 7 | went to pay, and the boy told him that that side was not |
| 11:00 | 8 | working, to turn to the other side, to turn like this, to the |
| 11:01 | 9 | front of the store. |
| 11:01 | 10 | Q. Okay. To use a different gas tank? |
| 11:01 | 11 | A. Yes, because that side was not working. |
| 11:01 | 12 | Q. Okay. And so -- let me break this down. You |
| 11:01 | 13 | stopped by one gas tank? |
| 11:01 | 14 | A. Yes. |
| 11:01 | 15 | Q. And then what happened? |
| 11:01 | 16 | A. My son went to pay. |
| 11:01 | 17 | Q. Okay. And who gave him the money? |
| 11:01 | 18 | A. Me. |
| 11:01 | 19 | Q. Okay. And how much money did you give him? |
| 11:01 | 20 | A. $10. |
| 11:01 | 21 | Q. I see. And how much gas were you going to buy? |
| 11:01 | 22 | A. Only $5. |
| 11:01 | 23 | Q. Okay. And so your son took the money, and where did |
| 11:02 | 24 | he go? |
| 11:02 | 25 | A. To the Jack in the Box, to buy the hamburgers. |

11:02  1        Q.   Okay, back up.  You stopped first at one -- at a gas

11:02  2    pump in front of the Circle K?

11:02  3        A.   Yes.

11:02  4        Q.   And you give -- and you give money to your son to go

11:02  5    in and buy gas.  And what happens?  What happens when he

11:02  6    comes back?

11:02  7        A.   Well, he tells me to move from there.

11:02  8        Q.   Okay.  Did you do that?

11:02  9        A.   Yes, I moved.

11:02 10        Q.   And then what happened?

11:02 11        A.   My son came and told me to move, and I moved.  I

11:02 12    turned.  And he went, you know, because he left his Coke

11:03 13    there, and the money -- he left it there.

11:03 14        Q.   Okay, so he went back into the store?

11:03 15        A.   Yes, he went back.

11:03 16        Q.   And while he was inside, you did what, ma'am?

11:03 17        A.   Well, nothing.  I was there waiting for him.

11:03 18        Q.   Okay.  So who was putting gas in the car?

11:03 19        A.   Him.

11:03 20        Q.   Okay.  And when did he do that?

11:03 21        A.   Well, when he paid and everything, he came and -- he

11:03 22    came and he put the gasoline.

11:03 23        Q.   Okay.  And then what did he do?

11:03 24        A.   He got in the car.  We left.

11:03 25        Q.   Okay.  And you say he bought something else besides

| | | |
|---|---|---|
| 11:03 | 1 | the gasoline? |
| 11:03 | 2 | A.   The Coke, a Coke. |
| 11:03 | 3 | Q.   He bought a Coke? |
| 11:03 | 4 | A.   Yes, one Coke. |
| 11:03 | 5 | Q.   Did you tell him that you were going to the Jack in |
| 11:04 | 6 | the Box before he bought the Coke? |
| 11:04 | 7 | A.   Yes. |
| 11:04 | 8 | Q.   Okay.  And during this time, did you see Mr. Ovalle |
| 11:04 | 9 | there, Luis Ovalle? |
| 11:04 | 10 | A.   I did not see him. |
| 11:04 | 11 | Q.   You didn't see anyone else you knew there? |
| 11:04 | 12 | A.   No, no. |
| 11:04 | 13 | Q.   Okay.  And you went from there to where?  Where did |
| 11:04 | 14 | you drive? |
| 11:04 | 15 | A.   On Filmore. |
| 11:04 | 16 | Q.   Yes. |
| 11:04 | 17 | A.   And I went to the Jack in the Box. |
| 11:04 | 18 | Q.   Okay.  Was there anyone in the car besides you and |
| 11:05 | 19 | your son as you drove to Jack in the Box? |
| 11:05 | 20 | A.   No. |
| 11:05 | 21 | Q.   Okay.  And what happened when you got to Jack in the |
| 11:05 | 22 | Box? |
| 11:05 | 23 | A.   I bought three hamburgers. |
| 11:05 | 24 | Q.   Okay, why did you buy three? |
| 11:05 | 25 | A.   Because one was for me, for my son and for my |

11:05  1    father-in-law.

11:05  2         Q.   What is your father-in-law's name?

11:05  3         A.   Emeregildo Esquivel.

11:05  4         Q.   And where -- did you go inside Jack in the Box or

11:05  5    did you go through the drive-through?

11:05  6         A.   No, through the window.

11:05  7         Q.   The window outside?

11:05  8         A.   Yes, the one outside.

11:06  9         Q.   And when you ordered, did you order in English or

11:06 10    Spanish?

11:06 11         A.   Spanish, because I don't know English.

11:06 12         Q.   Okay, and there was no one else in the vehicle

11:06 13    besides you and your son?

11:06 14         A.   No.

11:06 15         Q.   Okay, did you have any trouble -- did you have any

11:06 16    trouble with your order?

11:06 17         A.   No.

11:06 18         Q.   Did the people that were talking to you seem to

11:06 19    understand what you were saying?

11:06 20         A.   With who?

11:06 21         Q.   Well, either the person that took your order or the

11:06 22    person that gave you the food.

11:06 23         A.   I only paid, and that was all.  I didn't have

11:06 24    problems or anything, no.

11:06 25         Q.   Okay.  So after you bought your hamburgers, what did

| | | |
|---|---|---|
| 11:06 | 1 | you do? |
| 11:07 | 2 | A.  I came.  I came.  I got to the street that comes -- |
| 11:07 | 3 | I got like this, and then I got out on the Avenue, on 13th. |
| 11:07 | 4 | I was coming through there. |
| 11:07 | 5 | Q.  Okay.  You were on 13th Street? |
| 11:07 | 6 | A.  Yes, on 13th. |
| 11:07 | 7 | Q.  Okay, and then what happened? |
| 11:07 | 8 | A.  A police was coming, the front. |
| 11:07 | 9 | Q.  In front of you? |
| 11:07 | 10 | A.  Yes, he was coming like this. |
| 11:07 | 11 | Q.  Okay.  And then what happened? |
| 11:07 | 12 | A.  The police got in like this, and then he came back |
| 11:07 | 13 | and followed me. |
| 11:07 | 14 | Q.  Okay, and then what happened? |
| 11:07 | 15 | A.  He followed me and followed me, and then when we |
| 11:07 | 16 | reached a stop on Filmore Street, on the stop, a little bit |
| 11:08 | 17 | further down, that's when he turned on the lights. |
| 11:08 | 18 | Q.  Okay.  And then he turned on the lights, and what |
| 11:08 | 19 | happened? |
| 11:08 | 20 | A.  Well, they called me to get down, and I don't |
| 11:08 | 21 | understand English. |
| 11:08 | 22 | Q.  Okay.  Well, one step at a time.  You saw the |
| 11:08 | 23 | lights.  What happened? |
| 11:08 | 24 | A.  Well, I stopped. |
| 11:08 | 25 | Q.  Okay.  You pulled off to the side of the road? |

11:08  1     A.   Yes, I pulled to the side of the road.  I pulled to

11:08  2     the side.

11:08  3     Q.   And did one of the officers approach your car?  Did

11:08  4     you get out?  What happened?

11:08  5     A.   No one got close to my car.  They were screaming at

11:08  6     me.

11:08  7     Q.   Who was?

11:08  8     A.   The police officer that stopped me.

11:09  9     Q.   There was just one officer?

11:09  10          MR. PENA:  Just a second.  Do we need to take a

11:09  11    break?

11:09  12          THE VIDEOGRAPHER:  No.  Your jacket is hitting

11:09  13    the mike.

11:09  14          MR. PENA:  That's fine.

11:09  15    Q.   You pulled over?

11:09  16    A.   Yes, I pulled over.

11:09  17    Q.   And were your -- did you have the windows rolled up

11:09  18    or down?

11:09  19    A.   They were closed.  I had the air --

11:09  20    Q.   The windows were rolled up?

11:09  21    A.   Yes.

11:09  22    Q.   Did you have the radio on?

11:09  23    A.   I don't remember.  I don't remember.

11:09  24    Q.   Okay.  So you pulled over, and you heard the

11:09  25    officers doing something.  What was that?

11:09  1      A.   They were screaming at me.

11:10  2      Q.   How many officers were there?

11:10  3      A.   There were about three -- three or four, between

11:10  4   three and four.

11:10  5      Q.   Okay.  And where were they?

11:10  6      A.   They were all signaling.  My son told me, "Mom, get

11:10  7   down," and I got down.

11:10  8      Q.   And you say get down -- your son told you to get

11:10  9   down?

11:10 10      A.   Yes, to get out because they were yelling or

11:10 11   screaming at me, and he understood that they wanted me to get

11:10 12   down.

11:10 13      Q.   Okay.  When you say get down, do you mean to get out

11:10 14   of your car or to lie down on the ground, or what?

11:10 15      A.   To get out, they were telling me, and to put my

11:11 16   hands here.

11:11 17      Q.   Okay, so the officers were telling you to get out of

11:11 18   your car --

11:11 19      A.   Yes.

11:11 20      Q.   -- and to put your hands behind your head?

11:11 21      A.   Back here, yes.

11:11 22      Q.   Okay.  Were they speaking to you in English or

11:11 23   Spanish?

11:11 24      A.   In Spanish.

11:11 25      Q.   Okay.  So no officer came up to the vehicle and

11:11 1    talked to you?

11:11 2         A.   No, because I went to their car.  I got off, and to

11:11 3    get to the side of the officers' car, and then they had me

11:11 4    there, and some other ones went with my son.

11:11 5         Q.   Okay.  Let me make sure I understand.  You got out

11:11 6    of your car and went to them?

11:11 7         A.   Yes.

11:11 8         Q.   And you got out of your car because your son told

11:12 9    you that that's what he thought they wanted?

11:12 10        A.   Yes, to get off.

11:12 11        Q.   Okay.

11:12 12        A.   They were yelling at me.  They were speaking loudly.

11:12 13        Q.   And so you approached the officers?

11:12 14        A.   Yes.

11:12 15        Q.   And your son also got out of the car?

11:12 16        A.   Yes, they got him down to sit under the truck -- to

11:12 17   sit there.

11:12 18        Q.   Okay.  Let's talk about -- let's start with you

11:12 19   first.  What did the officers first tell you?

11:13 20        A.    They told me that they were stopping me because

11:13 21   someone had stole something at the store, someone had stole

11:13 22   something at Circle K, and that I had picked up or gotten

11:13 23   that person in my car, the one that had stole at the store,

11:13 24   and he told me, "That is why I stopped you."

11:13 25        Q.   Okay.  Do you know the name of the officer who told

11:13 1  you that?

11:13 2      A.  No, I don't remember.

11:13 3      Q.  And how -- when he told you this, how did he speak

11:13 4  to you?

11:13 5      A.  He told me just like that, what had happened there.

11:13 6  That's the only thing that he told me.

11:14 7      Q.  Okay.  And so when he said this, what did you say?

11:14 8      A.  I told him what I told him, "I'm innocent."  I told

11:14 9  him, "I don't know anything about this," I told him.

11:14 10     Q.  And then what did he say or do?

11:14 11     A.  He said, "Well, you know, what you are saying," he

11:14 12 said, "And what your son says does not coincide," that we

11:14 13 were lying.

11:14 14     Q.  Okay.  Did he use the word lying?

11:14 15     A.  That we were lying, yes, lies.

11:14 16     Q.  Okay.  And so after he told you this, what did you

11:14 17 say?

11:15 18     A.  And I told him, "Well, take me," because he got me

11:15 19 on the car, and he told me that, "You know what, this is

11:15 20 going to be fixed at the police."  He told me, "It's going to

11:15 21 be fixed over there."

11:15 22     Q.  Okay.  As he was talking to you, did he do anything?

11:15 23     A.  No.  He just got me on the car and arrested me,

11:15 24 that's all, he got me on --

11:15 25     Q.  I'm sorry.  I didn't mean to interrupt.  Are you

11:15  1    finished?

11:15  2        A.   Yes.

11:15  3        Q.   Okay.  When you say he got you on the car, what do

11:15  4    you mean?

11:15  5        A.   That they were going to arrest me, that I was

11:15  6    arrested already and they were going to take me.

11:15  7        Q.   Okay.  Did the officer grab you or touch you in some

11:16  8    way?

11:16  9        A.   No.  He just put the handcuffs on, and he got me on.

11:16 10        Q.   Okay.  Did he handle you roughly as he was putting

11:16 11    the handcuffs on?

11:16 12        A.   No, no, just that we were going to take care of this

11:16 13    over there.

11:16 14        Q.   Do you remember the name of the officer who told you

11:16 15    this?

11:16 16        A.   No, I don't remember because I was scared.  That's

11:16 17    why I don't remember him.

11:16 18        Q.   Okay.  Let me ask this.  Do you have a cell phone?

11:16 19        A.   I don't.

11:16 20        Q.   Did you have one with you that night?

11:16 21        A.   No.

11:16 22        Q.   Okay.  So the officer put the handcuffs on you?

11:17 23        A.   Yes.

11:17 24        Q.   And did he -- and then where did you go next?

11:17 25        A.   To the police.

31

11:17 1     Q.   To the police station here in Harlingen?

11:17 2     A.   Here in Harlingen.

11:17 3     Q.   Okay.  You were taken in a police vehicle?

11:17 4     A.   Yes.

11:17 5     Q.   Did the officer help you into the car?

11:17 6     A.   No.

11:17 7     Q.   Did you -- I mean, did you have any difficulty?  Was

11:17 8   it hard for you to get into the car?

11:17 9     A.   No.

11:17 10    Q.   Okay.

11:17 11    A.   Just -- he closed the door, you know.  I only did

11:17 12  what he told me, to sit down, and I sat.

11:17 13    Q.   Okay.  Now let's back up.  You said your son was

11:17 14  taken to a different place?

11:17 15    A.   They took him-- they took him -- first they took

11:18 16  me --

11:18 17    Q.   Yes.

11:18 18    A.   -- and then him.

11:18 19    Q.   Okay.  The officer separated you from your son at

11:18 20  the scene?

11:18 21    A.   Yes.

11:18 22    Q.   And where did they take your son first?

11:18 23    A.   To him, also they took him there, the same place.

11:18 24    Q.   Okay.  You could not hear what was said?

11:18 25    A.   No.

11:18  1        Q.   How far away were they when they were taking -- when

11:18  2    they were talking to your son?

11:18  3        A.   We were far, far.

11:18  4        Q.   Okay.  Correct me if I'm wrong.  I was having

11:18  5    trouble understanding you a while ago.  You say somehow your

11:18  6    son had to either sit down or get down on the ground?

11:18  7        A.   He had to get off of the truck, from the truck down

11:19  8    on the ground, on the dirt.  They sat him there.

11:19  9        Q.   Okay.  When you say they sat him there, how did that

11:19 10    happen?

11:19 11        A.   Well, first, like I said, me, then some were

11:19 12    speaking to me, and then the others went with him, yes.

11:19 13        Q.   Well, what I mean is, when he sat down, did he do

11:19 14    that voluntarily, or was he -- did someone make him do that?

11:19 15    How did that happen?

11:19 16        A.   That question, I can't answer because I did not know

11:19 17    there.

11:19 18        Q.   Okay.  Could you see him?

11:19 19        A.   Yes.

11:19 20        Q.   Okay.  Did you see him when the officers grabbed

11:20 21    him?

11:20 22        A.   No.

11:20 23        Q.   Did you see any of the officers throw him to the

11:20 24    ground?

11:20 25        A.   No, that, I did not see.

11:20  1      Q.   Okay, did you see any officers push him or force him

11:20  2  to the ground in some way?

11:20  3      A.   No, I did not see.

11:20  4      Q.   Well, was there something blocking your ability to

11:20  5  see, or was it too dark, or what?

11:20  6      A.   I couldn't see because the truck was like this, and

11:20  7  he was sitting over here, down.  I could not see from over

11:20  8  here.  I couldn't see well over there.

11:20  9      Q.   Okay.  And the officers who were talking to your

11:21  10  son, and your son, were not talking loud enough for you to

11:21  11  hear?

11:21  12      A.   No.

11:21  13      Q.   Okay.  Did the two of you go to the police station

11:21  14  in the same vehicle?

11:21  15      A.   No.  He and another one and myself and another one

11:21  16  separated, separated.

11:21  17              MR. PENA:  Is this a good place to take a short

11:21  18  break?

11:21  19              MR. HUGHES:  Sure, if you like.  Fine.

11:27  20              (Brief recess)

11:27  21      Q.   All right, what happened when you arrived at the

11:27  22  police station?

11:28  23      A.   They took me inside.  They took me inside, and they

11:28  24  took down some information, my name.

11:28  25      Q.   Okay.  Were you allowed to make any phone calls?

11:28 1      A.   They didn't want me to.

11:28 2      Q.   Were you, at any point that evening or the next day,

11:28 3   allowed to make a phone call to let your family know what had

11:28 4   happened to you?

11:28 5      A.   No.

11:28 6      Q.   All right.  So when they were taking this

11:28 7   information from you, how were you treated?

11:28 8      A.   Fine.

11:28 9      Q.   Okay.  And after they took the information from you,

11:28 10  what happened next?

11:29 11     A.   They locked me up.  They took me there to a room.

11:29 12     Q.   Was this a jail cell or another kind of room?

11:29 13     A.   Like a jail -- a jail, locked in.

11:29 14     Q.   Okay.  Before they took you to the jail cell, had

11:29 15  anyone attempted to ask you any more questions about how this

11:29 16  occurred or what your side of the story was?

11:29 17     A.   Would you please repeat it again?  I did not

11:29 18  understand.

11:29 19     Q.   Sorry about that.  While they were taking this

11:29 20  information from you that they had to write down and taking

11:29 21  you to the cell, do any of the officers ask you questions

11:30 22  about what happened or what was your -- what was your side of

11:30 23  the story?

11:30 24     A.   Well, I asked them, you know, and they told me that,

11:30 25  well, I was guilty.

35

| Time | Line | |
|---|---|---|
| 11:30 | 1 | Q.  Who told you that? |
| 11:30 | 2 | A.  The man that was taking down my statement. |
| 11:30 | 3 | Q.  Okay. |
| 11:30 | 4 | A.  He said that I was guilty. |
| 11:30 | 5 | Q.  Okay.  This -- when did this statement occur? |
| 11:30 | 6 | A.  Early in the morning. |
| 11:30 | 7 | Q.  Okay.  Okay.  Were after -- let me back up.  When |
| 11:30 | 8 | you arrived and they were taking you in for the information |
| 11:30 | 9 | to write down in the records about who you were and all of |
| 11:31 | 10 | that -- |
| 11:31 | 11 | A.  Yes. |
| 11:31 | 12 | Q.  -- and before they took you to the jail cell, did |
| 11:31 | 13 | anyone attempt to take a declaration from you? |
| 11:31 | 14 | A.  I don't remember. |
| 11:31 | 15 | Q.  Okay.  Were any the officers who were taking this |
| 11:31 | 16 | information to you or the officers that took you to the jail |
| 11:31 | 17 | cell, were they rude? |
| 11:31 | 18 | A.  No. |
| 11:31 | 19 | Q.  Did they speak loudly or harshly to you? |
| 11:31 | 20 | A.  No, only the detective. |
| 11:31 | 21 | Q.  But these officers, the ones that were taking the |
| 11:31 | 22 | information and then took you to the jail, did they try to |
| 11:31 | 23 | grab you or handle you roughly? |
| 11:31 | 24 | A.  No. |
| 11:31 | 25 | Q.  Okay.  Was there anyone in the jail cell besides |

11:32  1    you?

11:32  2         A.   Another lady --

11:32  3         Q.   Okay.

11:32  4         A.   -- with me.

11:32  5         Q.   And what were the conditions of the jail cell?  What

11:32  6    were they like?

11:32  7         A.   Just there, nothing -- no drinking water or

11:32  8    anything, just there, just there locked in.

11:32  9         Q.   Okay.  And for how long were you in the cell?

11:32 10         A.   They took me -- well, I arrived there before 11:00

11:32 11    at night, and I was there until 1:30 of the next day.  At

11:33 12    noon was when I left.

11:33 13         Q.   Okay.  And how long were you in the cell before

11:33 14    someone attempted to take your declaration?

11:33 15         A.   I don't remember.

11:33 16         Q.   Okay, later in the morning, someone -- one of the

11:33 17    detectives wanted to take a declaration from you?

11:33 18         A.   Yes.

11:33 19         Q.   And did the officer take you from your jail cell to

11:33 20    another place?

11:33 21         A.   Yes, to his office.

11:33 22         Q.   I see.  Do you remember the name of this officer?

11:33 23         A.   I think it's Ruben Fuentes --

11:33 24         Q.   Okay.

11:33 25         A.   -- the investigator.

11:33 1      Q.   Okay.  Do you recall -- do you recall whether it was

11:33 2  light or dark outside?

11:34 3      A.   It was day.

11:34 4      Q.   And you were taken to an office?

11:34 5      A.   Yes, to his office.

11:34 6      Q.   Okay.  Were you -- you weren't in handcuffs any

11:34 7  longer, were you?

11:34 8      A.   No.

11:34 9      Q.   When did they remove the handcuffs, ma'am?

11:34 10     A.   When they put me in.

11:34 11     Q.   In the jail cell?

11:34 12     A.   Yes, that's when they took them off.

11:34 13     Q.   Okay.  Until this officer came to talk to you for

11:34 14  your declaration, did any of the other officers talk to you

11:34 15  in any way?

11:34 16     A.   No.

11:34 17     Q.   Okay.  And during this time that you were in the

11:34 18  jail cell, what did you do?

11:34 19     A.   No -- well, what could I do there?  Only --

11:35 20     Q.   Did they -- was there a place to sleep?

11:35 21     A.   Yes, a small place.

11:35 22     Q.   Okay.  Did you sleep?

11:35 23     A.   No, I couldn't sleep, no.

11:35 24     Q.   Okay.  And what was the reason that you couldn't

11:35 25  sleep, ma'am?

11:35 1  A. Thinking of my children and my son -- above all, my

11:35 2 son.

11:35 3  Q. Okay.  When you first arrived at the jail, did you

11:35 4 see what happened to your son?

11:35 5  A. I saw that he was behind, and then they took him in,

11:35 6 and then I did not know anything more about him.

11:35 7  Q. Okay.  Now, the officer who took you to an office to

11:35 8 talk to you, did he talk to you by himself or was there

11:36 9 another officer present?

11:36 10  A. Alone, there.

11:36 11  Q. Okay.  And what happened when you got to his office?

11:36 12  A. He started telling me that I was guilty.  He said,

11:36 13 "Do you know why you're here?"  And I told him, "I'm not

11:36 14 guilty."  I told him, "I did not do that."

11:36 15  Q. Okay, what else did he tell you?

11:36 16  A. He told me that I was going to be deported, that

11:36 17 they were going to take away my documents, that I was going

11:36 18 to lose that, and that I was going to be in for like 90 years

11:37 19 of jail.  I think it was $1,000 for me to be able to get

11:37 20 out -- for me to get out.  That's what he told me.

11:37 21  Q. Okay.

11:37 22  A. And that they were also going to take my truck away.

11:37 23 I was going to lose my truck.

11:37 24  Q. Before he began to talk to you, did he explain to

11:37 25 you that you didn't have to talk to him?

11:37 1        A.   Would you please repeat?

11:37 2        Q.   Before he began to speak to you to take your

11:37 3   statement, did he tell you that you did not have to speak to

11:37 4   him if you did not wish?

11:38 5        A.   No, he told me that I had to say, to give my

11:38 6   statement.

11:38 7        Q.   Okay, you were not told that you did not have to

11:38 8   speak and you could remain silent?

11:38 9        A.   No.

11:38 10       Q.   Did he ask you to sign a paper giving your consent

11:38 11  to give a statement?

11:38 12       A.   He told me that I had to sign.

11:38 13       Q.   He didn't tell you what it said?

11:38 14       A.   That I was guilty, that I was guilty and that I had

11:38 15  to sign, and I told him that I couldn't, that, no.

11:39 16       Q.   Do you recall him asking you to sign a form that

11:39 17  said he had your consent to speak to you?

11:39 18       A.   I don't remember.

11:39 19            MR. HUGHES:  Can we take a short break?

11:39 20            MR. PENA:  Sure.

11:42 21            (Brief recess)

11:42 22       Q.   Ma'am, I'm going to show you what has been marked as

11:42 23  Exhibit 1.  Down there next to the word firmado, that looks

11:42 24  like your signature.  Is that your signature?

11:42 25       A.   Yes.

11:44  1          A.   Yes.

11:44  2          Q.   Okay.  Do you recall how it was that you came to

11:45  3     sign this form?

11:45  4          A.   I think it was there with him.

11:45  5          Q.   So it was when this officer -- these officers --

11:45  6     when you were in the office and being asked questions by

11:45  7     these officers, that's when you were asked to sign Exhibit

11:45  8     No. 1 in front of you?

11:45  9          A.   Yes.

11:45 10          Q.   Okay.  Do you recall what they told you about it,

11:45 11     the form Exhibit 1?

11:45 12          A.   I don't remember.

11:45 13          Q.   How long were you with the officers?

11:45 14          A.   I'm going to ask, with what officer?

11:45 15          Q.   The officers that -- okay, you went to an office and

11:46 16     there was an officer there who took your statement?

11:46 17          A.   It was Ruben.  That was where he took me, to his

11:46 18     office.

11:46 19          Q.   Okay.  And do you recall which one of these officers

11:46 20     told you you were guilty and would be deported?

11:46 21          A.   It was him.

11:46 22          Q.   Which one?

11:46 23          A.   Ruben, the investigator, was the one that told me.

11:46 24     He was the one that told me.

11:46 25          Q.   And he told you that you would be deported?

| | | |
|---|---|---|
| 11:46 | 1 | A.  Yes, that they were going to take my documents. |
| 11:46 | 2 | Q.  How did he know you had any documents? |
| 11:46 | 3 | A.  I don't know, but he told me. |
| 11:46 | 4 | Q.  Did you tell him that you were a citizen of Mexico? |
| 11:47 | 5 | A.  No, that I am a Mexican, but that I -- it was fixed. |
| 11:47 | 6 | Q.  Okay.  Well, that's what I meant.  How did he find |
| 11:47 | 7 | that out? |
| 11:47 | 8 | A.  I don't know. |
| 11:47 | 9 | Q.  Did you tell the officers when you arrived at the |
| 11:47 | 10 | police station that you were here on a visa? |
| 11:47 | 11 | A.  Yes, because they asked me if my documents were |
| 11:47 | 12 | fixed.  They asked if I had documents. |
| 11:47 | 13 | Q.  And how long were you talking with Officer |
| 11:47 | 14 | Contreras? |
| 11:47 | 15 | A.  Between 10 and 15 minutes. |
| 11:47 | 16 | Q.  And then what happened? |
| 11:48 | 17 | A.  Well, again, back -- they took me back to the jail, |
| 11:48 | 18 | there to the room. |
| 11:48 | 19 | Q.  Okay. |
| 11:48 | 20 | A.  There. |
| 11:48 | 21 | Q.  I'm sorry. |
| 11:48 | 22 | A.  There. |
| 11:48 | 23 | Q.  While here, the other officer was talking to you, |
| 11:48 | 24 | did they raise their voices? |
| 11:48 | 25 | A.  No. |

11:48  1    Q.   Did they use profanity or offensive language?

11:48  2    A.   No, only that I was guilty, that.

11:48  3    Q.   Okay.  Did either of the officers seem like he was

11:48  4    going to strike you or grab you in any way?

11:48  5    A.   No.

11:48  6    Q.   Now, after you were then taken back to your cell,

11:48  7    what happened next?

11:48  8    A.   They came to tell me -- they came to tell me that I

11:49  9    was going to be released, to go out.

11:49 10    Q.   Okay.

11:49 11    A.   Because they had found nothing about me or with me.

11:49 12    Q.   Okay.  Who told you that?

11:49 13    A.   The same -- he opened the jail.  He was there in

11:49 14    front when they put me in.  He was the one that went and told

11:49 15    me, and he opened.

11:49 16    Q.   Okay.  And so when you left the police station, did

11:49 17    you meet somebody there?

11:49 18    A.   No.  They only told me that I was free.

11:49 19    Q.   Okay, so was there a member of the family there

11:49 20    waiting to pick you up, or did you -- how did you get home?

11:50 21    A.   Yes, my husband.

11:50 22    Q.   Your husband was there?

11:50 23    A.   Yes.

11:50 24    Q.   Who else was there?

11:50 25    A.   Some sisters of the church that I go to.

| | | |
|---|---|---|
| 11:50 | 1 | Q.   Members of your church? |
| 11:50 | 2 | A.   Yes, members of the church. |
| 11:50 | 3 | Q.   Any other family members? |
| 11:50 | 4 | A.   My sister-in-law. |
| 11:50 | 5 | Q.   Okay.  Is that Mrs. Ovalle? |
| 11:50 | 6 | A.   No, another sister-in-law. |
| 11:50 | 7 | Q.   Okay.  And how did they know you were there? |
| 11:50 | 8 | A.   Because they found out that I was there at jail. |
| 11:50 | 9 | Q.   Well, how did they find out? |
| 11:50 | 10 | A.   Because I made a call there early in the morning. |
| 11:50 | 11 | You could say in the morning. |
| 11:50 | 12 | Q.   Okay.  So you called them to tell them you were |
| 11:51 | 13 | there? |
| 11:51 | 14 | A.   Yes, so that they would know, so that my husband |
| 11:51 | 15 | would know. |
| 11:51 | 16 | Q.   And when you were released, where was your son? |
| 11:51 | 17 | A.   My son? |
| 11:51 | 18 | Q.   Yes, your son, your oldest. |
| 11:51 | 19 | A.   There at the jail. |
| 11:51 | 20 | Q.   He was still there? |
| 11:51 | 21 | A.   Yes. |
| 11:51 | 22 | Q.   Okay.  Was he released at the same time? |
| 11:51 | 23 | A.   I got out at 1:30, and about 2:00, my husband went |
| 11:51 | 24 | and picked him up. |
| 11:51 | 25 | Q.   2:00 in the afternoon? |

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ORELIA ESQUIVEL,                )(
INDIVIDUALLY AND A/N/F          )(
JESUS ESQUIVEL, JR.             )(
        Plaintiffs              )(
                                )(
VS.                             )(  CIVIL ACTION NO. B-03-104
                                )(
SSP PARTNERS & CITY OF          )(
HARLINGEN POLICE DEPARTMENT     )(
        Defendants              )(

---

ORAL AND VIDEOTAPED DEPOSITION OF
JESUS MARIO ESQUIVEL, JR.
MARCH 8, 2004

---

    ORAL AND VIDEOTAPED DEPOSITION OF JESUS MARIO

ESQUIVEL, JR., produced as a witness at the instance of the

DEFENDANT CITY OF HARLINGEN POLICE DEPARTMENT, taken in the

above styled and numbered cause on MARCH 8, 2004, reported by

MAUREEN STINGLEY, Certified Court Reporter No. 691, in and for

the State of Texas, at the offices of ADAMS & GRAHAM, L.L.P.,

222 East Van Buren, Harlingen, Texas, pursuant to the Federal

Rules of Civil Procedures and any provisions stated on the

record or attached therein.

# ORIGINAL

2

<u>APPEARANCES</u>

COUNSEL FOR PLAINTIFFS:

RUBEN PENA
LAW OFFICE OF RUBEN R. PENA, P.C.
222 West Harrison Street
Harlingen, Texas  78550

COUNSEL FOR DEFENDANT CITY OF HARLINGEN POLICE
DEPARTMENT:

ROGER W. HUGHES
ADAMS & GRAHAM, L.L.P.
222 East Van Buren Street
West Tower
Harlingen, Texas  78550

ALSO PRESENT:

Orelia Esquivel
Joe Mendoza, Videographer

<u>INDEX</u>

                                                    <u>PAGE</u>

Appearances ....................................... 2

<u>JESUS MARIO ESQUIVEL, JR.</u>

Examination by Mr. Hughes ......................... 3

Errata Sheet/Signature Page ....................... 40

Reporter's Certificate ............................ 41

20    (No exhibits marked)

21

22

23

24

25

3

|   |   |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| 13:21 | 4 |
| 13:22 | 5 |
| 13:22 | 6 |
| 13:22 | 7 |
| 13:22 | 8 |
| 13:22 | 9 |
| 13:22 | 10 |
| 13:22 | 11 |
| 13:22 | 12 |
| 13:22 | 13 |
| 13:22 | 14 |
| 13:22 | 15 |
| 13:22 | 16 |
| 13:22 | 17 |
| 13:22 | 18 |
| 13:22 | 19 |
| 13:22 | 20 |
| 13:23 | 21 |
| 13:23 | 22 |
| 13:23 | 23 |
| 13:23 | 24 |
| 13:23 | 25 |

                    JESUS MARIO ESQUIVEL, JR.,

having been duly sworn, testified as follows:

                        EXAMINATION

BY MR. HUGHES:

    Q.   Okay, could you please state your full name?

    A.   Jesus Mario Esquivel, Jr.

    Q.   And where do you currently live?

    A.   1120 South 4th Street.

    Q.   Okay, and how old are you?

    A.   16.

    Q.   Where were you born?

    A.   San Juan, Texas.

    Q.   Okay.  You're in school now?

    A.   Yes, sir.

    Q.   What year and what school?

    A.   10th, in Harlingen South High School.

    Q.   Okay.  Now, you understand I'm the attorney for the

City of Harlingen in this case?

    A.   Yes, sir.

    Q.   And do you understand that, on your behalf, your

mother has brought a lawsuit for injuries or damages claimed

or arising out of this arrest?

    A.   Yes, sir.

    Q.   And you understand the lady over here on, I guess,

your right is taking down my questions and your answers word

13:26 1     A.   Miranda, Larry.

13:26 2     Q.   And were you ever injured while you were on the

13:26 3  football team there at Coakley?

13:26 4     A.   Would you repeat it?

13:26 5     Q.   Were you ever injured?

13:26 6     A.   No, sir.

13:26 7     Q.   Okay.  And currently at High, who are some of your

13:27 8  teachers?

13:27 9     A.   Ms. Ruiz, Ms. Acosta, Mr. Rada, and Ms. Robbins.

13:27 10     Q.   And what do they teach?

13:27 11     A.   Language -- it's English now.

13:27 12     Q.   Say again.

13:27 13     A.   It's English, algebra, geometry and speech.

13:27 14     Q.   Okay.  Do you participate in any of the outside

13:27 15  activities there, like clubs, UIL, that sort of thing?

13:27 16     A.   No, sir.

13:27 17     Q.   Okay.  On the incident -- the night when you were

13:28 18  arrested, you were at home that night?

13:28 19     A.   Yes, sir.

13:28 20     Q.   And you went out with your mother?

13:28 21     A.   I went in and woke her up.

13:28 22     Q.   I'm sorry?

13:28 23     A.   I went and woke her up because she was asleep.

13:28 24     Q.   Why did you wake her up?

13:28 25     A.   Because I was hungry.

BRYANT & STINGLEY, INC.
McAllen      Harlingen      Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

8

| | | |
|---|---|---|
| 13:28 | 1 | Q.   You were hungry.   Who else was there at the house |
| 13:28 | 2 | with you at the time? |
| 13:28 | 3 | A.   Me and my mom, my grandpa and my sisters and my |
| 13:28 | 4 | brothers. |
| 13:28 | 5 | Q.   And you wanted to go get something to eat? |
| 13:28 | 6 | A.   Yes, sir. |
| 13:28 | 7 | Q.   Okay.   And you-all left? |
| 13:28 | 8 | A.   Yes. |
| 13:28 | 9 | Q.   Who was in the vehicle with you? |
| 13:28 | 10 | A.   Me and my mom. |
| 13:28 | 11 | Q.   Just the two of you? |
| 13:28 | 12 | A.   Yes, sir. |
| 13:28 | 13 | Q.   Who is Mr. Ovalle, Luis Ovalle? |
| 13:28 | 14 | A.   My uncle. |
| 13:28 | 15 | Q.   Your uncle.   Did you see him at any time that night? |
| 13:28 | 16 | A.   Yes, sir. |
| 13:28 | 17 | Q.   Where did you see him? |
| 13:28 | 18 | A.   Outside the store.   He was parked. |
| 13:28 | 19 | Q.   He was parked in his car? |
| 13:28 | 20 | A.   No, with his friend. |
| 13:29 | 21 | Q.   Who is his friend? |
| 13:29 | 22 | A.   I don't know his name.   He was inside with his |
| 13:29 | 23 | friend. |
| 13:29 | 24 | Q.   He was like a passenger? |
| 13:29 | 25 | A.   Yes, sir. |

| | | |
|---|---|---|
| 13:29 | 1 | Q. And was he sitting on the passenger's side of the |
| 13:29 | 2 | vehicle? |
| 13:29 | 3 | A. Yes. |
| 13:29 | 4 | Q. Okay. Did you say hello to him? |
| 13:29 | 5 | A. Repeat it. |
| 13:29 | 6 | Q. Did you say hello to him? |
| 13:29 | 7 | A. Yes. |
| 13:29 | 8 | Q. Did he go inside the store? |
| 13:29 | 9 | A. Who? |
| 13:29 | 10 | Q. Your uncle. |
| 13:29 | 11 | A. No. |
| 13:29 | 12 | Q. All right. Let's keep going. You left your house, |
| 13:29 | 13 | and where did you go? |
| 13:29 | 14 | A. To the Circle K. |
| 13:29 | 15 | Q. Your mother didn't stop anywhere? |
| 13:29 | 16 | A. No. |
| 13:29 | 17 | Q. She was driving? |
| 13:29 | 18 | A. Yes, sir. |
| 13:29 | 19 | Q. So what happens when you get to the store? |
| 13:29 | 20 | A. Well, she parked on the gasoline pumps, and I got |
| 13:29 | 21 | off and paid and bought a Coke, too, and some guy, he told me |
| 13:29 | 22 | to tell my mom that the pumps weren't working. So I went |
| 13:29 | 23 | outside with my change and my Coke, and I went and told her, |
| 13:30 | 24 | and she moved. |
| 13:30 | 25 | Then I went back inside to get my change and my |

13:30 1    Coke, and I was seeing something strange there with some guy,

13:30 2    and I was just seeing it, and I just left.  I grabbed my Coke

13:30 3    and my change, and I left.  And that's it.

13:30 4        Q.  Okay.  Let's back up.  When did you first see your

13:30 5    uncle there?

13:30 6        A.  When I got off, outside.

13:30 7        Q.  When you first got out of the car?

13:30 8        A.  He was outside.

13:30 9        Q.  Where was his vehicle parked?

13:30 10       A.  By the store.

13:30 11       Q.  In front?

13:30 12       A.  Yes.

13:30 13       Q.  Do you recall what kind of vehicle it was?

13:30 14       A.  Chevy, blue Chevy.

13:30 15       Q.  Blue?

13:30 16       A.  A Silverado Chevy.

13:30 17       Q.  So a pickup truck?

13:30 18       A.  Yes, sir.

13:30 19       Q.  Was there anyone inside the vehicle with him, or was

13:30 20   he just by himself?

13:30 21       A.  He was by himself.

13:30 22       Q.  And when you saw him, did you greet him in any way,

13:31 23   say hello to him?

13:31 24       A.  I just said hello.

13:31 25       Q.  Okay, what did he say?

13:31 1       A.   Nothing.  He just said hello back.

13:31 2       Q.   Did you ask him what he was doing there?  So you

13:31 3   just said hello to him?

13:31 4       A.   Yes, sir.

13:31 5       Q.   You went on inside the store?

13:31 6       A.   Yes.

13:31 7       Q.   And what were you wearing that night?

13:31 8       A.   Can you repeat it?

13:31 9       Q.   What were you wearing?  Describe your clothes.

13:31 10      A.   A white T-shirt, muscle shirt, and blue shorts.

13:31 11      Q.   Okay.  Is that what they call a muscle shirt?

13:31 12      A.   Yes, sir.

13:31 13      Q.   No sleeves on either side.  Okay.  Do you know the

13:31 14  name of the person your uncle was there with that evening?

13:31 15      A.   No, but I seen him.

13:31 16      Q.   Okay.  You saw him inside the store?

13:31 17      A.   Yes, sir.

13:31 18      Q.   Do you know his name?

13:31 19      A.   No.

13:31 20      Q.   Do you recall how he was dressed?

13:31 21      A.   I don't remember.

13:31 22      Q.   Do you recall how the person your uncle was with was

13:31 23  dressed?

13:31 24      A.   No, I don't remember.

13:32 25      Q.   Now, when you went back out the first time after

13:32 1    leaving, after talking with the clerk, did you see your uncle

13:32 2    again?

13:32 3        A.   Yes.  He was still there.

13:32 4        Q.   He was still there.  Did you say anything to him as

13:32 5    you were going back out?

13:32 6        A.   No.

13:32 7        Q.   So you go to your mother's vehicle, and you do what?

13:32 8        A.   I tell her to move around to the other side of the

13:32 9    pump, and she moves.  And then I went back again inside.

13:32 10       Q.   Okay.  And was the Chevy Silverado still there at

13:32 11   that time?

13:32 12       A.   When I went back in, he was leaving already.

13:32 13       Q.   And you say he was leaving.  How do you know that?

13:32 14   Why do you think that?

13:32 15       A.   Because when I went inside, I saw the lights turn

13:32 16   on, and when I went back outside, they were gone already.

13:33 17       Q.   Now, you then went back in, right?  And both times

13:33 18   there was -- the first time you went in, there was kind of a

13:33 19   line there?

13:33 20       A.   Yes, sir.

13:33 21       Q.   You had to stand in line for a while.  And there was

13:33 22   a gentleman standing next to you with one of those shirts

13:33 23   that the front of the shirt is one color and then the sleeves

13:33 24   are like white?

13:33 25       A.   I don't remember.

13:33  1      Q.    Okay, but there was a guy standing next to you --

13:33  2      A.    Yeah.

13:33  3      Q.    -- as you were in line the first time, right?

13:33  4      A.    Yes, sir.

13:33  5      Q.    And when you went back in, he stood next -- he

13:33  6  happened to be next to you again --

13:33  7      A.    A man.

13:33  8      Q.    -- as you were paying?

13:33  9      A.    On my left side.

13:33 10      Q.    Okay.  And would it surprise you to know that that

13:33 11  was the person with the gun who robbed the store?

13:33 12      A.    Yes.

13:33 13      Q.    Okay.  You didn't recognize that individual?

13:34 14      A.    No, sir.

13:34 15      Q.    Now, you thought you saw something unusual about

13:34 16  him, though?

13:34 17      A.    Yes, sir.

13:34 18      Q.    What was that?

13:34 19      A.    That he was just grabbing things there, and he was

13:34 20  just looking at them and asking the clerk how much it was,

13:34 21  and then how much it cost and all this.

13:34 22      Q.    Okay.  So when you went out the second time, the

13:34 23  Silverado was gone?

13:34 24      A.    Yes, sir.

13:34 25      Q.    And, at this time, you didn't know that the store

14

13:34  1    was being robbed?

13:34  2        A.   No.

13:34  3        Q.   And so you exited the store again, and then what do

13:34  4    you do?

13:34  5        A.   The last time?

13:35  6        Q.   Yeah.

13:35  7        A.   Just leave.  I went to Jack in the Box.

13:35  8        Q.   Okay.  What happened there?

13:35  9        A.   We ordered three hamburgers, one for me and one for

13:35 10    my mom and one for my grandpa.

13:35 11        Q.   Okay.  How did you know -- how did you all know to

13:35 12    get a hamburger for your grandfather?

13:35 13        A.   Because he was awake, and he was hungry, too.

13:35 14        Q.   I'm sorry, say again.

13:35 15        A.   Because he was awake and he was hungry too, and we

13:35 16    didn't know what to cook.

13:35 17        Q.   He asked you to get him something before you left?

13:35 18        A.   Can you repeat it?

13:35 19        Q.   Did he ask you all to get him something to eat?

13:35 20        A.   No, sir.

13:35 21        Q.   So your grandfather didn't ask you to bring him

13:35 22    anything?

13:35 23        A.   No, sir.

13:35 24        Q.   Okay.  Who did the ordering?

13:35 25        A.   My mom.

| | | |
|---|---|---|
| 13:35 | 1 | Q. Your mother?  So she ordered three hamburgers? |
| 13:36 | 2 | A. Three hamburgers. |
| 13:36 | 3 | Q. You all went through like the drive-through line? |
| 13:36 | 4 | A. The drive-through. |
| 13:36 | 5 | Q. And when she asked for three hamburgers, did you ask |
| 13:36 | 6 | her why she was ordering three? |
| 13:36 | 7 | A. Two? |
| 13:36 | 8 | Q. Did you ask your mother why she was ordering three |
| 13:36 | 9 | hamburgers? |
| 13:36 | 10 | A. No, sir. |
| 13:36 | 11 | Q. You never asked her why she was ordering three? |
| 13:36 | 12 | A. First I told her for me and my grandpa and for her. |
| 13:36 | 13 | Q. Oh, you told her? |
| 13:36 | 14 | A. I told her. |
| 13:36 | 15 | Q. Okay.  And your grandfather had not asked you to get |
| 13:36 | 16 | him anything? |
| 13:36 | 17 | A. No, sir. |
| 13:36 | 18 | Q. Did he ask anybody before you left to get him |
| 13:36 | 19 | anything? |
| 13:36 | 20 | A. No, sir. |
| 13:36 | 21 | Q. That was just your idea? |
| 13:36 | 22 | A. My idea. |
| 13:36 | 23 | Q. So no one was in the car with you at that time? |
| 13:36 | 24 | A. No, sir. |
| 13:36 | 25 | Q. Did your mother have any trouble ordering? |

17

| | | |
|---|---|---|
| 13:37 | 1 | A. Which ones? |
| 13:37 | 2 | Q. Your car's windows were up? |
| 13:38 | 3 | A. Yes. |
| 13:38 | 4 | Q. Did you all have the radio on? |
| 13:38 | 5 | A. I don't remember. |
| 13:38 | 6 | Q. And when you say yelling, were they using like a |
| 13:38 | 7 | bull horn or something, or what? |
| 13:38 | 8 | A. No, just to get off. They were just screaming |
| 13:38 | 9 | regularly. |
| 13:38 | 10 | Q. Okay. So you heard the police yelling. What did |
| 13:38 | 11 | they yell to do? What did they say? |
| 13:38 | 12 | A. Just to pass -- the driver, the one driving, to get |
| 13:38 | 13 | off. |
| 13:38 | 14 | Q. For the driver to get out? |
| 13:38 | 15 | A. Yes, sir. |
| 13:38 | 16 | Q. Okay, and then what happened? |
| 13:38 | 17 | A. And my mom didn't know what they were saying because |
| 13:38 | 18 | she doesn't understand English. |
| 13:38 | 19 | Q. Okay. |
| 13:38 | 20 | A. I was just telling her to get off. |
| 13:38 | 21 | Q. Okay. |
| 13:38 | 22 | A. And she got off, and they were telling for me to get |
| 13:38 | 23 | off, too. |
| 13:38 | 24 | Q. All right. |
| 13:38 | 25 | A. So I got off, and they handcuffed me and they just |

| 13:39 | 1 | What did you do? |
| 13:39 | 2 | A.   I move kind of far away from them so they could see |
| 13:39 | 3 | me. |
| 13:39 | 4 | Q.   Okay, and then what happens? |
| 13:39 | 5 | A.   Like two police officers come to me. |
| 13:39 | 6 | Q.   Yes. |
| 13:39 | 7 | A.   And they told me that why were we stopped and all |
| 13:39 | 8 | this, that they had robbed the Circle K and they thought it |
| 13:39 | 9 | was us. |
| 13:39 | 10 | Q.   Okay. |
| 13:39 | 11 | A.   And I was like, "What?" I didn't know that.  And |
| 13:39 | 12 | they just handcuffed me and they sat me on the floor, on the |
| 13:39 | 13 | sidewalk.  They had me there. |
| 13:39 | 14 | Q.   Okay, when they handcuffed you, how did they do |
| 13:40 | 15 | that? |
| 13:40 | 16 | A.   They just grabbed my arm to the back and they just |
| 13:40 | 17 | tied it. |
| 13:40 | 18 | Q.   Okay.  Did they tell you you were under arrest? |
| 13:40 | 19 | A.   Yes, sir. |
| 13:40 | 20 | Q.   Okay.  Did they ask you to put your hands behind |
| 13:40 | 21 | your back? |
| 13:40 | 22 | A.   Yes, sir. |
| 13:40 | 23 | Q.   Okay.  And you're saying they held you in some way? |
| 13:40 | 24 | What happened? |
| 13:40 | 25 | A.   Well, because I was like, "Why are you all going to |

13:40  1    handcuff me because we didn't do nothing?"  He was like,

13:40  2    "They robbed the Circle K."  I was like, "Okay."  I just let

13:40  3    myself and they grabbed me and pulled me down.

13:40  4        Q.  When you say they grabbed you, who grabbed you?

13:40  5        A.  Two police officers.

13:40  6        Q.  Okay, did one or both do that?

13:40  7        A.  One.

13:40  8        Q.  One.  And when the one officer grabbed you, how did

13:40  9    he grab you?  Where did he put his hands?

13:40 10        A.  Right here on my shoulders.

13:40 11        Q.  Now, the camera, you put your hand on your left

13:40 12    shoulder.  He grabbed you on your left shoulder?

13:40 13        A.  I don't remember.

13:41 14        Q.  Okay.  So he grabbed you and did what?

13:41 15        A.  Just pulled me down.  I was sitting down.

13:41 16        Q.  So you sat down yourself?

13:41 17        A.  Yes, sir.

13:41 18        Q.  Did he like trip you?

13:41 19        A.  No.

13:41 20        Q.  Or did he try to kick your legs out in any way?

13:41 21        A.  No, sir.

13:41 22        Q.  So you more or less sat down under your own power?

13:41 23        A.  Yes, sir.

13:41 24        Q.  But he kept his hand on your shoulder as you were

13:41 25    going down?

13:41  1      A.   Yes, sir.

13:41  2      Q.   Okay, did you fall down?

13:41  3      A.   No, sir.

13:41  4      Q.   Okay.  Did he bruise you in some manner?

13:41  5      A.   No, sir.

13:41  6      Q.   Okay.  Did he leave a mark?

13:41  7      A.   No, sir.

13:41  8      Q.   Okay, so you sat down.  Did you hurt yourself as you

13:41  9  fell down?

13:41 10      A.   No, sir.

13:41 11      Q.   Okay.  When you sat down, where were you sitting?

13:41 12      A.   On the sidewalk.

13:41 13      Q.   Okay, were you like -- well, like were you sitting

13:41 14  like kneeling, or were you like sitting like cross-legged,

13:41 15  what they sometimes call Indian, or were you like sitting on

13:41 16  the grass with your feet on the curb, or what?

13:41 17      A.   I was just sitting on top of the sidewalk with my

13:42 18  legs straight, straight.

13:42 19      Q.   Okay.  And did they tell you why they thought you

13:42 20  were involved?

13:42 21      A.   Because -- they said that some -- that they had

13:42 22  reported us because they said the one that stole took off to

13:42 23  the right-hand and we took off that way too and they thought

13:42 24  we picked them up.  And they thought we were with them, the

13:42 25  one that stole.

13:42  1     Q.  Okay, they told you that?

13:42  2     A.  Yes, sir.

13:42  3     Q.  And what did you tell them when they said that?

13:42  4     A.  Nothing.  What could I say, that it wasn't us.

13:42  5     Q.  Okay, so when did you tell them about your uncle

13:42  6  Luis Ovalle?

13:42  7     A.  When they took me to the police department.

13:42  8     Q.  You didn't mention his name before they took you to

13:42  9  the police department?

13:42 10     A.  I don't remember.

13:42 11     Q.  Okay, so while you were at the scene, you might have

13:42 12  mentioned seeing your uncle there?

13:42 13     A.  Yes, sir.

13:42 14     Q.  Okay.  Do you think maybe you had mentioned that

13:42 15  maybe your uncle might have been involved in it, you thought

13:43 16  that he was involved in it somehow?

13:43 17     A.  I don't remember.

13:43 18     Q.  You don't remember?  You can't remember whether you

13:43 19  said that or whether you didn't?

13:43 20     A.  I don't remember.

13:43 21     Q.  Well, so you can't remember whether you did or did

13:43 22  not say anything about your uncle, Mr. Ovalle, to the police

13:43 23  while you were under arrest there where they stopped the car?

13:43 24     A.  Not when they stopped us.

13:43 25     Q.  You don't recall saying anything to them one way or

BRYANT & STINGLEY, INC.
McAllen       Harlingen      Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

13:43 1    the other about Mr. Ovalle, when they stopped you?

13:43 2        A.  I don't remember.

13:43 3        Q.  You don't remember at all.  What else did they tell

13:43 4    you?

13:44 5        A.  When they stopped us?

13:44 6        Q.  Well, they have arrested you, you're sitting on the

13:44 7    ground.  What else did they tell you at that point?

13:44 8        A.  That I was saying some other thing and she was

13:44 9    saying some other thing.

13:44 10       Q.  Yes.

13:44 11       A.  Different.

13:44 12       Q.  Okay, and did they tell you what that difference

13:44 13   was?

13:44 14       A.  No, sir.

13:44 15       Q.  All right.  So what else did they tell you as you

13:44 16   were sitting there?

13:44 17       A.  That I was going to go to juvenile that night.

13:44 18       Q.  That you were going to the juvenile detention

13:44 19   center?

13:44 20       A.  Yes, sir.

13:44 21       Q.  That's what they told you.  What else, sir?

13:44 22       A.  For that time, that I was going to go to the police

13:44 23   station so I could say what we did and all this supposedly.

13:44 24       Q.  Okay.  And what else did they tell you while you

13:45 25   were still seated there on the ground?

13:45  1      A.   That's all I remember.

13:45  2      Q.   Okay.  And you were taken to the police station --

13:45  3      A.   Yes, sir.

13:45  4      Q.   -- in a police vehicle.  Okay, how did you get in

13:45  5  the vehicle?

13:45  6      A.   Because they were opening the doors, and they were

13:45  7  like, "Get in."   And they just helped me.

13:45  8      Q.   Did they help you get up?  Did they hurt you as they

13:45  9  helped you get up?

13:45 10      A.   No, sir.

13:45 11      Q.   Did they help you get in the car?

13:45 12      A.   Yes, sir.

13:45 13      Q.   Did they hurt you when they did that?

13:45 14      A.   No, sir.

13:45 15      Q.   Did they help you do that -- get in the car?

13:45 16      A.   Yes, sir.

13:45 17      Q.   Okay.  I'm sorry?

13:45 18      A.   I said yes, sir.

13:45 19      Q.   All right.  And the police officers took you to --

13:45 20  well, let's just stop right there.

13:45 21          Other than accuse you of being involved in this

13:45 22  robbery, did the police officers use any profanity to you?

13:46 23      A.   No, sir.

13:46 24      Q.   Did they threaten to hurt you in any way?

13:46 25      A.   No, sir.

13:46 1    Q.   Did they act like they were going to hurt you in

13:46 2    some way -- strike you, I mean?

13:46 3    A.   No, sir.

13:46 4    Q.   You mentioned something about the handcuffs.  Was

13:46 5    there a problem with the handcuffs other than you had to wear

13:46 6    them?

13:46 7    A.   No, sir, they were tight.

13:46 8    Q.   Tight.  And did they leave a bruise?

13:46 9    A.   No, sir.

13:46 10   Q.   When they took the cuffs off, were you able to move

13:46 11   your hands?

13:46 12   A.   Yes, sir.

13:46 13   Q.   Had you lost any feeling in your hands at all?

13:46 14   A.   No, sir.

13:46 15   Q.   Okay.  So you went to the police station, and when

13:46 16   you arrived at the police station, what happened?

13:46 17   A.   They took me to a different room --

13:46 18   Q.   Yes.

13:46 19   A.   -- from where my mother was at, and they were asking

13:46 20   me all these questions.

13:46 21   Q.   Do you know the names of the officers that asked you

13:46 22   questions?

13:46 23   A.   No, sir.

13:46 24   Q.   Okay.  And for how long were you asked questions?

13:47 25   A.   For about 30 minutes.

13:48  1       A.   I think where they work at, where they have all

13:48  2    those computers.

13:48  3       Q.   Okay.  Now, what did the police officers say to you

13:48  4    as they were questioning you, asking you questions?

13:48  5       A.   That if I knew who committed the crime.

13:48  6       Q.   Okay.

13:48  7       A.   And I don't remember anything else.

13:48  8       Q.   Okay.  Did you tell them who you thought had

13:48  9    committed it?

13:48 10       A.   No, sir.

13:48 11       Q.   Did you tell them anything about your uncle,

13:48 12    Mr. Ovalle, being there?

13:48 13       A.   Yes, sir.

13:48 14       Q.   What did you tell them?

13:48 15       A.   That -- because the police officers told me that

13:48 16    they saw that I did a signal to someone, and I did it to my

13:48 17    uncle.  I was telling him hi, and they thought that he was

13:48 18    the one that committed the crime.

13:48 19       Q.   Okay, you said you made a gesture of some sort while

13:49 20    you were inside?

13:49 21       A.   No, while I was walking towards inside.

13:49 22       Q.   I see.  And you were just making a gesture for your

13:49 23    uncle?

13:49 24       A.   Yes, sir.

13:49 25       Q.   And what else did they ask you?

13:49  1        A.    That Mom was going to stay there, if I wanted for

13:49  2    her to stay or me.

13:49  3        Q.    Okay.  What did they say about that?

13:49  4        A.    They were telling me that if I wanted my mom to stay

13:49  5    there longer or if I wanted to take the blame and all this.

13:49  6        Q.    What else did they say about your mother?

13:49  7        A.    Only that.

13:50  8        Q.    Okay.  Other than did you want your mother to stay

13:50  9    longer and whether you would take the blame or she would,

13:50  10   what else did they say about your mother?

13:50  11       A.    I don't remember.

13:50  12       Q.    Did they threaten to do anything to your mother?

13:50  13       A.    No, I don't remember nothing.

13:50  14       Q.    Did they tell you that she would be hurt in some way

13:50  15   if you didn't tell them what they wanted to hear?

13:50  16       A.    No, sir.

13:50  17       Q.    Did they tell you that something would happen to her

13:50  18   if you didn't talk?

13:50  19       A.    Yeah, that she would stay longer.

13:50  20       Q.    Anything else?

13:50  21       A.    No, sir.

13:50  22       Q.    Do you recall anything else that was said during the

13:50  23   half hour that the officers asked you questions?

13:50  24       A.    That they were telling me that I was under the

13:50  25   influence.

13:50  1      Q.   Okay.  Did they tell you why they thought that?

13:50  2      A.   Because my eyes -- because I get sick and my eyes

13:51  3   turn red and they dilate when you're under the influence.

13:51  4      Q.   Okay, when you say you get sick, your eyes turn red,

13:51  5   what kind of illness is that?

13:51  6      A.   I don't remember, but I have some pills, though.

13:51  7      Q.   Okay.  Were you sick that night for some reason?

13:51  8      A.   Yes, sir.

13:51  9      Q.   You were?  How were you ill?

13:51 10      A.   The flu.

13:51 11      Q.   Okay.  Were you taking anything for that?

13:51 12      A.   No, sir.

13:51 13      Q.   You hadn't taken like, you know, medicine you buy at

13:51 14   the store or medicine a doctor would prescribe?

13:51 15      A.   No, sir.

13:51 16      Q.   Where did you get -- how long had you had the flu?

13:51 17      A.   For the night, the first night.

13:51 18      Q.   Okay.  I asked this question earlier, and you were

13:51 19   going to answer, but it was your mother's deposition, so we

13:52 20   wouldn't let you.  Was school out by this time?

13:52 21      A.   Yes, sir.

13:52 22      Q.   Now, that was a Saturday, right?

13:52 23      A.   Yes, sir.

13:52 24      Q.   And what had you been doing that evening?

13:52 25      A.   Saturday?

13:52 1    Q.    Yeah.

13:52 2    A.    I was just home.

13:52 3    Q.    You didn't go out that night?

13:52 4    A.    No, sir.

13:52 5    Q.    So the officers saw that you might have eyes that

13:52 6    were red and thought you were under the influence.  What did

13:52 7    you tell them?

13:52 8    A.    That I was sick.

13:52 9    Q.    Okay.  Did you ask them to take you to a doctor?

13:52 10    A.    No, sir.

13:52 11    Q.    Did you ask them for any medicine?

13:52 12    A.    No, sir.

13:53 13    Q.    And after you told them that, what did they say?

13:53 14    A.    They didn't believe me.

13:53 15    Q.    Okay.  And did you tell them anything to try to make

13:53 16    them believe you?

13:53 17    A.    No, sir.

13:53 18    Q.    Okay.  And after they said that, what happened next?

13:53 19    A.    That they were taking me to juvenile.

13:53 20    Q.    Okay, who took you to juvenile?

13:53 21    A.    An officer.

13:53 22    Q.    Okay, one of the officers that asked you questions?

13:53 23    A.    Yes, sir.

13:53 24    Q.    And do you have any idea about what time it was that

13:53 25    you left the police station to go to juvenile?

13:53 1   A. Like 3:00 or 4:00 in the morning.

13:53 2   Q. Okay.  Now, between the time they -- where were you

13:53 3 after they finished questioning you but before you left to go

13:54 4 to juvenile -- where did you stay?

13:54 5   A. With them.  That means sitting down in a chair.

13:54 6   Q. Okay, with the officers?

13:54 7   A. Yes, sir.

13:54 8   Q. They only tried to ask you questions for about half

13:54 9 an hour.  When were the handcuffs taken off you, sir?

13:54 10   A. When they took me into juvenile.

13:54 11   Q. Okay, so while they were questioning you, you were

13:54 12 in handcuffs?

13:54 13   A. Yes, sir.

13:54 14   Q. And the handcuffs were not removed until you went to

13:54 15 the juveniles place?

13:54 16   A. Yes, sir.

13:54 17   Q. At any time during this time did you ask the

13:54 18 officers to remove the handcuffs?

13:54 19   A. No, sir.

13:54 20   Q. At any time before you went to juvenile, did you

13:54 21 tell them that the handcuffs are causing you any distress or

13:54 22 any pain?

13:54 23   A. No, sir.

13:54 24   Q. You didn't tell the officers that.  And the time

13:54 25 after they quit asking you questions but before you were

| | | |
|---|---|---|
| 13:54 | 1 | taken to juvenile, did any of the officers try to strike you |
| 13:55 | 2 | or look like they might try to strike you? |
| 13:55 | 3 | A.  No, sir. |
| 13:55 | 4 | Q.  Did they curse you or use profanity towards you? |
| 13:55 | 5 | A.  No, sir. |
| 13:55 | 6 | Q.  Did they say they were going to hurt you or your |
| 13:55 | 7 | mother during that time? |
| 13:55 | 8 | A.  No, sir. |
| 13:55 | 9 | Q.  During this time after they finished questioning you |
| 13:55 | 10 | but before they took you to juvenile, did they make any |
| 13:55 | 11 | threats toward you or your mother? |
| 13:55 | 12 | A.  No, sir. |
| 13:55 | 13 | Q.  And then they took you to juvenile? |
| 13:55 | 14 | A.  Yes, sir. |
| 13:55 | 15 | Q.  What happened when you got to the juvenile center? |
| 13:55 | 16 | A.  They took off the handcuffs, and they made me sign |
| 13:55 | 17 | all these papers that I was going in, and they let me take a |
| 13:55 | 18 | shower.  They took me to a cell like almost 5:00 in the |
| 13:55 | 19 | morning. |
| 13:55 | 20 | Q.  Okay.  And after you went to the cell, what did you |
| 13:56 | 21 | do? |
| 13:56 | 22 | A.  Nothing.  I was just there, just hang out. |
| 13:56 | 23 | Q.  Okay, did you get any sleep that night or that |
| 13:56 | 24 | morning? |
| 13:56 | 25 | A.  No, sir. |

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ORELIA ESQUIVEL,               ) (
INDIVIDUALLY AND A/N/F          ) (
JESUS ESQUIVEL, JR.             ) (
     Plaintiffs          ) (
                     ) (
VS.                            ) (CIVAL ACTION NO. B-03-104
                     ) (
SSP PARTNERS & CITY OF          ) (
HARLINGEN POLICE DEPARTMENT ) (
     Defendants          ) (

---

ORAL AND VIDEOTAPED DEPOSITION OF
JORGE SALINAS
MARCH 9, 2004

---

    ORAL AND VIDEOTAPED DEPOSITION OF JORGE

SALINAS, produced as a witness at the instance of the

PLAINTIFFS, taken in the above styled and numbered

cause on MARCH 9, 2004, reported by SHELLEY STINGLEY,

Certified Court Reporter No. 5725, in and for the State

of Texas, at the offices of Adams & Graham, L.L.P., 222

East Van Buren, Harlingen, Texas, pursuant to the

Federal Rules of Civil Procedures.



2

## APPEARANCES

COUNSEL FOR PLAINTIFFS:

    RUBEN PENA
    LAW OFFICE OF RUBEN R. PENA, P.C.
    222 West Harrison Street
    Harlingen, Texas  78550

COUNSEL FOR CITY OF HARLINGEN POLICE DEPARTMENT:

    ROGER W. HUGHES
    ADAMS & GRAHAM, L.L.P.
    222 East Van Buren Street
    West Tower
    Harlingen, Texas  78550

## INDEX

| | PAGE |
|---|---|
| Appearances ................................... | 2 |
| JORGE SALINAS | |
| Examination by Mr. Pena ....................... | 4 |
| Errata Sheet/Signature Page ................... | 44 |
| Reporter's Certificate ........................ | 45 |

3

## EXHIBITS

| EXHIBIT NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| 1 | Cross-Notice for Deposition of Jorge Salinas ......................... | 4 |
| 2 | Arrest Report ......................... | 31 |
| 3 | Drawing by Jorge Salinas .............. | 36 |
| 4 | Harlingen Detention Center Intake Screening Form ....................... | 36 |
| 5 | Investigator's Report ................. | -- |
| 6 | Affidavit of Julio Gonzalez ........... | -- |
| 7 | Affidavit of Norma Parke .............. | -- |
| 8 | Affidavit of Thomas Hushen ............ | -- |

09:32  1     A.  Yeah.

09:32  2     Q.  What do you recall about the arrest on May the

09:32  3  17th, 2003 of Jorge Luis -- I'm sorry of Orelia Perez

09:32  4  Esquivel and her son Jesus?

09:32  5     A.  We were given a call at Circle K on Commerce.

09:32  6     Q.  Okay.

09:32  7     A.  About an aggravated robbery.  A witness saw the

09:33  8  vehicle, a white Ford explorer, gave the license

09:33  9  plates, which I don't recall at this time.  I went

09:33 10  ahead and responded as a back-up officer and --

09:33 11     Q.  I'm sorry.  You did what, now?

09:33 12     A.  I responded as a back-up officer.  Supposedly

09:33 13  the vehicle had left the scene so we were out there

09:33 14  looking for the vehicle.

09:33 15     Q.  Okay.

09:33 16     A.  I spotted a vehicle matching the description on

09:33 17  13th and Tyler.  I turned around and read the plates

09:33 18  and dispatch confirmed that those were the plates for

09:33 19  the suspect involved in the aggravated robbery,

09:33 20  according to the witness.

09:33 21     Q.  Okay.

09:33 22     A.  I conducted a traffic stop as soon as I had

09:33 23  additional units as backup, pulled them over about 9th

09:33 24  and Filmore.  I recall that the driver was a female and

09:33 25  there was a passenger.  I didn't approach the vehicle.

09:33  1    Pretty much we had them exit the vehicle and I

09:34  2    remember --

09:34  3        Q.  Why would you do that?

09:34  4        A.  The situation, a felony stop, so we're trained

09:34  5    not to approach the vehicle.

09:34  6        Q.  Were you advised that the robbery -- or the

09:34  7    witness or the victim had indicated a gun had been used

09:34  8    in the robbery?

09:34  9        A.  Yes, sir.

09:34  10       Q.  Okay.  And that would have been sufficient

09:34  11   reason for you to protect yourself and your fellow

09:34  12   officers and not approach the vehicle?

09:34  13       A.  Yes, sir.

09:34  14       Q.  Is that the training and the -- I guess the --

09:34  15   the training that you go through in the academy or --

09:34  16       A.  Yes, sir, the training plus the experience.

09:34  17       Q.  Okay.  So what happened next?

09:34  18       A.  I was yelling to the driver to exit the vehicle

09:34  19   in English, and she kind of hesitated so I switched

09:34  20   from English to Spanish.

09:34  21       Q.  Okay.

09:34  22       A.  And finally I guess she understood Spanish so

09:35  23   she started getting off the vehicle, and I signaled and

09:35  24   verbally commanded her to come closer to me, closer to

09:35  25   the unit.  And the other gentleman was asked to exit

09:39 1    A.   Probably a couple of minutes.

09:39 2    Q.   A couple of minutes?

09:39 3    A.   Right.

09:39 4    Q.   Was there very much traffic at all?

09:39 5    A.   No, sir.

09:39 6    Q.   Okay, do you recall what time of the evening it

09:39 7  was?

09:39 8    A.   About 10:30, 11:00.

09:39 9    Q.   Okay.  During the time that you were following

09:39 10  this vehicle, did the driver in any way attempt to take

09:40 11  any kind of evasive action?

09:40 12    A.   No, sir.

09:40 13    Q.   Did she speed up?

09:40 14    A.   No, sir.

09:40 15    Q.   Okay.  When you were following her, did you

09:40 16  have your overhead lights on or not?

09:40 17    A.   At first I didn't have my overheads because I

09:40 18  was waiting for additional units.

09:40 19    Q.   Okay.

09:40 20    A.   And at around 10th Street, that's when I

09:40 21  initiated the traffic stop.

09:40 22    Q.   Okay.

09:40 23    A.   And she kind of rolled for about a block and

09:40 24  then pulled over.

09:40 25    Q.   Okay.  And during the time that you were

09:40  1    following this vehicle, did anybody get out of the

09:40  2    vehicle --

09:40  3        A.  No, sir.

09:40  4        Q.  -- before the stop?

09:40  5        A.  No, sir.

09:40  6        Q.  All right, now, how many officers ended up

09:40  7    arriving at the scene when you made the stop?

09:41  8        A.  I believe there was two more officers.

09:41  9        Q.  Two more officers, okay.  Now, walk me through

09:41 10    the procedure that you used when you -- you turned your

09:41 11    overheads on, Ms. Esquivel pulled over, and you stopped

09:41 12    behind her, correct?

09:41 13        A.  Yes, sir.

09:41 14        Q.  How far behind her were you?

09:41 15        A.  About two or three car lengths.

09:41 16        Q.  Okay, two or three car lengths.  And did you

09:41 17    get out of your vehicle?

09:41 18        A.  Yes, sir, I got off and stood by the door.

09:41 19        Q.  Okay, and you stood by your door.  Were you

09:41 20    behind the door or had you closed the door?

09:41 21        A.  I was behind the door.

09:41 22        Q.  And at that time I guess you would have had to

09:41 23    have yelled at her, correct?

09:41 24        A.  Yes, sir.

09:41 25        Q.  And that's when you said that you're not sure

09:41 1    she understood English, correct?

09:41 2        A.   Right.

09:41 3        Q.   So then you switched over to Spanish, correct?

09:41 4        A.   That's correct.

09:41 5        Q.   And she got out of the vehicle.  When she got

09:41 6    out of the vehicle, can you describe her demeanor to

09:42 7    me?

09:42 8        A.   She kind of looked nervous.

09:42 9        Q.   Okay.

09:42 10       A.   Scared.  She didn't know what was going on.

09:42 11       Q.   Okay.  Did you have your gun drawn?

09:42 12       A.   No, I didn't, sir.

09:42 13       Q.   Okay.  Did any of the other officers have their

09:42 14   guns drawn?

09:42 15       A.   I don't know, sir.

09:42 16       Q.   Okay.  Did you have your gun unholstered?

09:42 17       A.   No, sir, it was in the holster.

09:42 18       Q.   Okay.  Weren't you concerned that someone else

09:42 19   had a weapon that could harm you or your fellow

09:42 20   officers?

09:42 21       A.   Yes, sir.

09:42 22       Q.   Okay.  Is there a procedure that you follow

09:42 23   that -- I guess my question is when you would determine

09:42 24   to, you know, pull your weapon out and not pull your

09:42 25   weapon out.

09:42 1    A.   Yes, sir.

09:42 2    Q.   Okay, and what is that procedure?

09:42 3    A.   Well, it's up to the officer.

09:42 4    Q.   Okay, so it's up to your discretion?

09:42 5    A.   Yes, sir.

09:42 6    Q.   So when Ms. Esquivel got out of the vehicle,

09:43 7  what did you tell her?

09:43 8    A.   I told her, "Walk towards me."

09:43 9    Q.   Okay.  And did she do that?

09:43 10   A.   Yes, sir.

09:43 11   Q.   Okay.  And when she walked towards you, how far

09:43 12  did she come to you?

09:43 13   A.   Close enough to pretty much make contact, about

09:43 14  from me to where you're at.

09:43 15   Q.   Okay, so two or three feet?

09:43 16   A.   Yes, sir.

09:43 17   Q.   Okay.  And at the time, the other individual

09:43 18  that was in the vehicle, where was he?

09:43 19   A.   He was being asked, also, to exit the vehicle.

09:43 20   Q.   Okay.

09:43 21   A.   But that was another officer.

09:43 22   Q.   Okay, and was that the other officer that you

09:43 23  mentioned?

09:43 24   A.   Yes, sir, Charles.

09:43 25   Q.   Charles Fechner?

27

09:43  1        A.   Fechner.

09:43  2        Q.   Fechner.  Is Officer Fechner still with the

09:43  3   Harlingen Police Department?

09:43  4        A.   Yes, sir.

09:43  5        Q.   All right, and when Ms. Esquivel approached

09:43  6   you, what happened?

09:44  7        A.   I just told her to step back to the rear of the

09:44  8   vehicle, my vehicle.

09:44  9        Q.   Okay.

09:44 10        A.   And I began to ask her questions regarding the

09:44 11   incident that had occurred.

09:44 12        Q.   Okay.

09:44 13        A.   And I explained to her why she had been pulled

09:44 14   over and stuff like that.

09:44 15        Q.   Okay.  And what did you ask her?

09:44 16        A.   I asked her first the initial questions, "Where

09:44 17   are you coming from?"

09:44 18        Q.   And did she tell you?

09:44 19        A.   Yes.

09:44 20        Q.   What did she tell you?

09:44 21        A.   At first she said she was coming from

09:44 22   Jack-In-The-Box.  Then I asked her, "Were you at

09:44 23   Circle K on Commerce?"  And she said she was prior to

09:44 24   going to Jack-In-The-Box.

09:44 25        Q.   And what happened after that?

09:44  1      A.   I just continued questioning her as far as what
09:44  2  she was doing at Circle K, what she was doing at
09:45  3  Jack-In-The-Box and stuff like that, asking her about
09:45  4  the incident.
09:45  5      Q.   Okay.  Did you ask her if she had been involved
09:45  6  in the robbery?
09:45  7      A.   Yes, sir, I asked her if she had anything to do
09:45  8  -- pretty much I explained the situation, "We had an
09:45  9  aggravated robbery.  There was a witness giving this
09:45  10  description as to where the suspect fled and in this
09:45  11  vehicle and that's why we're questioning you."
09:45  12      Q.   And what did she say?  How did she respond?
09:45  13      A.   She said she was at the Circle K but she had
09:45  14  nothing to do with the robbery.
09:45  15      Q.   Okay.
09:45  16      A.   She just kept saying she had nothing to do with
09:45  17  the robbery.
09:45  18      Q.   Okay.  And what did you do after you asked her
09:45  19  if she had anything to do with the robbery?
09:45  20      A.   Pretty much I just stood there for a while
09:45  21  while the other officer tried to get the other
09:46  22  passenger -- come to find out their stories weren't
09:46  23  matching.
09:46  24      Q.   Okay.
09:46  25      A.   I don't know exactly what their stories were at

09:46  1    this point, but the questions I was asking her, the

09:46  2    other gentleman was answering with a different

09:46  3    response.

09:46  4        Q.  Okay.  But you don't know what his responses

09:46  5    were?

09:46  6        A.  No, sir.

09:46  7        Q.  Okay.  Now, how do you know that their stories

09:46  8    weren't matching?

09:46  9        A.  Because I was talking to the officer and I was

09:46  10   telling him, "I asked her this," and he was asking the

09:46  11   same questions and he told him this and she told me

09:46  12   this.

09:46  13       Q.  And at some point you made a determination to

09:46  14   go ahead and arrest her, correct?

09:46  15       A.  No, sir.  I was given information from the

09:46  16   actual scene from my supervisor.

09:46  17       Q.  Who is your supervisor?

09:46  18       A.  Lieutenant Hushen, Tom Hushen.

09:46  19       Q.  Okay.

09:47  20       A.  They were the ones investigating what was going

09:47  21   on, and at that point we had detained both of them and

09:47  22   were just waiting to see what was evolving over there

09:47  23   at the scene.

09:47  24       Q.  So your testimony is that Mr. Hushen, a captain

09:47  25   or lieutenant -- or what was his position?

```
10:02  1   them while you had them, I guess, under your custody at
10:02  2   the time, correct?
10:02  3       A.  That's correct.
10:02  4       Q.  When Officer Hushen called you --
10:02  5              MR. HUGHES:  Just a second.  It's Hushen,
10:02  6   H-u-s-s -- or I mean H-u-s-h-e-n.
10:02  7              MR. PENA:  Hushen?
10:02  8              MR. HUGHES:  Hushen.  It's just we're
10:02  9   mispronouncing it and I know we can all clean this up
10:02 10   later but --
10:02 11              MR. PENA:  Hushen, thank you.
10:02 12       Q.  See, this is what he does.  He does these
10:02 13   little things to get me off track so I forget my
10:02 14   question.  He plays these tricks on me all the time.
10:02 15              Officer Salinas, at the time that
10:03 16   Ms. Esquivel was standing -- I guess standing next to
10:03 17   you and you were waiting for Officer Hushen to get back
10:03 18   to you, was she handcuffed?
10:03 19       A.  No, sir, she was sitting in the back of my
10:03 20   unit.
10:03 21       Q.  And where was her son?
10:03 22       A.  Her son was on the front yard to this other
10:03 23   residence where she had pulled over with the other
10:03 24   officer.
10:03 25       Q.  He was in the front yard?
```

43

```
10:03  1        A.   Yes, sir, to the house that she pulled over,
10:03  2   the front yard of that residence.  I don't recall the
10:03  3   address.  But the other officer was talking to him
10:03  4   pretty much by their vehicle and in the front yard.
10:03  5        Q.   Do you know if he was handcuffed?
10:03  6        A.   No, he wasn't handcuffed.  When we were talking
10:03  7   to them, they weren't handcuffed at all.
10:03  8        Q.   They didn't get handcuffed until you got the
10:03  9   word to arrest them?
10:03 10        A.   Yes, sir, that's correct.
10:03 11        Q.   Have you understood my questions here today?
10:04 12        A.   Yes, sir.
10:04 13             MR. PENA:  That's all the questions I
10:04 14   have.  Thank you very much.  Pass the witness.
10:04 15             MR. HUGHES:  I have no questions.  You're
10:04 16   free to go.
      17             (Deposition concluded)
      18
      19
      20
      21
      22
      23
      24
      25
```

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

```
ORELIA ESQUIVEL,           ) (
INDIVIDUALLY AND A/N/F      ) (
JESUS ESQUIVEL, JR.         ) (
        Plaintiffs          ) (
                            ) (
VS.                         ) (CIVAL ACTION NO. B-03-104
                            ) (
SSP PARTNERS & CITY OF      ) (
HARLINGEN POLICE DEPARTMENT ) (
        Defendants          ) (
```

---

ORAL AND VIDEOTAPED DEPOSITION OF
JORGE LUIS MORENO
MARCH 9, 2004

---

ORAL AND VIDEOTAPED DEPOSITION OF JORGE LUIS

MORENO, produced as a witness at the instance of the

PLAINTIFFS, taken in the above styled and numbered

cause on MARCH 9, 2004, reported by SHELLEY STINGLEY,

Certified Court Reporter No. 5725, in and for the State

of Texas, at the offices of Adams & Graham, L.L.P., 222

East Van Buren, Harlingen, Texas, pursuant to the

Federal Rules of Civil Procedures.



<u>APPEARANCES</u>

COUNSEL FOR PLAINTIFFS:

    RUBEN PENA
    LAW OFFICE OF RUBEN R. PENA, P.C.
    222 West Harrison Street
    Harlingen, Texas  78550

COUNSEL FOR CITY OF HARLINGEN POLICE DEPARTMENT:

    ROGER W. HUGHES
    ADAMS & GRAHAM, L.L.P.
    222 East Van Buren Street
    West Tower
    Harlingen, Texas  78550

<u>INDEX</u>

|  | PAGE |
|---|---|
| Appearances ................................... | 2 |
| <u>JORGE LUIS MORENO</u> | |
| Examination by Mr. Pena ....................... | 4 |
| Errata Sheet/Signature Page ................... | 24 |
| Reporter's Certificate ........................ | 25 |

3

## EXHIBITS

| EXHIBIT NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| 1 | Cross-Notice for Deposition of Jorge Salinas ......................... | -- |
| 2 | Arrest Report ......................... | 9 |
| 3 | Drawing by Jorge Salinas .............. | -- |
| 4 | Harlingen Detention Center Intake Screening Form ....................... | -- |
| 5 | Investigator's Report ................. | -- |
| 6 | Affidavit of Julio Gonzalez ........... | -- |
| 7 | Affidavit of Norma Parke .............. | -- |
| 8 | Affidavit of Thomas Hushen ............ | -- |

10:21 1    Q.  When did you speak to the clerk?

10:21 2    A.  When I first arrived at the store.

10:21 3    Q.  And what time did you arrive at the store?

10:21 4    A.  Approximately about -- I would have to

10:21 5    estimate.

10:21 6    Q.  Sure.

10:21 7    A.  Approximately about two, maybe three minutes

10:21 8    after the call came out.

10:22 9    Q.  All right, so approximately three -- two or

10:22 10   three minutes after Mr. Gonzalez made the call, you

10:22 11   arrived at that Circle K, correct?

10:22 12   A.  Correct.

10:22 13   Q.  I'm right?  Approximately.  Where were you

10:22 14   before you got the call?

10:22 15   A.  We were released from briefing and we had to do

10:22 16   an inspection check on our vehicles.

10:22 17   Q.  Is that what you were doing?

10:22 18   A.  Correct.

10:22 19   Q.  At the PD?

10:22 20   A.  Yes, sir.

10:22 21   Q.  How far is the location of the police

10:22 22   department from this Circle K?

10:22 23   A.  Again, I would have to estimate.  Between a

10:22 24   quarter to half a mile.

10:22 25   Q.  I think you're right.  It's not very far?

10:23 1     A.   Right.

10:23 2     Q.   And were you inspecting your vehicle when you

10:23 3   got the call?

10:23 4     A.   I don't remember exactly what I was doing when

10:23 5   I got the call.

10:23 6     Q.   All right.

10:23 7     A.   But --

10:23 8     Q.   Were you outside or were you inside the

10:23 9   building?

10:23 10    A.   Again --

10:23 11    Q.   You can't remember?

10:23 12    A.   -- I don't remember exactly.

10:23 13    Q.   All right.  When you arrived at the Circle K,

10:23 14  the information that you put in this arrest report was

10:23 15  the information that you got from Mr. Gonzalez,

10:23 16  correct, his telling you what happened to him?

10:23 17    A.   Not the entire --

10:23 18    Q.   No, I'm sorry.  I don't mean the entire thing.

10:23 19  The -- I didn't want to read the whole thing, but let

10:23 20  me go ahead.  The next sentence, "The subject was

10:23 21  handed a small brown bag with $5 and $1 dollar bills

10:24 22  and he also took a lighter without consent."  That's

10:24 23  information that Mr. Gonzalez gave you?

10:24 24    A.   Right.

10:24 25    Q.   All right.  "The witness" -- when you say "The

10:24  1     witness," who is the witness that you're referring to?

10:24  2         A.   On this one -- okay, that was Norma Parke.

10:24  3         Q.   Okay.  Do you know Ms. Parke?  Did you know her

10:24  4     before this?

10:24  5         A.   Oh, no, no, sir, I didn't.

10:24  6         Q.   Okay.  All right, so did you talk to her and

10:24  7     get this information that "The subject with the gun

10:24  8     exited the store and got into the passenger side of a

10:24  9     white Ford Explorer displaying Texas license plates

10:24 10     R53LGR"?

10:25 11         A.   I spoke to her, yes, and I got that

10:25 12     information.

10:25 13         Q.   Then the next line says, "The vehicle was

10:25 14     spotted by Officer J. Salinas and he initiated a

10:25 15     traffic stop on or at Filmore and 9th Street."  And I

10:25 16     assume that's the information you got from Officer

10:25 17     Salinas?

10:25 18         A.   That was the information I actually received

10:25 19     over the radio.

10:25 20         Q.   Okay.  When you received that over the radio,

10:25 21     were you still at the store?

10:25 22         A.   Correct.

10:25 23         Q.   And it goes on to say, "The subject with the

10:25 24     gun was not located in the vehicle; however, Arrestee

10:25 25     Orelia and Jesus are related to the subject."  Where

10:26 1    did you get that information?

10:26 2        A.  From Lieutenant Hushen.

10:26 3        Q.  And where was Lieutenant Hushen?

10:26 4        A.  When I received that information?  He arrived

10:26 5    at the store.

10:26 6        Q.  Well, do you know that he knew that Orelia and

10:26 7    Jesus were related to the suspect?

10:26 8        A.  I can only -- I can only guess.  He was already

10:26 9    at the scene with Officer Salinas and then came over

10:26 10   and told me that, you know, the subject was related to

10:26 11   those two that were inside the vehicle.

10:26 12       Q.  So your suspicion is that Lieutenant Hushen was

10:26 13   actually with Officer Salinas and obtained this

10:26 14   information and then he relayed that to you?

10:27 15       A.  Suspicion?

10:27 16       Q.  I mean, you weren't there?

10:27 17       A.  Correct.

10:27 18       Q.  You said, "That's my guess."

10:27 19       A.  Correct.

10:27 20       Q.  Okay, because the first time you saw Lieutenant

10:27 21   Hushen was when he walked into the Circle K?

10:27 22       A.  Correct.

10:27 23       Q.  Let's go on here.  "The subject Luis Ovalle is

10:27 24   Orelia's brother-in-law."  Is that information you got

10:27 25   from Lieutenant Hushen or is that from some other

10:32 1      A.   Yes, sir.

10:32 2      Q.   Now, you viewed the videotape and since

10:32 3  Lieutenant Hushen told you this was Luis Ovalle, you

10:32 4  just wrote that down, correct?

10:32 5      A.   Yes, sir, exactly

10:32 6      Q.   The next sentence says, "The witness Norma

10:32 7  Parke was positive when she advised that she observed

10:32 8  the robbery and observed the suspect enter the

10:32 9  described vehicle."  And that's something you obtained

10:33 10 from her?

10:33 11     A.   Correct.

10:33 12     Q.   Now, when it says here that she was positive,

10:33 13 how was it that you determined that she was positive?

10:33 14 Did you ask her, "Are you positive?"

10:33 15     A.   Yes, I asked her at least twice prior to

10:33 16 Lieutenant Hushen also asking her.

10:33 17     Q.   Okay.

10:33 18     A.   And she said she felt very positive that she

10:33 19 saw him --

10:33 20     Q.   Okay.

10:33 21     A.   -- exit the store and enter the white Ford

10:33 22 Explorer.

10:33 23     Q.   Okay.  The next sentence says, "Witness was

10:33 24 parked in front of the two glass doors and from her

10:33 25 vantage point she could observe everything."  So that's

10:33  1    what she told you.  She was parked in front of the

10:33  2    store, correct?

10:33  3        A.  Correct.

10:33  4        Q.  "Her description of the suspect matched what

10:33  5    was seen on the videotape," correct?

10:33  6        A.  Yes, sir.

10:33  7        Q.  Okay.  And that's -- again, she told you what

10:33  8    the suspect looked like and you matched it with what

10:34  9    you had seen on the videotape, correct?

10:34  10       A.  That's correct.

10:34  11       Q.  Okay.  Then the next sentence says, "In the

10:34  12   front seat of the vehicle that was stopped were three

10:34  13   hot burgers from Jack-In-The-Box."  Now, again was

10:34  14   that --

10:34  15       A.  Information that Lieutenant Hushen.

10:34  16       Q.  Okay.

10:34  17       A.  Yes, sir.

10:34  18       Q.  Do you know what happened to those burgers?

10:34  19       A.  No.

10:34  20       Q.  Were they taken in as evidence, do you know?

10:34  21       A.  No, I don't.

10:34  22            MR. PENA:  Do you have those burgers?

10:34  23            MR. HUGHES:  I don't know.  I'll have to

10:34  24   check the evidence manifest.

10:34  25            MR. PENA:  Thank you.

10:34 1      Q.   Then the next sentence says, "The receipt

10:34 2   stated that they had been there at approximately

10:34 3   10:23 p.m."  Is that Lieutenant Hushen telling you that

10:34 4   or is that independent information that you obtained?

10:34 5      A.   No, that's information that Lieutenant Hushen

10:34 6   shared.

10:35 7      Q.   Clerk from Jack-In-The-Box Lori Trevino was

10:35 8   contacted.  Did you contact her?

10:35 9      A.   No.

10:35 10     Q.   Lieutenant Hushen?

10:35 11     A.   Lieutenant Hushen.

10:35 12     Q.   And she advised that she remembered the white

10:35 13  Explorer and saw a female driver and a young man and

10:35 14  another subject in the vehicle.  Again, that's

10:35 15  Lieutenant Hushen and not you, correct?

10:35 16     A.   Correct, sir.

10:35 17     Q.   Now, at the bottom of this page 3 of 3 is -- it

10:35 18  has signatures.  Do you see that, where it says Orelia

10:35 19  Esquivel?

10:35 20     A.   Yes, sir.

10:35 21     Q.   Did you have her sign that?

10:35 22     A.   No, sir.

10:35 23     Q.   Okay.  Do you know how she came to be signing

10:35 24  this document?

10:35 25     A.   No, sir.

10:35 1    Q.   Did you ever interview Orelia Esquivel?

10:35 2    A.   No, sir.

10:35 3    Q.   Did you ever interview her son Jesus?

10:35 4    A.   No, sir.

10:35 5    Q.   Okay.  When you were interviewing Norma Parke,

10:35 6 did you smell alcohol on her breath?

10:35 7    A.   No, sir.

10:35 8    Q.   Okay.  Did she seem intoxicated?

10:36 9    A.   No, sir.

10:36 10   Q.   When you viewed the videotape, could you see

10:36 11 where the suspect fled?

10:36 12   A.   No, sir.

10:36 13   Q.   Now, after you did this report, Officer Moreno,

10:37 14 what else did you do in regards to this particular

10:37 15 case?

10:37 16   A.   Report -- that was about it.

10:37 17   Q.   Okay.  All right, now, you told me you brought

10:37 18 another document and you said that's the incident

10:37 19 report that you have there; is that correct?

10:37 20   A.   Oh, yeah, this is the incident report.

10:37 21   Q.   Could I see that for just a second?

10:37 22   A.   Sure.

10:37 23   Q.   I'm sure I have a copy of that.

10:37 24   A.   Yeah, it's basically this.

10:38 25   Q.   Okay, on the incident report on page 6 of 7, is

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ORELIA ESQUIVEL,              ) (
INDIVIDUALLY AND A/N/F        ) (
JESUS ESQUIVEL, JR.           ) (
        Plaintiffs            ) (
                              ) (
VS.                           ) (CIVAL ACTION NO. B-03-104
                              ) (
SSP PARTNERS & CITY OF        ) (
HARLINGEN POLICE DEPARTMENT   ) (
        Defendants            ) (

---

ORAL AND VIDEOTAPED DEPOSITION OF
RUBEN CONTRERAS, III
MARCH 9, 2004

---

ORAL AND VIDEOTAPED DEPOSITION OF RUBEN

CONTRERAS, III, produced as a witness at the instance

of the PLAINTIFFS, taken in the above styled and

numbered cause on MARCH 9, 2004, reported by SHELLEY

STINGLEY, Certified Court Reporter No. 5725, in and for

the State of Texas, at the offices of Adams & Graham,

L.L.P., 222 East Van Buren, Harlingen, Texas, pursuant

to the Federal Rules of Civil Procedures.



<u>APPEARANCES</u>

COUNSEL FOR PLAINTIFFS:

    RUBEN PENA
    LAW OFFICE OF RUBEN R. PENA, P.C.
    222 West Harrison Street
    Harlingen, Texas  78550

COUNSEL FOR CITY OF HARLINGEN POLICE DEPARTMENT:

    ROGER W. HUGHES
    ADAMS & GRAHAM, L.L.P.
    222 East Van Buren Street
    West Tower
    Harlingen, Texas  78550

<u>INDEX</u>

|                                        | PAGE |
|----------------------------------------|------|
| Appearances ...........................| 2    |
| RUBEN CONTRERAS, III                    |      |
| Examination by Mr. Pena ...............| 4    |
| Errata Sheet/Signature Page ...........| 50   |
| Reporter's Certificate ................| 51   |

3

## EXHIBITS

| EXHIBIT NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| 1 | Cross-Notice for Deposition of Jorge Salinas ........................ | 10 |
| 2 | Arrest Report ........................ | -- |
| 3 | Drawing by Jorge Salinas ............. | -- |
| 4 | Harlingen Detention Center Intake Screening Form ...................... | -- |
| 5 | Investigator's Report ............... | 23 |
| 6 | Affidavit of Julio Gonzalez .......... | 36 |
| 7 | Affidavit of Norma Parke ............. | 39 |
| 8 | Affidavit of Thomas Hushen ........... | -- |

11:07 1    the jail.  And I always ask the arrestees if they are

11:07 2    aware of why they are in jail, what they are being

11:07 3    charged with, and she advised she did.  And we went to

11:07 4    the CID division and I interviewed her.

11:07 5        Q.  Did you tape-record or videotape the interview?

11:07 6        A.  No, sir.

11:07 7        Q.  Does the Harlingen Police Department not

11:07 8    tape-record interviews or --

11:07 9        A.  No.

11:08 10       Q.  Do you take notes?

11:08 11       A.  Yes, sir.

11:08 12       Q.  Okay.  So what do you recall about your

11:08 13   interview of Ms. Esquivel?

11:08 14       A.  Well, it wasn't very long.  I advised her of

11:08 15   her Miranda warning.  She spoke Spanish so it was read

11:08 16   to her in Spanish.  And, as I recall, she signed,

11:08 17   initialed everything properly.  And I began to question

11:08 18   her as far as the incidents that happened the night

11:08 19   before, you know, what her knowledge was or

11:08 20   participation in that area.

11:08 21       Q.  Okay.  What did she tell you?

11:08 22       A.  She said that she didn't recall being involved

11:08 23   in anything, for the most part.  I just remember her

11:08 24   demeanor.  She was very, very, very nervous, very

11:09 25   nervous.

11:09  1       Q.   Okay.

11:09  2       A.   Evasive in some areas.  When I would ask her,

11:09  3   she wouldn't give me a flat out answer.

11:09  4       Q.   Do you remember some of the questions that she

11:09  5   was being evasive about?

11:09  6       A.   If she knew the identity of the person that had

11:09  7   committed the offense, at which point she said, "Well,

11:09  8   no, I don't know" -- her demeanor, in my experience in

11:09  9   interviewing suspects, led me to believe that she was

11:09 10   trying to conceal something.

11:09 11       Q.   Okay.  What do you think she was trying to

11:09 12   conceal?

11:09 13       A.   Well, at this point in time, obviously the name

11:09 14   of our offender.

11:09 15       Q.   Okay.  You had got -- you mentioned that you

11:09 16   had gotten copies of the report?

11:10 17       A.   Yes, a general copy basically stating what had

11:10 18   happened and what had transpired as far as the arrests

11:10 19   that were made, all the probable cause that led up to

11:10 20   landing this mother and son in custody.

11:10 21       Q.   Did you ever interview the son?

11:10 22       A.   No, he was already gone by the time I arrived

11:10 23   that morning.

11:10 24       Q.   Okay.  Let me show you what has been marked as

11:10 25   Exhibit No. 2.  It's the arrest report.  I'll turn to

11:14  1        A.   At this point, no.

11:14  2        Q.   Did you make any effort to find out where Luis

11:14  3   Ovalle was located?

11:14  4        A.   Okay, now, back to this point I was at earlier.

11:14  5   When we terminated the interview, there was a large

11:14  6   group of family members up front concerned, and I made

11:14  7   contact with them, advised them of the charges, etc.

11:14  8             At this point, I asked if they knew where

11:14  9   Luis Ovalle was.  I was met with a lot of evasiveness.

11:14 10   No one would give me an answer.  No one would give me

11:14 11   an answer.

11:14 12             I asked several of the parishioners that

11:15 13   were there if Luis Ovalle was related somehow here, and

11:15 14   I could not get a concise answer.

11:15 15        Q.   You asked who now?

11:15 16        A.   There was several parishioners from her church

11:15 17   there --

11:15 18        Q.   From her church.

11:15 19        A.   -- concerned about her, a large group.

11:15 20        Q.   How many people were there?

11:15 21        A.   I would say 15 to 20 people.

11:15 22        Q.   Okay.  And who did you ask if they knew Luis

11:15 23   Ovalle?

11:15 24        A.   I asked the group in general.  There was a

11:15 25   female pastor there that I spoke to.

11:15  1      Q.  Okay.  And about what time did this occur?

11:15  2      A.  I'm not sure.  I know that it was after our

11:15  3  interview.

11:15  4      Q.  Okay.  What did you do after you -- how long

11:15  5  did you talk to this group?

11:15  6      A.  I spent approximately 15 to 20 minutes talking

11:16  7  to them trying to determine the location, more

11:16  8  information with reference to Luis Ovalle.

11:16  9      Q.  Okay.  What else did you do?

11:16 10      A.  I spoke to them and just basically asked them

11:16 11  if they had any information, that the best interest of

11:16 12  all concerned was just to let us know.

11:16 13          And, again, there was tremendous

11:16 14  evasiveness.  No one wanted to cooperate.  They said

11:16 15  they did know him, didn't know that much about him,

11:16 16  which again led me to believe they were trying to

11:16 17  conceal something from me.

11:16 18          Approximately 30 minutes after this, I

11:16 19  received a call from a police officer from Mercedes,

11:16 20  Texas.  The police officer informs me that he knows who

11:17 21  committed the offense.

11:17 22          And I said, "You do?"

11:17 23          He said, "Yes.  It's a relative of mine by

11:17 24  marriage by the name of Luis Ovalle."

11:17 25      Q.  Who was the police officer?

BRYANT & STINGLEY, INC.
McAllen        Harlingen       Brownsville
(956)618-2366    (956)428-0755    (956)542-1020

11:17 1    A.   I don't have his name right now.  He called.

11:17 2    Q.   So you got a phone call from a police officer

11:17 3  from Mercedes, Texas telling you, "I know who did it."

11:17 4    A.   Exactly.

11:17 5    Q.   "And he's a relative of mine and his name is

11:17 6  Luis Ovalle."

11:17 7    A.   Yes.

11:17 8    Q.   But you don't know his name?

11:17 9    A.   I can find it.

11:17 10   Q.   Oh, good.  When you find that --

11:17 11   A.   He tells me that he is the son-in-law of a

11:17 12  relative of Luis Ovalle and that the relative lives on

11:17 13  Pierce Street here in Harlingen and that she wants to

11:17 14  speak to me.

11:17 15   Q.   Okay.  All right, so would you get the name of

11:17 16  that police officer to Mr. Hughes for us?

11:17 17   A.   Yes, I will.  I'll try to find it.

11:17 18   Q.   Okay.  So then did you go talk to this

11:17 19  relative?

11:18 20   A.   I made contact at the residence there shortly

11:18 21  thereafter.  The mother-in-law was not there.

11:18 22   Q.   Okay.

11:18 23   A.   I stood by.  They called her via cell phone.

11:18 24  She was en route back to the residence from HEB.  Upon

11:18 25  arriving at the residence, she informed me immediately

11:18 1   that Luis Ovalle is in front of the police department,

11:18 2   at which point I dispatched patrol, "Be advised,

11:18 3   possible suspect is in front of the police department."

11:18 4   I recall her saying he was going to turn himself in.

11:18 5        Q.  Okay.

11:18 6        A.  We made contact there in front of the police

11:18 7   department with several of the parishioners again, and,

11:18 8   again, met with evasiveness.  No one will tell us who

11:18 9   Luis Ovalle is or where he's at.

11:18 10       Q.  So the parishioners are still there?

11:18 11       A.  They are still there.

11:18 12       Q.  Okay.

11:18 13       A.  After I asked for about five or ten minutes,

11:19 14  one of the persons finally admits that he's across the

11:19 15  street at the bail bonds office arranging for bond,

11:19 16  again leading me believe that he's getting his

11:19 17  priorities in order to come and turn himself in.

11:19 18       Q.  Okay.

11:19 19       A.  I made contact with three gentleman at

11:19 20  De Volada Bail Bonds and I ask all three which one is

11:19 21  Luis Ovalle and no one responds.

11:19 22       Q.  Again, being evasive?

11:19 23       A.  Again, being evasive.  I said, "Well, I was

11:19 24  just advised that -- someone from your group advised me

11:19 25  that Luis Ovalle is here.  Which one of you is Luis

11:19  1    Ovalle?"

11:19  2                One of the gentleman says, "Well, there's

11:19  3    more than one."

11:19  4                I'm like, "Okay."

11:19  5        Q.   More than one Luis Ovalle?

11:19  6        A.   Yes, more than one Luis Ovalle, again being

11:19  7    evasive.

11:19  8        Q.   Okay.

11:19  9        A.   I said, "Well, the Luis Ovalle I'm looking for

11:19 10    fits this description," etc.  And I said, "Which Luis

11:20 11    Ovalle are you referring to?"

11:20 12                And he said, "Well, this one is like 16

      13    years old."

11:20 14                And I said, "Well, that's not the one I

11:20 15    would be looking for."

11:20 16                And then, finally, the older gentleman

11:20 17    says, "I'm Luis Ovalle."

11:20 18        Q.   Okay.

11:20 19        A.   He finally identifies himself.  I say, "Okay."

11:20 20    We didn't make an arrest at this point because too much

11:20 21    time had elapsed.  We had to draw up a warrant,

11:20 22    obviously, so all we did at this point was field

11:20 23    interrogate him.

11:20 24        Q.   Wait a minute.  You finally find Luis Ovalle.

11:20 25    You had my client in custody.  You knew that this guy

11:20  1    was the suspect, but you didn't arrest him?

11:20  2       A.  We needed a warrant, sir.  Too much time had

11:20  3    elapsed since the offense.  We needed to draw up a

11:20  4    warrant.

11:20  5       Q.  Okay.  So you needed a warrant.  Did you go get

11:21  6    one?

11:21  7       A.  At this point, I made contact, again, with the

11:21  8    officer from Mercedes and advised him if he could meet

11:21  9    me at the police department.

11:21 10       Q.  Why would you need him at the police

11:21 11    department?

11:21 12       A.  Because he could positively identify

11:21 13    Mr. Ovalle.

11:21 14       Q.  Well, you had someone who admitted he was

11:21 15    Luis Ovalle, correct?

11:21 16       A.  Yes, sir.

11:21 17       Q.  Why would you need someone else?

11:21 18       A.  With the evasiveness I had met the entire

11:21 19    morning in contact with all these people, I wanted to

11:21 20    make sure that I had who I was looking for.  And the

11:21 21    gentleman who was a sworn police officer in Mercedes,

11:21 22    Texas advised me he could positively identify Luis

11:21 23    Ovalle.

11:21 24       Q.  Okay.

11:21 25       A.  So we make contact at the Harlingen Police

11:21 1    Department and we go review the tapes.

11:21 2        Q.   Why are you going to review the tapes?

11:21 3        A.   Because we have the perpetrator committing the

11:21 4    offense on the tape.

11:22 5        Q.   Okay.   That's when you find out it ain't Luis

11:22 6    Ovalle?

11:22 7        A.   Upon reviewing the tapes, we review it, and the

11:22 8    gentleman that commits the offense standing next to the

11:22 9    young boy is in fact not Luis Ovalle.

11:22 10       Q.   Okay.   Where is Luis Ovalle now when you're

11:22 11   reviewing this tape?

11:22 12       A.   When I'm reviewing it, Luis Ovalle is up front

11:22 13   in the police station.

11:22 14       Q.   Not running from you?

11:22 15       A.   No, he's not.

11:22 16       Q.   Did you ask Luis Ovalle when you finally met

11:22 17   him, "Did you commit the robbery?"

11:22 18       A.   No, sir, I didn't ask him anything like that.

11:22 19   He hadn't been charged with anything like that.

11:22 20       Q.   Did you tell him, "I've been looking for you

11:22 21   because you have been suspected of committing a

11:22 22   robbery"?

11:22 23       A.   I don't recall telling him anything like that.

11:22 24       Q.   Did you ask him to voluntarily accompany you so

11:22 25   that you could go in and check out his story, whether

11:22 1    or not he had committed the robbery or not?

11:22 2        A.   We didn't do any type of interview at that

11:23 3    point because he was a suspect.

11:23 4        Q.   Well, you certainly could have interviewed him.

11:23 5    All you had to do is give him his Miranda warnings,

11:23 6    correct?

11:23 7        A.   Well, he hadn't been charged with anything.

11:23 8        Q.   You still could have interviewed him?

11:23 9        A.   We chose not to.

11:23 10       Q.   I'm sorry?

11:23 11       A.   I believe we chose not to.

11:23 12       Q.   You chose not to?

11:23 13       A.   At this point.

11:23 14       Q.   All right.  So now you're at the police

11:23 15   department, you're reviewing the videotape with this

11:23 16   unknown police officer whose name you can't remember

11:23 17   from Mercedes who volunteered and, lo and behold, it's

11:23 18   not Luis Ovalle?

11:23 19       A.   That's right.

11:23 20       Q.   So what do you do now?

11:23 21       A.   At this point I informed Sergeant Means that

11:23 22   it's possible now, upon getting positive identification

11:23 23   on Luis Ovalle, that this family here may not be the

11:23 24   people we're looking for.

11:23 25       Q.   What did you do next?

11:48  1    paragraph.

11:48  2        A.  What specifically?

11:48  3        Q.  Tell me how you came up with the six

11:48  4    photographs to show Mr. Gonzalez.

11:48  5        A.  Okay.  Detective Gomez had generated a

11:48  6    possibility of a suspect in Joe Wayne Galipp at which

11:48  7    point, having his address in close proximity to the

11:48  8    scene of the first offense, we generate a six-person

11:49  9    lineup that closely resemble the suspect so that it's

11:49 10    not obviously biased in one way or another, try to make

11:49 11    it as neutral as possible, so that all suspects look

11:49 12    relatively closely the same.

11:49 13        Q.  Was Luis Ovalle's photograph in that six-person

11:49 14    lineup?

11:49 15        A.  To my knowledge, no, sir.

11:49 16        Q.  And Mr. Gonzalez positively identified

11:49 17    Mr. Galipp; is that correct?

11:49 18        A.  Yes, sir.

11:49 19        Q.  Now, on the day that you took this statement,

11:49 20    May the 18th, was Ms. Esquivel still in jail?

11:49 21        A.  To my knowledge, no, sir.

11:50 22        Q.  Okay.  Do you know when she got released?

11:50 23        A.  Around noon.

11:50 24        Q.  Noon the following day, the 18th?

11:50 25        A.  The 18th.  She was arrested Saturday night so

11:50 1    that morning around noonish, I believe, she was --

11:50 2        Q.  Tell me how it was determined she was going to

11:50 3    get released?

11:50 4        A.  Sergeant Means handled that aspect of it.

11:50 5        Q.  Okay.

11:50 6        A.  Upon identifying, or lack thereof, of a suspect

11:50 7    on behalf of the Mercedes officer, okay, Sergeant Means

11:50 8    handled it from there on in that respect, and I went on

11:50 9    with my investigation.

11:50 10       Q.  And although you told me that you don't recall

11:50 11   having interviewed Norma Parke, let me show you Exhibit

11:50 12   No. 7.  It's a copy of another statement, sworn

11:51 13   statement, that apparently you took from Norma Parke,

11:51 14   correct?

11:51 15       A.  Yes, sir, it is.

11:51 16       Q.  Do you remember that now?

11:51 17       A.  For some reason, I thought Sergeant Means had

11:51 18   taken this statement.

11:51 19       Q.  Okay.  That's your signature at the bottom,

11:51 20   isn't it?

11:51 21       A.  Yes, sir, it is.

11:51 22       Q.  And you don't execute someone's -- you don't

11:52 23   notarize someone's signature unless they are in front

11:52 24   of you, do you?

11:52 25       A.  For the most part.

11:52  1    Q.  Oh, okay.  So there are occasions when you

11:52  2  could?

11:52  3    A.  There are occasions when we'll get officer's

11:52  4  statements from the night before.

11:52  5    Q.  Will you do that with a witness?  Have you ever

11:52  6  done that with a witness?

11:52  7    A.  No, sir.

11:52  8    Q.  Now, let me direct your attention down to the

11:52  9  last paragraph.  Do you recall showing Norma Parke the

11:52 10  videotape of the robbery?

11:52 11    A.  No, sir, I don't.

11:52 12    Q.  See that last paragraph, the last couple of

11:52 13  sentences, it starts out, "I then watched the video and

11:52 14  saw that he did not walk past my door, but it looked

11:52 15  like he walked out of the store to the right."  Do you

11:53 16  see where it says that?

11:53 17    A.  Yes, sir.

11:53 18    Q.  Then it says, "I now know that he did not walk

11:53 19  past my door but I'm sure I saw him get inside the Ford

11:53 20  Explorer."

11:53 21    A.  Yes.

11:53 22    Q.  And then she goes on saying, "I had three beers

11:53 23  to drink that night and I was feeling 'buzzed' at the

11:53 24  time that I witnessed the robbery."

11:53 25    A.  Sir, I don't recollect that.  My recollection

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

```
ORELIA ESQUIVEL,           )(
INDIVIDUALLY AND A/N/F      )(
JESUS ESQUIVEL, JR.         )(
        Plaintiffs          )(
                            )(
VS.                         )(CIVAL ACTION NO. B-03-104
                            )(
SSP PARTNERS & CITY OF      )(
HARLINGEN POLICE DEPARTMENT )(
        Defendants          )(
```

_____

ORAL AND VIDEOTAPED DEPOSITION OF
DAVID MEANS
MARCH 9, 2004

_____


ORAL AND VIDEOTAPED DEPOSITION OF DAVID MEANS,

produced as a witness at the instance of the

PLAINTIFFS, taken in the above styled and numbered

cause on MARCH 9, 2004, reported by SHELLEY STINGLEY,

Certified Court Reporter No. 5725, in and for the State

of Texas, at the offices of Adams & Graham, L.L.P., 222

East Van Buren, Harlingen, Texas, pursuant to the

Federal Rules of Civil Procedures.



<u>APPEARANCES</u>

COUNSEL FOR PLAINTIFFS:

    RUBEN PENA
    LAW OFFICE OF RUBEN R. PENA, P.C.
    222 West Harrison Street
    Harlingen, Texas  78550

COUNSEL FOR CITY OF HARLINGEN POLICE DEPARTMENT:

    ROGER W. HUGHES
    ADAMS & GRAHAM, L.L.P.
    222 East Van Buren Street
    West Tower
    Harlingen, Texas  78550

<u>INDEX</u>

|  | PAGE |
|---|---|
| Appearances ................................... | 2 |
| <u>DAVID MEANS</u> | |
| Examination by Mr. Pena ...................... | 4 |
| Errata Sheet/Signature Page ................... | 21 |
| Reporter's Certificate ........................ | 22 |

3

## EXHIBITS

| EXHIBIT NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| 1 | Cross-Notice for Deposition of Jorge Salinas ......................... | -- |
| 2 | Arrest Report ......................... | 5 |
| 3 | Drawing by Jorge Salinas .............. | -- |
| 4 | Harlingen Detention Center Intake Screening Form ....................... | -- |
| 5 | Investigator's Report ................. | -- |
| 6 | Affidavit of Julio Gonzalez ........... | -- |
| 7 | Affidavit of Norma Parke .............. | 17 |
| 8 | Affidavit of Thomas Hushen ............ | 10 |

12:11  1    Q.  Do you recognize that?

12:11  2    A.  I do.

12:11  3    Q.  Do you recognize the handwriting on the front,

12:11  4  sir?

12:11  5    A.  Yes, sir.

12:11  6    Q.  Whose is that?

12:11  7    A.  That's mine.

12:11  8    Q.  Okay.

12:11  9    A.  Part of it is mine.

12:11 10    Q.  Okay.  Tell me which part is yours.

12:11 11    A.  "Released after investigation, D Means,

12:11 12  May 18, '03, 1:00 p.m."

12:11 13    Q.  Okay.  What is the significant of that in this

12:11 14  particular case?

12:11 15    A.  After reviewing the evidence the morning after

12:11 16  the arrest of Ms. Esquivel and her son, I decided at

12:11 17  the time the prudent thing to do would be to release

12:11 18  them pending further investigation.

12:11 19    Q.  Okay.  When did you first come to familiarize

12:11 20  yourself with this particular case, Mr. Means?

12:11 21    A.  Probably 8:00 that morning.  It's standard that

12:12 22  when we come in, "we" being detectives, review jail

12:12 23  cards and who is in jail and for what, that it's an

12:12 24  aggravated robbery, that it's something we need to pay

12:12 25  attention to and look at.  Probably first thing that

12:12  1    morning, which was, I guess, the 18th.

12:12  2        Q.  The 18th?

12:12  3        A.  Yes.

12:12  4        Q.  Okay.  Can you tell the members of the jury

12:12  5    what you did in terms of the investigation of this

12:12  6    particular case?

12:12  7        A.  Of course.  What I remember is the family --

12:12  8    several family members for Ms. Esquivel were up front

12:12  9    inquiring as to the arrest and what it was for.

12:12 10            I had my investigators looking at all the

12:12 11    reports because one of our jobs is to complete a

12:12 12    probable cause affidavit and a complaint for the judge

12:12 13    to arraign people in the morning.  So they were

12:13 14    investigating their case.

12:13 15        Q.  Okay.

12:13 16        A.  Do you want me to keep going?

12:13 17        Q.  Yeah, go ahead.

12:13 18        A.  I remember Detective Contreras interviewing

12:13 19    Ms. Esquivel.  She denied any involvement in the

12:13 20    robbery.  The patrol officers that responded to the

12:13 21    call and conducted the investigation the night before

12:13 22    or the morning of the 18th arrested Ms. Esquivel and

12:13 23    her son based on information they gathered after the

12:13 24    robbery.  And part of that information was a statement

12:13 25    indicating -- from the juvenile that was arrested --

| | | |
|---|---|---|
| 12:27 | 1 | making statements that were inconsistent with her being |
| 12:27 | 2 | innocent? |
| 12:27 | 3 | A.  I don't recall. |
| 12:27 | 4 | Q.  Do you know why Lieutenant Hushen is no longer |
| 12:27 | 5 | with the police department? |
| 12:27 | 6 | A.  He took a position with the -- he resigned.  He |
| 12:27 | 7 | took a position with Cameron County, I believe. |
| 12:27 | 8 | Q.  Okay.  Did you ever talk to any of the |
| 12:27 | 9 | witnesses in the robbery of the Circle K on Filmore and |
| 12:27 | 10 | Commerce Street? |
| 12:27 | 11 | A.  Yes, sir. |
| 12:27 | 12 | Q.  Which ones? |
| 12:27 | 13 | A.  That I remember off the top of my head, |
| 12:27 | 14 | Ms. Parke, who was the reported eyewitness -- |
| 12:27 | 15 | Q.  Okay. |
| 12:27 | 16 | A.  -- to the bad guy getting in the Esquivel |
| 12:27 | 17 | vehicle.  I interviewed her.  I took her statement, I |
| 12:28 | 18 | believe. |
| 12:28 | 19 | Q.  All right.  Let me show you Exhibit No. 7.  Is |
| 12:28 | 20 | that her statement? |
| 12:28 | 21 | A.  Yes, sir. |
| 12:28 | 22 | Q.  Is that the statement that you took from her? |
| 12:28 | 23 | A.  Yes, sir, I believe it is, yes.  It looks |
| 12:28 | 24 | familiar. |
| 12:28 | 25 | Q.  Where did you take that statement? |

12:28  1      A.  I remember Ms. Parke coming into my office.  On

12:28  2  my desk, I had a picture of the robber.  There, she

12:28  3  immediately said, "That's the guy."

12:28  4              From there, I took her next door to the

12:28  5  interview room -- backing up, in my office, I asked her

12:29  6  what happened.  She told me what happened in a

12:29  7  nutshell, the same as in this statement.

12:29  8              I took her to the interview room, showed

12:29  9  her a videotape of the robbery, to review it, refresh

12:29 10  her memory.  And then I believe I sat her back down at

12:29 11  my desk, where I would have taken her statement.  What

12:29 12  I don't understand from here is that I didn't notarize

12:29 13  it.  I would have notarized it.

12:29 14      Q.  Yeah, because Officer Contreras, when I asked

12:29 15  him, said that he did not recall taking her statement

12:29 16  but that he did in fact notarize it.

12:29 17      A.  And I would have printed it out and notarized

12:29 18  it and given it to him.  If I didn't, he may have

12:29 19  printed it out to have her sign it.  I don't recall.

12:29 20  But, yes, I interviewed her.

12:29 21      Q.  All right.  Who else did you interview?

12:30 22      A.  I don't remember interviewing anyone else.

12:30 23      Q.  Okay.  She would have been the only one?  Okay,

12:30 24  can I have that back for just a second?

12:30 25              And do you recall this statement -- I

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ORELIA ESQUIVEL,              ) (
INDIVIDUALLY AND A/N/F        ) (
JESUS ESQUIVEL, JR.           ) (
        Plaintiffs            ) (
                              ) (
VS.                           ) (CIVAL ACTION NO. B-03-104
                              ) (
SSP PARTNERS & CITY OF        ) (
HARLINGEN POLICE DEPARTMENT   ) (
        Defendants            ) (

---

ORAL DEPOSITION OF
THOMAS HUSHEN
MARCH 17, 2004

---

     ORAL DEPOSITION OF THOMAS HUSHEN, produced as a witness at the instance of the PLAINTIFFS, taken in the above styled and numbered cause on MARCH 17, 2004, reported by SHELLEY STINGLEY, Certified Court Reporter No. 5725, in and for the State of Texas, at the offices of Adams & Graham, L.L.P., 222 East Van Buren, Harlingen, Texas, pursuant to the Federal Rules of Civil Procedures.



2

## APPEARANCES

COUNSEL FOR PLAINTIFFS:

    RUBEN PENA
    LAW OFFICE OF RUBEN R. PENA, P.C.
    222 West Harrison Street
    Harlingen, Texas  78550

COUNSEL FOR CITY OF HARLINGEN POLICE DEPARTMENT:

    ROGER W. HUGHES
    ADAMS & GRAHAM, L.L.P.
    222 East Van Buren Street
    West Tower
    Harlingen, Texas  78550

## INDEX

| | PAGE |
|---|---|
| Appearances ................................... | 2 |

THOMAS HUSHEN

| | |
|---|---|
| Examination by Mr. Pena ....................... | 3 |
| Examination by Mr. Hughes ..................... | 31 |
| Examination by Mr. Pena ....................... | 31 |
| Errata Sheet/Signature Page ................... | 33 |
| Reporter's Certificate ....................... | 34 |

## EXHIBITS

| EXHIBIT NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| 1 | Affidavit of Thomas Hushen (Signed).... | 9 |
| 2 | Affidavit of Thomas Hushen (Unsigned) | 9 |

1
2                          THOMAS HUSHEN,
3    having been duly sworn, testified as follows:
4                          EXAMINATION
09:10  5    BY MR. PENA:
09:10  6        Q.  Would you tell us your name for the record,
09:10  7    please?
09:10  8        A.  Thomas Hushen.
09:10  9        Q.  And, Mr. Hushen, what do you do for a living?
09:10 10        A.  Right now I'm the chief emergency officer for
09:10 11    Cameron County.
09:10 12        Q.  And how long have you been the chief emergency
09:10 13    officer for Cameron County?
09:10 14        A.  Since October.
09:10 15        Q.  October 2003?
09:10 16        A.  Yes.
09:10 17        Q.  Prior to that, were you employed by the
09:10 18    Harlingen Police Department?
09:10 19        A.  Yes.
09:10 20        Q.  And how long were you employed by them?
09:10 21        A.  15 years.
09:10 22        Q.  What was the highest rank you obtained in
09:10 23    Harlingen PD?
09:10 24        A.  Lieutenant.
09:10 25        Q.  And have you ever had your deposition taken

09:23 1    Q.   Okay.  All right, so do you recall who Officer

09:23 2    Salinas was with?

09:23 3    A.   Salinas was with the mother.

09:23 4    Q.   Okay.  And the other officer was with the son?

09:23 5    A.   Yes.

09:23 6    Q.   Okay.  When you arrived, were they handcuffed?

09:23 7    A.   No.

09:23 8    Q.   Okay.  At the time that you were there did you

09:23 9    witness them being handcuffed or not?

09:23 10   A.   While I was there?

09:23 11   Q.   Yes.

09:23 12   A.   When I told them to make the arrest.

09:23 13   Q.   Okay.  So you told them to make the arrest

09:23 14   while you were present?

09:23 15   A.   No.

09:23 16   Q.   No?

09:23 17   A.   No, I'm sorry.  I take that back.  I did tell

09:24 18   them to make the arrest from the radio.

09:24 19   Q.   Well, where were you?

09:24 20   A.   I went back to the Circle K to get the hundred

09:24 21   percent sure from the witness.

09:24 22   Q.   All right, so let me see if I understand this.

09:24 23   So you arrived --

09:24 24   A.   Okay, hold on.  Let me remember correctly.

09:24 25   Q.   Okay.

09:24  1    A.  Because it is a while back.  I can't remember

09:24  2  if they handcuffed them while I was there.  I did tell

09:24  3  them, "Detain them.  I will be right back."  And I went

09:24  4  back to the Circle K.

09:24  5    Q.  How long did it take you to get to the

09:24  6  Circle K?

09:24  7    A.  Oh, a couple of minutes.  It's right down the

09:24  8  street.

09:24  9    Q.  Exactly.  We're talking a few blocks from the

09:24 10  stop to the Circle K, correct?

09:24 11    A.  Uh-huh.

09:24 12    Q.  Did you interrogate Mrs. Esquivel?

09:24 13    A.  I asked her some questions.

09:24 14    Q.  What kinds of questions did you ask?  You can

09:24 15  look at the statement.

09:24 16    A.  Thank you.  I asked her if she was all right

09:24 17  and what happened at the Circle K.  She advised that

09:25 18  nothing happened, that she was only getting gas.  Then

09:25 19  I went and spoke to the passenger.

09:25 20    Q.  You went and spoke to the son?

09:25 21    A.  Yes.

09:25 22    Q.  Other than asking her if she was all right and

09:25 23  what happened at the Circle K, do you recall asking her

09:25 24  anything else?

09:25 25    A.  I don't recall asking her anything else.

09:25 1    Q.   Why would you ask her if she was all right?

09:25 2    A.   There was a robbery.  Her vehicle was seen.  I

09:25 3  don't know what happened to her.  I don't know if she

09:25 4  was a victim or if she was involved.  I want to make

09:25 5  sure she was all right and that's usually the question

09:25 6  I ask everybody, making sure they are all right and are

09:25 7  safe.

09:25 8    Q.   All right.  So then you went over and talked to

09:25 9  her son, right?

09:25 10    A.   Yes.

09:25 11    Q.   And what happened then?

09:25 12    A.   I asked him if he was all right and if they had

09:25 13  given a ride to anyone.

09:25 14    Q.   And what did he say?

09:25 15    A.   He said no.

09:25 16    Q.   Okay.  And anything else that you recall?

09:25 17    A.   Yes, I informed them of what happened at the

09:25 18  Circle K and that witnesses had seen a suspect enter

09:25 19  their car and if he had seen anything, and then of

09:26 20  course I asked if they were threatened or anything like

09:26 21  that because at that moment in time I didn't know what

09:26 22  was going on.  They could have been threatened.

09:26 23              He then advised me that it was his uncle

09:26 24  Luis Ovalle that was with them -- or was there in the

09:26 25  Circle K and that he had done the robbery.

09:30 1   the truth.

09:30 2     Q.  So you weren't surprised then when it didn't

09:30 3   turn out to be Luis Ovalle that committed the robbery?

09:30 4     A.  No, I was surprised.

09:30 5     Q.  You were surprised?

09:30 6     A.  Uh-huh.

09:30 7     Q.  Okay.  Now, let's go to your statement and in

09:30 8   kind of the middle of the page, let's go there.  Now,

09:30 9   apparently, when you told, I guess, Jesus that you had

09:31 10   information that someone had entered the car, that a

09:31 11   witness had seen the suspect enter the car, and you

09:31 12   asked if he had seen anything and that's when he -- you

09:31 13   asked if he had been threatened to give a ride or

09:31 14   something.

09:31 15     A.  Right.

09:31 16     Q.  And then you state, "Jesus then advised that

09:31 17   his uncle Luis Ovalle was the one in Circle K that had

09:31 18   done the robbery, but he was not involved," right?

09:31 19     A.  Right.

09:31 20     Q.  Okay.  Was that close to what his actual words

09:31 21   were?

09:31 22     A.  Pretty close.

09:31 23     Q.  Then you said, "I terminated the interview and

09:31 24   drove back to the Circle K to interview the witness."

09:31 25     A.  Right.

09:31 1    Q.   Norma Parke.   Okay, and "I asked her if she was

09:31 2    a hundred percent sure that she saw the suspect,"

09:31 3    correct?

09:31 4    A.   Uh-huh.

09:31 5    Q.   Correct?

09:31 6    A.   Yes.

09:31 7    Q.   So you talked to Norma Parke?

09:31 8    A.   Yes, I did.

09:31 9    Q.   When you interviewed her, where did you

09:31 10   interview her?

09:31 11   A.   Right in front of the doors of the Circle K.

09:31 12   She was sitting in her vehicle.

09:31 13   Q.   And when you interviewed her, was she in her

09:32 14   vehicle?

09:32 15   A.   Yes.

09:32 16   Q.   Okay, you didn't ask her to step out or go

09:32 17   somewhere else?

09:32 18   A.   No.

09:32 19   Q.   Okay.   What do you remember about Norma Parke?

09:32 20   A.   I remember the location where she was sitting

09:32 21   and I remember saying that that was a perfect viewpoint

09:32 22   to see what was going on in there.

09:32 23        I asked her if she was sure of what she

09:32 24   had seen.   She explained it to me one more time, what

09:32 25   she had seen, and that she saw the suspect get into the

09:32  1    vehicle and then drive off.

09:32  2         Q.  Anything else you remember about it?

09:32  3         A.  No, not really.

09:32  4         Q.  Okay.  Did you smell any alcohol on her breath?

09:32  5         A.  No.

09:32  6         Q.  None?

09:32  7         A.  Huh-uh.

09:32  8         Q.  Do you remember seeing her statement where she

09:32  9    said that she and her friend were buzzed?

09:32 10         A.  No.

09:32 11         Q.  Okay.  You didn't see that statement?

09:32 12         A.  No.

09:32 13         Q.  Okay.  Did you see the beer cans in the car

09:32 14    that they had just bought a short time before the --

09:32 15    or, actually, a short time right after the robbery?

09:33 16         A.  No.

09:33 17         Q.  All right, now, after you spoke to Norma Parke,

09:33 18    you note here that she described him, right?

09:33 19         A.  Right.

09:33 20         Q.  All right.  And then, after that, you looked at

09:33 21    the surveillance tape, correct?

09:33 22         A.  Yes.

09:33 23         Q.  And did the surveillance tape match the

09:33 24    description that she gave?

09:33 25         A.  Yes.

24

09:33 1    Q.  And you sent that out in this particular -- in

09:33 2  this statement that you made, correct?

09:33 3    A.  Yes.

09:33 4    Q.  And then you said you advised to arrest the two

09:33 5  subjects in the Explorer?

09:33 6    A.  Right.

09:33 7    Q.  Because, at that point, the story that Norma

09:33 8  Parke was giving you matched with the description of

09:33 9  the suspect, correct?

09:33 10    A.  Uh-huh.

09:33 11    Q.  All right.  The next statement that you have

09:34 12  there is that you checked the vehicle and you found a

09:34 13  Jack-In-The-Box bag and that it contained three

09:34 14  hamburgers.

09:34 15    A.  Right.

09:34 16    Q.  Did that confirm your suspicion that there were

09:34 17  three people in the vehicle?

09:34 18    A.  No.

09:34 19    Q.  Just confirmed that there were three

09:34 20  hamburgers?

09:34 21    A.  That there were three hamburgers.

09:34 22    Q.  And then, "The receipt stated that they were

09:34 23  purchased at 10:23"?

09:34 24    A.  Yes.

09:34 25    Q.  You then contacted management at

09:34  1    Jack-In-The-Box, right?

09:34  2        A.   Right.

09:34  3        Q.   Did you go over there yourself?

09:34  4        A.   Yes.

09:34  5        Q.   You spoke to Lori Trevino?

09:34  6        A.   I spoke to the manager who gave me the name of

09:34  7    the person that was there, home phone number, called

09:34  8    her up and asked her.

09:34  9        Q.   And she remembered the vehicle?

09:34  10       A.   Yes.

09:34  11       Q.   And she told you that she remembered that there

09:34  12   were three individuals in the vehicle, correct?

09:34  13       A.   Yes.

09:34  14       Q.   Is that correct?

09:34  15       A.   Yes.

09:34  16       Q.   Did you ever get a written statement from Lori

09:35  17   Trevino?

09:35  18       A.   No.

09:35  19       Q.   Is there any particular reason why we didn't do

09:35  20   that?

09:35  21       A.   I don't know what the investigators did after

09:35  22   that after I gave them the information.

09:35  23       Q.   All right.  What else did you have to do with

09:35  24   the investigation of this particular case?

09:35  25       A.   Just checked over the reports, did our

STATE OF TEXAS
COUNTY OF CAMERON



EXHIBIT NO. 6
Shelley Stingley

03-06105

BEFORE ME, the undersigned authority, a notary public in and for Cameron County, Texas on this day personally appeared __JULIO GONZALEZ, 02-05-83__ who, after by being duly sworn did depose and say:

I have been informed that under the Penal Code of the State of Texas, Section 37.02: A person commits the offense of perjury if, he makes a false statement under oath or swears to the truth of a false statement previously made; and the statement is required or authorized by law to be made under oath.

My name is Julio Gonzalez and I am 20 years old. I currently reside in Mexico and travel back and forth to work every day. I can be reached through a friend named Yolanda Rosenbaum at 956-548-9039.

On Saturday night I was on my shift at the Circle-K located at 705 S. Commerce. I was working from 3:00 PM to 11:00 PM. It was about 10:30 PM and the store was pretty busy. I remember a regular customer that came in and went about his business in the store. I do not know his name, but he is a regular customer. When he came in I "saluted" him or greeted him, as that is our store policy. I went about my work and this same customer came up to the counter area and was just standing there. I did not give it much thought because this particular customer always comes in and walks around for a while or goes to the rest room. He even came in earlier on my shift and used the restroom. While he was standing there he was by the lighters just standing there. I noticed that he was letting people go ahead of him, like he was waiting for people to leave. When he was the last one, he then asked me something and I could not really understand what he was saying. I understood something about Circle-K lighters and I responded. He kept looking at the lighters and I told him the ones that were there were all that we had left and I told him the price. He murmured something and he stepped in front of the counter and placed both of his hands upon the counter. I saw that he had a lighter in his right hand, so I took it out from under his hand and scanned it and put the lighter on the counter. At this point he stated," Give me the money!" I was surprised by what he said, because I was thinking, he was supposed to give me some money. At this point, he stated, " Open the register and give me the money!" I guess I must have just been looking at him because I was confused by what he was saying. I still did not realize what was happening. At this point he raised his shirt up above his waist and said," Get it!" I then looked at what he was revealing and I saw a gun. I could tell it was some type of gun. I then realized what he was doing. He then said to me, " Open the register and put the money in a paper bag!" I opened the register and got a paper bag and started putting the money into the bag. While I was doing this, he

SWORN AND SUBSCRIBED TO BEFORE ME, on this __18__ day of __MAY__ __2003_

_Julio Gonzalez_

Notary Public in and for Cameron County Texas
__RUBEN CONTRERAS III   02-04-06__
Name                              Commission Expires

RUBEN CONTRERAS, III
MY COMMISSION EXPIRES
February 4, 2006

raised his voice and said," Hurry up!" I kept putting the money into the bag and then I handed it to him. At this point, he took the bag from me and exited the store and walked to the south end of the building towards Filmore St. I then called police and reported what had happened.

On Sunday, 05-18-03, I made contact with Detective R. Contreras III of the Harlingen Police Department to provide this statement. During my time with Detective Contreras, he provided me with a six-person line up. He explained to me that the suspect may or may not be within the line-up. Upon viewing the line-up, I know that the man in position #4 is the man who robbed me last night. I mentioned earlier that this man is a regular customer and I see him on a very regular basis.

This is the truth to the best of my knowledge.



RUBEN CONTRERAS, III
MY COMMISSION EXPIRES
February 4, 2006

SWORN AND SUBSCRIBED TO BEFORE ME, on this __18__ day of ___MAY___2003_

Notary Public in and for Cameron County Texas
___RUBEN CONTRERAS III    02-04-06___
Name                        Commission Expires

STATE OF TEXAS
COUNTY OF CAMERON

**BEFORE ME, the undersigned authority, a notary public in and for Cameron County, Texas on this day personally appeared  Norma Parke  who, after by being duly sworn did depose and say:**

My name is Norma Parke and my date of birth is 4-23-73. I live at 514 S. "A" St. in Harlingen, TX. My home phone number is 789-5746. I am currently unemployed.

On Monday night, May 17, 2003, I was at home with my neighbor, Aida Velasco. We wanted to go to the Circle K and buy some more beer. My neighbor drove my Jeep and I rode in the passenger side. We pulled into the Circle K on Fillmore and Commerce Street. We parked in front of the front door to the store. My neighbor went inside the store and I stayed in the Jeep. From where I was sitting, I saw a guy at the counter wearing shorts and T-shirt and a baseball cap. I saw the guy in the shorts kind of lean over and then the clerk handed him a paper bag. The guy with the shorts then walked out of the store and I saw him fixing his shirt and I saw that he had a black gun underneath his shirt. I remembered him walking past my door and getting inside a white Ford Explorer that was parked at the gas pumps. My neighbor then came outside and said that someone had just robbed the store asked if I saw the guy. I asked if it was the guy wearing the T-shirt, shorts and a cap and she said yes. I asked where he was and I told her that he left in the Explorer. My neighbor then went back in the store and came outside again and that's when I memorized the license plates of the white Explorer as it left the parking lot. The Explorer peeled out as it drove off on Fillmore St.

I was asked to come to the Harlingen Police Station by Sgt. Means regarding this incident. When I came into his office, I saw a picture on his desk which I immediately recognized as the one who I saw leave the store with the paper bag. I have signed the picture and dated it. When I first spoke to Sgt. Means he asked what I saw and I remembered the man walking past my door and getting inside the Ford Explorer. I then watched the video and saw that he did not walk past my door, but it looked like he walked out of store to the right. I now know that he did not walk past my door but I'm sure I saw him get inside the Ford Explorer. I had three beers to drink that night and I was feeling "buzzed" at the time that I witnessed the robbery.

RUBEN CONTRERAS, III
MY COMMISSION EXPIRES
February 4, 2006

EXHIBIT NO. 7
Shelley Stingley

SWORN AND SUBSCRIBED TO BEFORE ME, on this  18  day of  may  20 03

Notary Public in and for Cameron County Texas

Ruben Contreras III        Feb 4, 2006

**Name (printed or typed)    Commission Expires**