**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

United States District Court
Southern District of Texas
FILED

MAY 1 ? 2004

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| ORELIA ESQUIVEL, INDIVIDUALLY | § | |
| AND A/N/F JESUS ESQUIVEL, JR. | § | |
| | § | |
| VS. | § | Civil Action No. B-03-104 |
| | § | |
| CIRCLE K. STORES AND CITY OF | § | |
| HARLINGEN POLICE DEPARTMENT, | § | |

---

**PLAINTIFFS' RESPONSE TO THE DEFENDANT**
**CITY OF HARLINGEN'S MOTION FOR SUMMARY JUDGMENT**

---

NOW COME, **PLAINTIFFS, ORELIA ESQUIVEL, INDIVIDUALLY AND A/N/F JESUS ESQUIVEL, JR.** and file this their response to the Defendant City of Harlingen's Motion for Summary Judgment and would respectfully show the Court as follows:

### I. BACKGROUND OF THE CASE

On May 17, 2003 at approximately between the hours of 10:00 and 10:15 p.m. Plaintiffs arrived at the Circle K store located on Commerce and Filmore in Harlingen, Texas. Mrs. Esquivel needed gas for her Explorer and sent her son to pay for the gas. When inside the store, the attendant informed Jesus Esquivel that the pump his mother had pulled up to was not working. Jesus exited the store and informed his mother to reposition the vehicle, he then pumped the gas, and returned to the store and paid for the gas and a soft drink. Immediately upon his exit, one Joseph Wayne Gallipp exhibited a gun and robbed the store. He exited the store and fled the scene.

Upon the perpetrator's exit, the clerk, Julio Gonzalez, called the police. He gave a description of the suspect, whom he stated among other things was "white" and who left on foot. (Exhibit 1 @22:24:52 -22:25:22) Rather, the Defendant relies on the questionable testimony of one Norma Parke, an officious witness who was purchasing beer at the time of the robbery and who later

admitted to being "buzzed" and in error  (Exhibit 3- Parke affidavit) Parke  is the Defendant's principal source of corroboration that the Plaintiffs were involved in the crime.

Plaintiffs were unaware of the robbery and left the scene and went to a Jack in the Box restaurant and purchased 3 burgers at 10:23 p.m.  The Harlingen Police department acting upon unreliable witnesses stopped and arrested the Plaintiffs at approximately 10:49 p.m.on May 17, 2003.

At approximately 3:20 a.m. on May 18, 2003, the same individual, Joseph Wayne Gallipp, robbed a second Circle K store on Morgan Blvd. in Harlingen, Texas.   Plaintiffs were detained for approximately 12 hours, after which they were completely exonerated and released.

**A.    Plaintiffs' Claims**

Plaintiffs are claiming violation of their Fourth Amendment rights to be free from unreasonable seizures.  Plaintiffs will show that the arrests made by the City of Harlingen Police Department were without probable cause, or that at least a genuine issue of material fact exists which precludes summary judgment.

**B.    The Circle K Robbery**

**1. The video tape:**

Defendant is in error when it states that the events which gave rise to this unlawful arrest occurred on June 17, 2033.  The events occurred on May 17, 2003 as noted in various reports attached.

Jesus Esquivel and his mother left their home to go purchase hamburgers at the Jack in the Box on Tyler and 77 Sunshine in Harlingen, Texas.  Needing gasoline, they first stopped at the Circle K on Commerce and Filmore St.  Mrs. Esquivel remained in the vehicle while her son went into the store to purchase a soft drink and pay for the gas. (See Exhibit 1- video tape of robbery at 22:15:48)

Just prior to entering the store, Jesus had waived to his uncle who was outside waiting for a friend to make a purchase.  (Exhibit 2 Jesus Esquivel, Jr. deposition -pgs 10-11)

At 22:17:12 Joseph Wayne Gallipp entered the store.

When Jesus Esquivel approached the counter he was informed by the clerk, Julio Gonzalez, that his mother needed to turn around because the pump where she had parked was not working.

Jesus left his drink and money on the counter, went outside, pumped the gas, returned to the store and paid for the gas and drink. (Exhibit 1 @ 22:19:20-22:22:00)

Immediately thereafter, Joseph Wayne Gallipp, commits the armed robbery. (Exhibit 1 @ 22:24:00) As is clearly heard on the tape, Joseph Wayne Gallipp is speaking English. Gallipp then exits the store to the right. The videotape shows the clerk calling the police and informing them that he left on foot.(22:24:52) Significantly, the clerk informs the police that it was a "white guy" not once but twice. (@22:25:11-22:25:22) Within minutes the first police officer arrives. (22:26:40). He then gives the officer the description. When the officious witness insists on the fact that the robber entered the plaintiff's vehicle the clerk tells the officer that the vehicle had been there for "quite a while", the clerk is hesitant to commit to the fact that Gallipp entered the vehicle.(Exhibit 1@22:29:26)

### 2: The independent witnesses -Norma Parke & Aide T. Velasco

Aide T. Velasco and Norma Parke arrive at the Circle K. Velasco is seen entering the store at the same time that Jesus Esquivel Jr. is leaving. Norma Parke is outside in her vehicle waiting for her friend Velasco to purchase some beer. Parke is the principal witness upon which the Defendant relied upon to make the arrest. However, in her sworn statement she admits to being intoxicated the night of the robbery and further admits that the perpetrator did not walk past her door but in fact walked out to the right, just as the clerk Gonzalez had informed the police. (Exhibit 3-affidavit of Parke) When officer Hushen was questioned about Ms. Parke's reliability the following transpired:

"Q: So you talked to Norma Parke?

A: Yes, I did.

Q: When you interviewed her, where did you interview her?

A: Right in front of the doors of the Circle K. She was sitting in her vehicle.

.........

Q. Okay, you didn't ask her to step out or go somewhere else?

A. No.

Q. Okay. What do you remember about Norma Parke?

A. I remember the location where she was sitting and I remember saying that was a perfect

viewpoint to see what was going on in there.

I asked her if she was sure of what she had seen. She explained it to me one more time, what she had seen, and that she saw the suspect get into the vehicle and then drive off.

.......

Q. Okay. Did you smell any alcohol on her breath?

A. No.

.......

Q. Do you remember seeing her statement where she said that she and her friend were buzzed?

A. No." (Exhibit 4-Deposition of Thomas Hushen pg. 22-23)

The failure of the police officer to notice that Parke was "buzzed", the failure by the police officer to detect that the video tape showed that Gallipp in fact fled to the right and not out to the gas pumps, coupled with the store clerk's description of the robber as being white, the clerk's reluctance to agree that the perpetrator fled in the Explorer should have placed the officer on notice that the information being received from Parke was suspect.

### 3. Res Gestae Statement of Jesus Esquivel, Jr.

The third and crucial piece of evidence was the purported *res gestae* statement of the minor, Jesus Esquivel, Jr. The only source for this purported statement is that of Thomas Hushen. The arresting officers at the scene, Jorge Salinas testified he questioned Mrs. Esquivel. The second officer at the scene, according to Salinas, was officer Charles Fechner. (Exhibit 5-Salinas deposition pg. 26-29). It was this second officer who according to Salinas was questioning Jesus Esquivel and who offered that the responses were different. (Exhibit 5-pg.28 ln18-pg. 29 ln 12). At some undetermined point in time Hushen appears to have questioned the minor. In his deposition, Hushen testified that Jesus Esquivel, Jr. advised him that his uncle Luis Ovalle had committed the robbery. (Exhibit 4-Hushen deposition pg. 16 ln 17-25).

The Defendant relies on the following evidence as supporting the decision to arrest the Plaintiffs:

1.  The video tape

2.  The eyewitness, Norma Parke, who the defendants was one who purportedly gave "reasonably trustworthy information" that an offense had been committed.

3.  Jesus' res gestae statement to the officers regarding his uncle Luis Ovalle[1]

With this in hand the Defendant argues that the requisite probable cause regimen was satisfied.

## II.

## Argument and Authorities

For a defendant to be entitled to qualified immunity, the district court must first determine whether the plaintiff alleged a violation of a clearly established right. The Defendant does not dispute this issue as the right to be free of unreasonable search and seizure under the Fourth Amendment is a clearly established right.

The court must then determine whether the defendant's official's conduct was objectively reasonable in light of clearly established law at the time of the alleged violation. *See Fontenot v. Cormier,* 56 F.3d 669, 673 (5th Cir. 1995) *See also Siegert v. Gilley,* 500 U.S. 226, 231-33, 114 L.Ed.2d 277, 111 S.Ct. 1789 (1991). An officer acts with objective reasonableness in arresting a person if he has probable cause to believe the person has committed a criminal offense. *See Graham v. Conner,* 490 U.S. 386, 396, 104 L.Ed.2d 443, 109 S.Ct. 1865 (1989). The determination of whether a defendant's conduct was objectively reasonable is a question of law, but that question of law can only be reviewed when there are no underlying genuine issues of material fact. *Bazan V. Hidalgo County,* 246 F.3d 481, 490 (5th Cir. 2001). As will be shown below, a number of genuine issues of material fact exist which preclude summary judgment.

### A. Arrest of Orelia Esquivel

The Defendant hangs its hat on the testimony of Norma Parke. However, as demonstrated by her own affidavit, her reliability is suspect. First, she was mistaken in what direction the robber fled and secondly, and most importantly, she was impaired because by her own testimony she was

---

[1]See Defendant's Motion for Summary Judgment at page 3 under "Factual Background"

"buzzed." An experienced police officer should have noticed the breath on Ms. Parke and held it to be suspect. A reasonable officer would have reviewed the tape and noticed that the robber did not exit past the parked vehicle of Ms. Parke. A review of the video tape shows Aide Velasco, Parke's friend going straight out of the store whereas the robber exited to the right. The video tape **and** the store clerk confirmed that the robber exited right. (Compare video tape at 22:22:50 [robber exits] with 22:25:30-22:25:58 [Velasco(Parke's friend) exiting store]) Hushen testified he reviewed the video tape (Exhibit 4 pg. 23 ln 20-25). Upon review a reasonable police officer would have requested Parke to explain how the tape showed the perpetrator exiting to the right of the store and not past her parked care. That coupled with the testimony of the "sober" clerk, that the robber exited to the right, was white and left on foot, made Parke's reliability not only suspect but easy fodder for an experienced officer to refute. Hushen's failure to resolve this discrepancy was more than a momentary lapse of police investigative procedure but bordering on the intentional.

The only other basis of the probable cause is that Orelia Esquivel's "account of the facts" differed from that of her son. However, there is nothing in the testimony of officer Salinas that offers such a conclusion. The only one to reach that conclusion is Hushen, because he asserts that Jesus admitted to his uncle's complicity in the robbery. Indeed as the Defendant points out, under section 7.01 of the Texas Penal Code Mrs. Esquivel could still have been convicted as a party to the offense. There was no "difference in the accounts" because no one ever asked Mrs. Esquivel about her brother in law. The fact that Jesus saw his uncle and that Mrs. Esquivel didn't could not be the basis of a "differing account" because she was never asked about Luis Ovalle. She may or may not have seen him. The fact remains that at the scene of the stop she was never asked. The paucity of this portion of the Defendant's summary judgment is indicative of its probable cause.

### B. Arrest of Jesus Esquivel, Jr.

The defendants have built a case of probable cause upon one unreliable witness and conclusions based on their preconceived idea of what occurred. *(See Exhibit* 6-Hushen Probable Cause affidavit and Exhibit 7-arrest report)

Aside from the unreliable witness, the only other basis for the arrest was the purported *res*

*gestae* statement of Jesus. However, if we are to believe what the Defendant's police officers have testified in their depositions, there could not have been a *res gestae* statement.

"A res gestae statement is one made in response to a starling event, spontaneously or impulsively, without time for reflection or contrivance, and such a statement can be made in response to an inquiry. *Smith v. State*, 737 S.W.2d 933 (Tex. App.–Dallas 1987, pet. ref'd). To be admissible, there must have been an exciting, emotionally stimulating, or physically painful event, the statement must have been made so soon after the occurrence that the declarant is still in the emotional grip of the shocking event, and the statement must relate to the event. *Beam v. State*, 500 S.W.2d 802, 804 (Tex. Crim. App. 1973). However, closeness in time to an arrest is not alone sufficient to render a statement res gestae of the arrest. *Smith v. State,* 507 S.W.2d 779,781 (Tex. Crim. App. 1974). The facts as related by either of the parties does not indicate that Jesus was excited, emotionally stimulated, or that anyone experienced physical pain. *See Williamson v. State*, 771 S.W.2d 601, 606-607 (Tex.App.–Dallas 1989, pet. ref'd)

A reading of officers Hushen's and Salinas' depositions show that the stop of the Esquivel vehicle was without incident, that the mother and son stopped and complied with the requests made by the officers. (Salinas' depo Exhibit 5 pg.26-30; Hushen's depo Exhibit 4 pg 15-16; Hushen's affidavit Exhibit 6) There is certainly no indication that there was anything exciting or emotionally stimulating that was occurring at the stop and in fact the arrest was made almost one half hour after the robbery, certainly not within the "emotional grip of the shocking event" to be considered a res gestae statement. As a result, this was not a res gestae statement.

## 1. Other inconsistencies

What Jesus Esquivel said at the stop was in fact the same thing he said at the police station. He was entering the Circle K, saw his uncle, waived to him and said hello. (Exhibit 2-pg 10-11). What the Defendants wish this court to take at face value is that Jesus implicated his uncle in the robbery. If Jesus had implicated his uncle while the questioning was occurring at the stop, why then did he not implicate him again at the police station? In building its summary judgment case, the defendant would also have this court make the same erroneous assumptions that it did. Had the officers viewed the video tape they would have known what the clerk was also asserting, that the

perpetrator fled on foot and to the right. This was a willful disregard of the only sober witness at the scene.

The defendant would also like the court to make the leap of faith that after a robbery, the criminal mind focuses on food. Driving to a nearby Jack in the Box, buying three hamburgers leads to the conclusion that there must have been three people in the Explorer.

Finally, the Defendant makes much of Jesus' inability to recall what was said at the initial stop regarding his uncle. However, the line of questioning by defense counsel was far from clear:

> "Q: Okay, so when did you tell them about your uncle Luis Ovalle?
>
> A: When they took me to the police department.
>
> Q: You didn't mention his name before they took you to the police department?
>
> A: I don't remember." (Exhibit 2 pg. 22)"

However, Jesus' memory was not the only one that was faulty. Officer Hushen's memory was also faulty as to when he asked Jesus or his mother where he could locate the criminal Luis Ovalle.

> Q: My question is, at the time that you were getting this statement from Jesus saying that it was his uncle that committed the robbery, did you ask him or his mother where you could locate Luis?
>
> A.: No I don't remember when I asked him that question." (Exhibit 4-pg 19 ln 1-9)

**2. The missing documentation**

Officer Hushen to bolster his probable cause has testified that he called the clerk at the Jack in the Box who informed him that there were three people in the Explorer. Yet, no written statement was ever taken from Lori Trevino. (Trevino no longer works at the Jack-In-The-Box- see declaration of Ruben R. Peña, attorney for plaintiffs-Exhibit 8).

### III.

### GENUINE ISSUE OF MATERIAL FACT

As seen above, there are several fact issues which preclude summary judgment. The facts surrounding this "false arrest" preclude the court granting summary judgment. Whether or not the Defendant's police officers acted within the prescribed parameters of their authority is a question of

fact to be determined by the finder of fact. To establish such entitlement, Defendant must show that the conduct in question occurred while the officer was acting "in his official capacity and within the scope of his discretionary authority." *Garris v. Rowland,* 678 F.2d 1264, 1271 (5th Cir. 1982). The burden then shifts to the plaintiff "to rebut this "good faith' defense." *Saldana v. Garza,* 684 F.2d 1159, 1163 (5th Cir.1982) The plaintiffs in this case have shown why the Defendant's motion for summary judgment is based on an unreliable witness whose testimony was suspect at the time it was given, and whose testimony the police should have if not totally discounted then certainly made further inquiry. The motion is further flawed in that the defendant has failed to address the issue of the store clerk, who described the robber as "white," fleeing on foot and who left to the right of the store and not past a stationary Norma Parke. Finally, there was no res gestae statement because if the statement was in fact made by Jesus, it did not meet the standard for a res gestate statement.

Wherefore, Plaintiffs would respectfully move this Honorable Court to deny the Defendant, City of Harlingen's, Motion for Summary Judgment.

Respectfully submitted,

_____

Ruben R. Peña
Counsel for Plaintiffs
State Bar No. 15740900
Federal I.D. No. 1216
222 W. Harrison
Harlingen, Texas 78550
956-412-8200 telephone
956-412-8282 facsimile

## VIDEO TAPE EVENT/TIME

| | |
|---|---|
| 22:15:48 | Jesus Esquivel enters store |
| 22:17:12 | Gallipp (robber) enters store |
| 22:19:20 | Jesus gives clerk money for gas and exits |
| 22:20:20 | Jesus returns and gets in line |
| 22:22:00 | Jesus pays and exits |
| 22:22:14 | Aide T. Velasco (Norma Parke's friend) enters store |
| 22:22:24 | Robbery in progress: Gallipp speaks in English |
| 22:22:54 | Robber exits to the right |
| 22:24:52 | clerk calls police and tells them he left on foot (se fue caminando a pie) |
| 22:25:11 | Was it a white guy? Yes |
| 22:25:22 | "White male", green hat...... |
| 22:25:43 | License plate given to clerk |
| 22:25:28 | Clerk says not sure about getting into vehicle |
| 22:26:45 | First officer on the scene enters |
| 22:28:33: | clerk gives description |
| 22:29:26 | clerk tells officer "cherokee" was here quite a while |
| 22:32:48 | clerk tells cops and gestures that robber fled to the right of the store. |

# EXHIBIT 2

## DEPOSITION EXCERPTS
## OF
## JESUS MARIO ESQUIVEL, JR.

Taken March 8, 2004

Deposition -pgs. 10-11

Deposition pg. 22

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

BROWNSVILLE DIVISION

ORELIA ESQUIVEL,                  ) (

INDIVIDUALLY AND A/N/F            ) (

JESUS ESQUIVEL, JR.               ) (

     Plaintiffs                 ) (

                                ) (

VS.                               ) ( CIVIL ACTION NO. B-03-104

                                ) (

SSP PARTNERS & CITY OF            ) (

HARLINGEN POLICE DEPARTMENT       ) (

     Defendants                 ) (

**WITNESS COPY**

---

ORAL AND VIDEOTAPED DEPOSITION OF

JESUS MARIO ESQUIVEL, JR.

MARCH 8, 2004

---

     ORAL AND VIDEOTAPED DEPOSITION OF JESUS MARIO

ESQUIVEL, JR., produced as a witness at the instance of the

DEFENDANT CITY OF HARLINGEN POLICE DEPARTMENT, taken in the

above styled and numbered cause on MARCH 8, 2004, reported by

MAUREEN STINGLEY, Certified Court Reporter No. 691, in and for

the State of Texas, at the offices of ADAMS & GRAHAM, L.L.P.,

222 East Van Buren, Harlingen, Texas, pursuant to the Federal

Rules of Civil Procedures and any provisions stated on the

record or attached therein.

## Page 2

APPEARANCES

COUNSEL FOR PLAINTIFFS:
   RUBEN PENA
   LAW OFFICE OF RUBEN R. PENA, P.C.
   222 West Harrison Street
   Harlingen, Texas 78550

COUNSEL FOR DEFENDANT CITY OF HARLINGEN POLICE
DEPARTMENT:
   ROGER W. HUGHES
   ADAMS & GRAHAM, L.L.P.
   222 East Van Buren Street
   West Tower
   Harlingen, Texas 78550

ALSO PRESENT:
   Orelia Esquivel
   Joe Mendoza, Videographer

INDEX
                  PAGE

Appearances ........................................ 2

JESUS MARIO ESQUIVEL, JR.

Examination by Mr. Hughes ........................ 3

Errata Sheet/Signature Page ...................... 40

Reporter's Certificate ............................ 41

20   (No exhibits marked)
21
22
23
24
25

## Page 3

1      JESUS MARIO ESQUIVEL, JR.,
2  having been duly sworn, testified as follows:
3        EXAMINATION
4  BY MR. HUGHES:
5    Q.  Okay, could you please state your full name?
6    A.  Jesus Mario Esquivel, Jr.
7    Q.  And where do you currently live?
8    A.  1120 South 4th Street.
9    Q.  Okay, and how old are you?
10   A.  16.
11   Q.  Where were you born?
12   A.  San Juan, Texas.
13   Q.  Okay.  You're in school now?
14   A.  Yes, sir.
15   Q.  What year and what school?
16   A.  10th, in Harlingen South High School.
17   Q.  Okay.  Now, you understand I'm the attorney for the
18  City of Harlingen in this case?
19   A.  Yes, sir.
20   Q.  And do you understand that, on your behalf, your
21  mother has brought a lawsuit for injuries or damages claimed
22  or arising out of this arrest?
23   A.  Yes, sir.
24   Q.  And you understand the lady over here on, I guess,
25  your right is taking down my questions and your answers word

## Page 4

1  for word?
2    A.  Yes.
3    Q.  Do you understand that the answers that you give to
4  my questions or perhaps Mr. Pena's questions can be used
5  later on in the lawsuit?
6    A.  Yes, sir.
7    Q.  So, therefore, it's very important that you
8  understand what the questions are.  Do you understand that?
9    A.  Yes.
10   Q.  Now, if for any reason you don't understand the
11  questions, you can ask.  All right?
12   A.  Yes, sir.
13   Q.  And you understand that after today, after you're
14  finished testifying, the court reporter is going to prepare a
15  booklet of my questions and perhaps Mr. Pena's questions and
16  the answers you give.  Do you understand that?
17   A.  Yes.
18   Q.  And that you will be allowed to review that before
19  it can be used in court; do you understand that?
20   A.  Yes.
21   Q.  And that you will be allowed to make corrections in
22  it if there's anything that's wrong or that needs to be
23  changed; do you understand that?
24   A.  Yes.
25   Q.  And you sat here today through your mother's

## Page 5

1  deposition?
2    A.  Yes, sir.
3    Q.  So you understand that when you answer, you have to
4  answer using words --
5    A.  Yes.
6    Q.  -- because if you make like uh-huh or huh-uh, the
7  court reporter hasn't got a clue what you mean and doesn't
8  know how to write that down.  Do you understand that?
9    A.  Yes, sir.
10   Q.  Okay.  Do you work outside school, or you just go to
11  school?
12   A.  Just go to school.
13   Q.  And at school, are you in any sports or clubs?
14   A.  No, sir.
15   Q.  No sports?  Have you been in sports at all in the
16  last couple of years?
17   A.  Yes, sir.
18   Q.  What were they?
19   A.  Football.
20   Q.  What years were you on -- this was the Harlingen
21  High South?
22   A.  No, Coakley Middle School.
23   Q.  Coakley.  And what years were you on the football
24  team?
25   A.  7th and 8th.

2 (Pages 2 to 5)

## Page 6

1    Q.  And what position did you play?
2    A.  Safety and wide receiver.
3    Q.  And did you try out again for the football team when
4    you started the high school?
5    A.  No.
6    Q.  Okay.  And after school and when you aren't
7    studying, of course, what do you do for recreation?
8    A.  Nothing.  Just sleep.
9    Q.  Sleep, okay.
10       MR. PENA:  Sounds like mine.
11       MR. HUGHES:  I was going to say, that sounds
12   familiar in my house, also.
13   Q.  Are you involved in any church-related activities,
14   youth groups, church teams, anything like that?
15   A.  Sometimes when I go.
16   Q.  Could you give me some examples, please?
17   A.  I just go to church once in a while.
18   Q.  Okay.  Do you have a driver's license?
19   A.  No, sir.
20   Q.  Have you been to see a doctor for any reason in the
21   past five years?
22   A.  Five years, yes.
23   Q.  What for, sir?
24   A.  For when I get the flu.
25   Q.  What doctor do you go to?

## Page 7

1    A.  Miranda, Larry.
2    Q.  And were you ever injured while you were on the
3    football team there at Coakley?
4    A.  Would you repeat it?
5    Q.  Were you ever injured?
6    A.  No, sir.
7    Q.  Okay.  And currently at High, who are some of your
8    teachers?
9    A.  Ms. Ruiz, Ms. Acosta, Mr. Rada, and Ms. Robbins.
10   Q.  And what do they teach?
11   A.  Language -- it's English now.
12   Q.  Say again.
13   A.  It's English, algebra, geometry and speech.
14   Q.  Okay.  Do you participate in any of the outside
15   activities there, like clubs, UIL, that sort of thing?
16   A.  No, sir.
17   Q.  Okay.  On the incident -- the night when you were
18   arrested, you were at home that night?
19   A.  Yes, sir.
20   Q.  And you went out with your mother?
21   A.  I went in and woke her up.
22   Q.  I'm sorry?
23   A.  I went and woke her up because she was asleep.
24   Q.  Why did you wake her up?
25   A.  Because I was hungry.

## Page 8

1    Q.  You were hungry.  Who else was there at the house
2    with you at the time?
3    A.  Me and my mom, my grandpa and my sisters and my
4    brothers.
5    Q.  And you wanted to go get something to eat?
6    A.  Yes, sir.
7    Q.  Okay.  And you-all left?
8    A.  Yes.
9    Q.  Who was in the vehicle with you?
10   A.  Me and my mom.
11   Q.  Just the two of you?
12   A.  Yes, sir.
13   Q.  Who is Mr. Ovalle, Luis Ovalle?
14   A.  My uncle.
15   Q.  Your uncle.  Did you see him at any time that night?
16   A.  Yes, sir.
17   Q.  Where did you see him?
18   A.  Outside the store.  He was parked.
19   Q.  He was parked in his car?
20   A.  No, with his friend.
21   Q.  Who is his friend?
22   A.  I don't know his name.  He was inside with his
23   friend.
24   Q.  He was like a passenger?
25   A.  Yes, sir.

## Page 9

1    Q.  And was he sitting on the passenger's side of the
2    vehicle?
3    A.  Yes.
4    Q.  Okay.  Did you say hello to him?
5    A.  Repeat it.
6    Q.  Did you say hello to him?
7    A.  Yes.
8    Q.  Did he go inside the store?
9    A.  Who?
10   Q.  Your uncle.
11   A.  No.
12   Q.  All right.  Let's keep going.  You left your house,
13   and where did you go?
14   A.  To the Circle K.
15   Q.  Your mother didn't stop anywhere?
16   A.  No.
17   Q.  She was driving?
18   A.  Yes, sir.
19   Q.  So what happens when you get to the store?
20   A.  Well, she parked on the gasoline pumps, and I got
21   off and paid and bought a Coke, too, and some guy, he told me
22   to tell my mom that the pumps weren't working.  So I went
23   outside with my change and my Coke, and I went and told her,
24   and she moved.
25       Then I went back inside to get my change and my

3 (Pages 6 to 9)

Page 10

1    Coke, and I was seeing something strange there with some guy,
2    and I was just seeing it, and I just left. I grabbed my Coke
3    and my change, and I left. And that's it.
4    Q. Okay. Let's back up. When did you first see your
5    uncle there?
6    A. When I got off, outside.
7    Q. When you first got out of the car?
8    A. He was outside.
9    Q. Where was his vehicle parked?
10   A. By the store.
11   Q. In front?
12   A. Yes.
13   Q. Do you recall what kind of vehicle it was?
14   A. Chevy, blue Chevy.
15   Q. Blue?
16   A. A Silverado Chevy.
17   Q. So a pickup truck?
18   A. Yes, sir.
19   Q. Was there anyone inside the vehicle with him, or was
20   he just by himself?
21   A. He was by himself.
22   Q. And when you saw him, did you greet him in any way,
23   say hello to him?
24   A. I just said hello.
25   Q. Okay, what did he say?

Page 11

1    A. Nothing. He just said hello back.
2    Q. Did you ask him what he was doing there? So you
3    just said hello to him?
4    A. Yes, sir.
5    Q. You went on inside the store?
6    A. Yes.
7    Q. And what were you wearing that night?
8    Q. Can you repeat it?
9    Q. What were you wearing? Describe your clothes.
10   A. A white T-shirt, muscle shirt, and blue shorts.
11   Q. Okay. Is that what they call a muscle shirt?
12   A. Yes, sir.
13   Q. No sleeves on either side. Okay. Do you know the
14   name of the person your uncle was there with that evening?
15   A. No, but I seen him.
16   Q. Okay. You saw him inside the store?
17   A. Yes, sir.
18   Q. Do you know his name?
19   A. No.
20   Q. Do you recall how he was dressed?
21   A. I don't remember.
22   Q. Do you recall how the person your uncle was with was
23   dressed?
24   A. No, I don't remember.
25   Q. Now, when you went back out the first time after

Page 12

1    leaving, after talking with the clerk, did you see your uncle
2    again?
3    A. Yes. He was still there.
4    Q. He was still there. Did you say anything to him as
5    you were going back out?
6    A. No.
7    Q. So you go to your mother's vehicle, and you do what?
8    A. I tell her to move around to the other side of the
9    pump, and she moves. And then I went back again inside.
10   Q. Okay. And was the Chevy Silverado still there at
11   that time?
12   A. When I went back in, he was leaving already.
13   Q. And you say he was leaving. How do you know that?
14   Why do you think that?
15   A. Because when I went inside, I saw the lights turn
16   on, and when I went back outside, they were gone already.
17   Q. Now, you then went back in, right? And both times
18   there was -- the first time you went in, there was kind of a
19   line there?
20   A. Yes, sir.
21   Q. You had to stand in line for a while. And there was
22   a gentleman standing next to you with one of those shirts
23   that the front of the shirt is one color and then the sleeves
24   are like white?
25   A. I don't remember.

Page 13

1    Q. Okay, but there was a guy standing next to you --
2    A. Yeah.
3    Q. -- as you were in line the first time, right?
4    A. Yes, sir.
5    Q. And when you went back in, he stood next -- he
6    happened to be next to you again --
7    A. A man.
8    Q. -- as you were paying?
9    A. On my left side.
10   Q. Okay. And would it surprise you to know that that
11   was the person with the gun who robbed the store?
12   A. Yes.
13   Q. Okay. You didn't recognize that individual?
14   A. No, sir.
15   Q. Now, you thought you saw something unusual about
16   him, though?
17   A. Yes, sir.
18   Q. What was that?
19   A. That he was just grabbing things there, and he was
20   just looking at them and asking the clerk how much it was,
21   and then how much it cost and all this.
22   Q. Okay. So when you went out the second time, the
23   Silverado was gone?
24   A. Yes, sir.
25   Q. And, at this time, you didn't know that the store

4 (Pages 10 to 13)

Page 14

1  was being robbed?
2      A.  No.
3      Q.  And so you exited the store again, and then what do
4  you do?
5      A.  The last time?
6      Q.  Yeah.
7      A.  Just leave.  I went to Jack in the Box.
8      Q.  Okay.  What happened there?
9      A.  We ordered three hamburgers, one for me and one for
10  my mom and one for my grandpa.
11      Q.  Okay.  How did you know -- how did you all know to
12  get a hamburger for your grandfather?
13      A.  Because he was awake, and he was hungry, too.
14      Q.  I'm sorry, say again.
15      A.  Because he was awake and he was hungry too, and we
16  didn't know what to cook.
17      Q.  He asked you to get him something before you left?
18      A.  Can you repeat it?
19      Q.  Did he ask you all to get him something to eat?
20      A.  No, sir.
21      Q.  So your grandfather didn't ask you to bring him
22  anything?
23      A.  No, sir.
24      Q.  Okay.  Who did the ordering?
25      A.  My mom.

Page 15

1      Q.  Your mother?  So she ordered three hamburgers?
2      A.  Three hamburgers.
3      Q.  You all went through like the drive-through line?
4      A.  The drive-through.
5      Q.  And when she asked for three hamburgers, did you ask
6  her why she was ordering three?
7      A.  Two?
8      Q.  Did you ask your mother why she was ordering three
9  hamburgers?
10      A.  No, sir.
11      Q.  You never asked her why she was ordering three?
12      A.  First I told her for me and my grandpa and for her.
13      Q.  Oh, you told her?
14      A.  I told her.
15      Q.  Okay.  And your grandfather had not asked you to get
16  him anything?
17      A.  No, sir.
18      Q.  Did he ask anybody before you left to get him
19  anything?
20      A.  No, sir.
21      Q.  That was just your idea?
22      A.  My idea.
23      Q.  So no one was in the car with you at that time?
24      A.  No, sir.
25      Q.  Did your mother have any trouble ordering?

Page 16

1      A.  No.
2      Q.  Did she have any trouble at the window when she had
3  to pick up and pay?
4      A.  No.
5      Q.  Did she talk to the people there in Spanish?
6      A.  Spanish.
7      Q.  Did they have any trouble understanding her?
8      A.  No.
9      Q.  Okay.  And when you left Jack in the Box, what
10  happened?
11      A.  Well, we left through Walgreen's there on 13th
12  Street.
13      Q.  Uh-huh.
14      A.  And we stopped at the red light, and we saw a cop
15  passing.  He went straight.  And the light turned green, and
16  we left, and we saw him do a U-turn and he came after us.
17  And by -- I think by Filmore, a little bit further, they
18  turned on the lights on us, and my mom was like, "What?"  She
19  didn't know what was happening and neither was I, and they
20  stopped us.  And we just pulled over, and they were just
21  yelling to get out.  My mom didn't understand English.
22      Q.  Let me stop you.  Your mother pulls over?
23      A.  Yes, sir.
24      Q.  And you hear yelling?  Is that what you heard?  Let
25  me stop.  The car's windows were up?

Page 17

1      A.  Which ones?
2      Q.  Your car's windows were up?
3      A.  Yes.
4      Q.  Did you all have the radio on?
5      A.  I don't remember.
6      Q.  And when you say yelling, were they using like a
7  bull horn or something, or what?
8      A.  No, just to get off.  They were just screaming
9  regularly.
10      Q.  Okay.  So you heard the police yelling.  What did
11  they yell to do?  What did they say?
12      A.  Just to pass -- the driver, the one driving, to get
13  off.
14      Q.  For the driver to get out?
15      A.  Yes, sir.
16      Q.  Okay, and then what happened?
17      A.  And my mom didn't know what they were saying because
18  she doesn't understand English.
19      Q.  Okay.
20      A.  I was just telling her to get off.
21      Q.  Okay.
22      A.  And she got off, and they were telling for me to get
23  off, too.
24      Q.  All right.
25      A.  So I got off, and they handcuffed me and they just

BRYANT & STINGLEY, INC.

Page 18

1 sat me down on the sidewalk.
2   Q.  Okay, let's stop and take it a little bit slower.
3 Your mother gets out first?
4   A.  Yes.
5   Q.  Or you do?
6   A.  She does.
7   Q.  And she gets out on the driver's side?
8   A.  Yes, sir.
9   Q.  And then you're told to get out?
10  A.  Yes, sir.
11  Q.  Okay, what do you do?
12  A.  I just got off there and put my hands in the air, in
13 the back of my head.
14  Q.  Okay.
15  A.  And they just handcuffed me.
16  Q.  When you got out of the car, you were on the
17 passenger's side?
18  A.  Passenger's.
19  Q.  Now, was the car like parked next to the curb?
20  A.  Yes, sir.
21  Q.  It was next to the curb.  So the side you got out
22 was the curb side?
23  A.  Yes, sir.
24  Q.  So when you step out and you put your hands behind
25 your head, do you stay next to the car or move someplace?

Page 19

1 What did you do?
2   A.  I move kind of far away from them so they could see
3 me.
4   Q.  Okay, and then what happens?
5   A.  Like two police officers come to me.
6   Q.  Yes.
7   A.  And they told me that why were we stopped and all
8 this, that they had robbed the Circle K and they thought it
9 was us.
10  Q.  Okay.
11  A.  And I was like, "What?" I didn't know that.  And
12 they just handcuffed me and they sat me on the floor, on the
13 sidewalk.  They had me there.
14  Q.  Okay, when they handcuffed you, how did they do
15 that?
16  A.  They just grabbed my arm to the back and they just
17 tied it.
18  Q.  Okay.  Did they tell you you were under arrest?
19  A.  Yes, sir.
20  Q.  Okay.  Did they ask you to put your hands behind
21 your back?
22  A.  Yes, sir.
23  Q.  And you're saying they held you in some way?
24 What happened?
25  A.  Well, because I was like, "Why are you all going to

Page 20

1 handcuff me because we didn't do nothing?" He was like,
2 "They robbed the Circle K." I was like, "Okay." I just let
3 myself and they grabbed me and pulled me down.
4   Q.  When you say they grabbed you, who grabbed you?
5   A.  Two police officers.
6   Q.  Okay, did one or both do that?
7   A.  One.
8   Q.  One.  And when the one officer grabbed you, how did
9 he grab you?  Where did he put his hands?
10  A.  Right here on my shoulders.
11  Q.  Now, the camera, you put your hand on your left
12 shoulder.  He grabbed you on your left shoulder?
13  A.  I don't remember.
14  Q.  Okay.  So he grabbed you and did what?
15  A.  Just pulled me down.  I was sitting down.
16  Q.  So you sat down yourself?
17  A.  Yes, sir.
18  Q.  Did he like trip you?
19  A.  No.
20  Q.  Or did he try to kick your legs out in any way?
21  A.  No, sir.
22  Q.  So you more or less sat down under your own power?
23  A.  Yes, sir.
24  Q.  But he kept his hand on your shoulder as you were
25 going down?

Page 21

1   A.  Yes, sir.
2   Q.  Okay, did you fall down?
3   A.  No, sir.
4   Q.  Okay.  Did he bruise you in some manner?
5   A.  No, sir.
6   Q.  Okay.  Did he leave a mark?
7   A.  No, sir.
8   Q.  Okay, so you sat down.  Did you hurt yourself as you
9 fell down?
10  A.  No, sir.
11  Q.  Okay.  When you sat down, where were you sitting?
12  A.  On the sidewalk.
13  Q.  Okay, were you like -- well, like were you sitting
14 like kneeling, or were you like sitting like cross-legged,
15 what they sometimes call Indian, or were you like sitting on
16 the grass with your feet on the curb, or what?
17  A.  I was just sitting on top of the sidewalk with my
18 legs straight, straight.
19  Q.  Okay.  And did they tell you why they thought you
20 were involved?
21  A.  Because -- they said that some -- that they had
22 reported us because they said the one that stole took off to
23 the right-hand and we took off that way too and they thought
24 we picked them up.  And they thought we were with them, the
25 one that stole.

BRYANT & STINGLEY, INC.

(956)428-0755

0165704f-eb53-4c4c-baa8-3347b2957989

Page 22

1    Q.  Okay, they told you that?
2    A.  Yes, sir.
3    Q.  And what did you tell them when they said that?
4    A.  Nothing.  What could I say, that it wasn't us.
5    Q.  Okay, so when did you tell them about your uncle
6    Luis Ovalle?
7    A.  When they took me to the police department.
8    Q.  You didn't mention his name before they took you to
9    the police department?
10   A.  I don't remember.
11   Q.  Okay, so while you were at the scene, you might have
12   mentioned seeing your uncle there?
13   A.  Yes, sir.
14   Q.  Do you think maybe you had mentioned that
15   maybe your uncle might have been involved in it, you thought
16   that he was involved in it somehow?
17   A.  I don't remember.
18   Q.  You don't remember?  You can't remember whether you
19   said that or whether you didn't?
20   A.  I don't remember.
21   Q.  Well, so you can't remember whether you did or did
22   not say anything about your uncle, Mr. Ovalle, to the police
23   while you were under arrest there where they stopped the car?
24   A.  Not when they stopped us.
25   Q.  You don't recall saying anything to them one way or

Page 23

1    the other about Mr. Ovalle, when they stopped you?
2    A.  I don't remember.
3    Q.  You don't remember at all.  What else did they tell
4    you?
5    A.  When they stopped us?
6    Q.  Well, they have arrested you, you're sitting on the
7    ground.  What else did they tell you at that point?
8    A.  That I was saying some other thing and she was
9    saying some other thing.
10   Q.  Yes.
11   A.  Different.
12   Q.  Okay, and did they tell you what that difference
13   was?
14   A.  No, sir.
15   Q.  All right.  So what else did they tell you as you
16   were sitting there?
17   A.  That I was going to go to juvenile that night.
18   Q.  That you were going to the juvenile detention
19   center?
20   A.  Yes, sir.
21   Q.  That's what they told you.  What else, sir?
22   A.  For that time, that I was going to go to the police
23   station so I could say what we did and all this supposedly.
24   Q.  Okay.  And what else did they tell you while you
25   were still seated there on the ground?

Page 24

1    A.  That's all I remember.
2    Q.  Okay.  And you were taken to the police station --
3    A.  Yes, sir.
4    Q.  -- in a police vehicle.  Okay, how did you get in
5    the vehicle?
6    A.  Because they were opening the doors, and they were
7    like, "Get in."  And they just helped me.
8    Q.  Did they help you get up?  Did they hurt you as they
9    helped you get up?
10   A.  No, sir.
11   Q.  Did they help you get in the car?
12   A.  Yes, sir.
13   Q.  Did they hurt you when they did that?
14   A.  No, sir.
15   Q.  Did they help you do that -- get in the car?
16   A.  Yes, sir.
17   Q.  Okay.  I'm sorry?
18   A.  I said yes, sir.
19   Q.  All right.  And the police officers took you to --
20   well, let's just stop right there.
21        Other than accuse you of being involved in this
22   robbery, did the police officers use any profanity to you?
23   A.  No, sir.
24   Q.  Did they threaten to hurt you in any way?
25   A.  No, sir.

Page 25

1    Q.  Did they act like they were going to hurt you in
2    some way -- strike you, I mean?
3    A.  No, sir.
4    Q.  You mentioned something about the handcuffs.  Was
5    there a problem with the handcuffs other than you had to wear
6    them?
7    A.  No, sir, they were tight.
8    Q.  Tight.  And did they leave a bruise?
9    A.  No, sir.
10   Q.  When they took the cuffs off, were you able to move
11   your hands?
12   A.  Yes, sir.
13   Q.  Had you lost any feeling in your hands at all?
14   A.  No, sir.
15   Q.  Okay.  So you went to the police station, and when
16   you arrived at the police station, what happened?
17   A.  They took me to a different room --
18   Q.  Yes.
19   A.  -- from where my mother was at, and they were asking
20   me all these questions.
21   Q.  Do you know the names of the officers that asked you
22   questions?
23   A.  No, sir.
24   Q.  Okay.  And for how long were you asked questions?
25   A.  For about 30 minutes.

BRYANT & STINGLEY, INC.                    (956)428-0755
0165704f-eb53-4c4c-baa8-3347b2957989

Page 26

1    Q.  Okay.  How many officers were asking questions?
2    A.  Like two.
3    Q.  Two?
4    A.  Two different ones.
5    Q.  So there were two in the room.  Did only one of them
6    ask?  Did both of them ask questions?  Mostly one?  What was
7    it?
8    A.  Both of them.
9    Q.  Both of them.  Now, while they were asking you
10   questions, did they use any profanity or swear at you?
11   A.  No, sir.
12   Q.  Did they say they were going to hurt you or did they
13   hint that they were going to try to hurt you?
14   A.  No, sir.
15   Q.  Did they do anything physically that made you think
16   they might try to hurt you in some manner?
17   A.  No, sir.
18   Q.  Do you recall where in the police station this room
19   was?
20   A.  Can you repeat it?
21   Q.  Yeah.  Where the two officers were talking to you,
22   do you recall what room in the police station that was?
23   A.  It's where they have all these computers at.
24   Q.  Okay.  Was this like a little cubicle in an office,
25   or was it something else?

Page 27

1    A.  I think where they work at, where they have all
2    those computers.
3    Q.  Okay.  Now, what did the police officers say to you
4    as they were questioning you, asking you questions?
5    A.  That if I knew who committed the crime.
6    Q.  Okay.
7    A.  And I don't remember anything else.
8    Q.  Okay.  Did you tell them who you thought had
9    committed it?
10   A.  No, sir.
11   Q.  Did you tell them anything about your uncle,
12   Mr. Ovalle, being there?
13   A.  Yes, sir.
14   Q.  What did you tell them?
15   A.  That -- because the police officers told me that
16   they saw that I did a signal to someone, and I did it to my
17   uncle.  I was telling him hi, and they thought that he was
18   the one that committed the crime.
19   Q.  Okay, you said you made a gesture of some sort while
20   you were inside?
21   A.  No, while I was walking towards inside.
22   Q.  I see.  And you were just making a gesture for your
23   uncle?
24   A.  Yes, sir.
25   Q.  And what else did they ask you?

Page 28

1    A.  That Mom was going to stay there, if I wanted for
2    her to stay or me.
3    Q.  Okay.  What did they say about that?
4    A.  They were telling me that if I wanted my mom to stay
5    there longer or if I wanted to take the blame and all this.
6    Q.  What else did they say about your mother?
7    A.  Only that.
8    Q.  Okay.  Other than did you want your mother to stay
9    longer and whether you would take the blame or she would,
10   what else did they say about your mother?
11   A.  I don't remember.
12   Q.  Did they threaten to do anything to your mother?
13   A.  No, I don't remember nothing.
14   Q.  Did they tell you that she would be hurt in some way
15   if you didn't tell them what they wanted to hear?
16   A.  No, sir.
17   Q.  Did they tell you that something would happen to her
18   if you didn't talk?
19   A.  Yeah, that she would stay longer.
20   Q.  Anything else?
21   A.  No, sir.
22   Q.  Do you recall anything else that was said during the
23   half hour that the officers asked you questions?
24   A.  That they were telling me that I was under the
25   influence.

Page 29

1    Q.  Okay.  Did they tell you why they thought that?
2    A.  Because my eyes -- because I get sick and my eyes
3    turn red and they dilate when you're under the influence.
4    Q.  Okay, when you say you get sick, your eyes turn red,
5    what kind of illness is that?
6    A.  I don't remember, but I have some pills, though.
7    Q.  Okay.  Were you sick that night for some reason?
8    A.  Yes, sir.
9    Q.  You were?  How were you ill?
10   A.  The flu.
11   Q.  Okay.  Were you taking anything for that?
12   A.  No, sir.
13   Q.  You hadn't taken like, you know, medicine you buy at
14   the store or medicine a doctor would prescribe?
15   A.  No, sir.
16   Q.  Where did you get -- how long had you had the flu?
17   A.  For the night, the first night.
18   Q.  Okay.  I asked this question earlier, and you were
19   going to answer, but it was your mother's deposition, so we
20   wouldn't let you.  Was school out by this time?
21   A.  Yes, sir.
22   Q.  Now, that was a Saturday, right?
23   A.  Yes, sir.
24   Q.  And what had you been doing that evening?
25   A.  Saturday?

Page 30

1    Q.   Yeah.
2    A.   I was just home.
3    Q.   You didn't go out that night?
4    A.   No, sir.
5    Q.   So the officers saw that you might have eyes that
6    were red and thought you were under the influence.  What did
7    you tell them?
8    A.   That I was sick.
9    Q.   Okay.  Did you ask them to take you to a doctor?
10   A.   No, sir.
11   Q.   Did you ask them for any medicine?
12   A.   No, sir.
13   Q.   And after you told them that, what did they say?
14   A.   They didn't believe me.
15   Q.   Okay.  And did you tell them anything to try to make
16   them believe you?
17   A.   No, sir.
18   Q.   Okay.  And after they said that, what happened next?
19   A.   That they were taking me to juvenile.
20   Q.   Okay, who took you to juvenile?
21   A.   An officer.
22   Q.   Okay, one of the officers that asked you questions?
23   A.   Yes, sir.
24   Q.   And do you have any idea about what time it was that
25   you left the police station to go to juvenile?

Page 31

1    A.   Like 3:00 or 4:00 in the morning.
2    Q.   Okay.  Now, between the time they -- where were you
3    after they finished questioning you but before you left to go
4    to juvenile -- where did you stay?
5    A.   With them.  That means sitting down in a chair.
6    Q.   Okay, with the officers?
7    A.   Yes, sir.
8    Q.   They only tried to ask you questions for about half
9    an hour.  When were the handcuffs taken off you, sir?
10   A.   When they took me into juvenile.
11   Q.   Okay, so while they were questioning you, you were
12   in handcuffs?
13   A.   Yes, sir.
14   Q.   And the handcuffs were not removed until you went to
15   the juveniles place?
16   A.   Yes, sir.
17   Q.   At any time during this time did you ask the
18   officers to remove the handcuffs?
19   A.   No, sir.
20   Q.   At any time before you went to juvenile, did you
21   tell them that the handcuffs were causing you any distress or
22   any pain?
23   A.   No, sir.
24   Q.   You didn't tell the officers that.  And the time
25   after they quit asking you questions but before you were

Page 32

1    taken to juvenile, did any of the officers try to strike you
2    or look like they might try to strike you?
3    A.   No, sir.
4    Q.   Did they curse you or use profanity towards you?
5    A.   No, sir.
6    Q.   Did they say they were going to hurt you or your
7    mother during that time?
8    A.   No, sir.
9    Q.   During this time after they finished questioning you
10   but before they took you to juvenile, did they make any
11   threats toward you or your mother?
12   A.   No, sir.
13   Q.   And then they took you to juvenile?
14   A.   Yes, sir.
15   Q.   What happened when you got to the juvenile center?
16   A.   They took off the handcuffs, and they made me sign
17   all these papers that I was going in, and they let me take a
18   shower.  They took me to a cell like almost 5:00 in the
19   morning.
20   Q.   Okay.  And after you went to the cell, what did you
21   do?
22   A.   Nothing.  I was just there, just hang out.
23   Q.   Okay, did you get any sleep that night or that
24   morning?
25   A.   No, sir.

Page 33

1    Q.   Okay, who picked you up?
2    A.   My mom and my dad.
3    Q.   Now, it is possible -- and I don't know -- that's
4    why I'm going to ask you if during that period you were what
5    we call arraigned.  And that means you were taken before a
6    judge or somebody called a magistrate and told what the
7    charges are against you.  Do you recall when you were there
8    meeting with a judge or somebody called a magistrate?
9    A.   I don't remember.
10   Q.   Okay, fair enough.  Were you told why you were being
11   released?
12   A.   No, sir.
13   Q.   Who picked you up?
14   A.   My dad and my mom.
15   Q.   And what did you do for the rest of the day?
16   A.   Stayed home.
17   Q.   Stayed home?  And when you got home, did the rest of
18   your family know what had happened?
19   A.   Yes, sir.
20   Q.   Did you tell anyone that day that you had been
21   arrested?
22   A.   Yes, sir.
23   Q.   Who did you tell?
24   A.   My brother.
25   Q.   Your brother.  Anyone else?

9 (Pages 30 to 33)

Page 34

1  A.  I don't remember.
2  Q.  In the next couple of days, did you tell anyone that
3  you had been arrested?
4  A.  No, sir.
5  Q.  Did you tell any of your friends during the
6  following -- next week or so that you had been arrested?
7  A.  No, sir.
8  Q.  Okay.  Now, did you sleep that night?  This was
9  Sunday night.
10      MR. PENA:  You mean after he got out?
11      MR. HUGHES:  Yes, that's why I said Sunday
12  night.
13      MR. PENA:  Oh, okay.
14      MR. HUGHES:  I'm sorry, I didn't mean Sunday
15  morning while he was at --
16  Q.  That night, after you were released.
17  A.  I did for a little bit.
18  Q.  You did for a little bit.  And the next night, how
19  did you sleep?
20  A.  My mom told me that I woke up and I was hitting the
21  walls.
22  Q.  Okay.  And did you have any other sleepless nights
23  or difficulty sleeping that week?
24  A.  I don't remember.
25  Q.  You don't remember.  Well, how many times in the

Page 35

1  next, say, couple of weeks did you have difficulty sleeping?
2  A.  Probably for a week.
3  Q.  For a week.  And after that, no more?  I'm sorry,
4  you have to answer out loud.
5  A.  Oh, no, sir.
6  Q.  Okay.  You were frightened to be in jail?
7  A.  Yes, sir.
8  Q.  And for how long -- how long was it after you were
9  released that you continued to feel fright or fear about
10  being in jail?
11  A.  For the first night.
12  Q.  The first night.  And for how long after that did
13  the fright or fear go on?
14  A.  For a week only.
15  Q.  A week.  And after that, you didn't feel it, or
16  what?
17  A.  No, sir.
18  Q.  You didn't feel it anymore after that.  Have you
19  talked to any of your friends about having been in the
20  detention center and in the jail?
21  A.  No, sir.
22  Q.  Have any of your friends found out about it?
23  A.  No, sir.
24  Q.  Have you talked with anybody in school about it,
25  teachers, schoolmates?

Page 36

1  A.  No, sir.
2  Q.  Have you -- and I know you may not know the answer
3  to this one, and it's okay to say you don't know.  Do you
4  think any of your teachers or any of your schoolmates have
5  heard about this?
6  A.  I don't think so.
7  Q.  Has anybody at school sort of mentioned it, I mean
8  just came up to you and said, "I heard this.  What happened?"
9  A.  No, sir.
10  Q.  Not your teachers?  Not your schoolmates?  Has
11  anyone outside your family told you that they heard about
12  that you were arrested?
13  A.  I don't remember.
14  Q.  Okay.  I know that -- I shouldn't ask this question.
15  You said you were in the 10th grade.  Does that mean that
16  you're in the 10th grade this year or going to be in the 10th
17  grade next year?
18  A.  This year.
19  Q.  You're in this year.  So at semester break, at
20  Christmas, how were your grades?
21  A.  They were all right.
22  Q.  Were they worse than the year before, about the
23  same, better, or what?
24  A.  I think lower.
25  Q.  Lower, okay.  Was there any course that you can

Page 37

1  point to that was lower this year at spring -- I mean at
2  semester's end, at Christmas?
3  A.  I don't remember.
4  Q.  You can't think of it right off.  Okay.  Have you
5  talked to any of your teachers about why it is you may not be
6  doing as well as you thought?
7  A.  No, sir.
8  Q.  Okay.  Since your arrest, have you visited with any
9  doctors?
10  A.  No, sir.
11  Q.  Let's say -- I know in the last week this has become
12  an issue because your attorney told you you would have to
13  give a deposition.  But let's say a month ago, how often
14  would you think about this incident?
15  A.  Every two weeks.
16  Q.  Say again?
17  A.  Two weeks.
18  Q.  Once every two weeks.  And what would happen when
19  you would think about it?
20  A.  While I was sleeping, I would get up and be hitting
21  the walls.
22  Q.  Hitting the walls.  Do you recall this, or is this
23  something that people tell you later?
24  A.  It was my mom and my dad is always telling me.
25  Q.  Okay.  They tell you that this is what you do?

10 (Pages 34 to 37)

Page 38

1   A. Yes, sir.
2   Q. But you don't recall this actually happening?
3   A. Well, only once because my hands were hurting when I
4   woke up.
5   Q. Okay. Do you recall having nightmares then or
6   something?
7   A. No, sir.
8   Q. Okay, so you don't know -- you don't recall anything
9   about how that happened at all? And that never happened
10  before you were arrested?
11  A. No, sir.
12  Q. Not at all?
13  A. Not at all.
14  Q. Are there any medications that you take regularly?
15  A. Probably eye drops.
16  Q. Eye drops. And who prescribed those for you?
17  A. Larry Miranda.
18  Q. Okay. When was the last time you saw Dr. Miranda?
19  A. I don't know.
20  Q. I'm sorry?
21  A. For the eye drops?
22  Q. Yes.
23  A. Probably like four months.
24  Q. Say again.
25  A. Four months.

Page 39

1   Q. Okay. Are there any other medications you're
2   taking?
3   A. No. I don't remember.
4   Q. Okay. Other than members of your family and your
5   attorney, who else have you talked with about being arrested?
6   A. I don't know.
7   Q. Do you know of anybody today who holds a poor
8   opinion of you because you were arrested by the police?
9   A. No, sir.
10  Q. Is there anyone that you can think of that seems
11  to -- that after you were arrested seem to want to have
12  nothing to do with you or seem now to dislike you in some
13  manner?
14  A. No, sir.
15  Q. Okay.
16      MR. HUGHES: That's it. I'll reserve the rest
17  of my questions for trial.
18      MR. PENA: We're done.
19      (Deposition concluded)
20
21
22
23
24
25

Page 40

1   ERRATA SHEET/SIGNATURE PAGE
2   PAGE LINE CHANGE                REASON
3   _____
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  I, JESUS MARIO ESQUIVEL, JR., have read the foregoing
    transcript and hereby affix my signature that same is true and
15  correct, except as noted above.
16      _____
        JESUS MARIO ESQUIVEL, JR.
17
18  THE STATE OF TEXAS
19  COUNTY OF COUNTY
20      SUBSCRIBED AND SWORN TO BEFORE ME, the
21  undersigned authority on this the _____ day of
22  _____, 2004.
23
24      _____
        Notary Public in and for
25      The State of Texas

Page 41

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION
ORELIA ESQUIVEL,              X
INDIVIDUALLY AND A/N/F        X
JESUS ESQUIVEL, JR.           X
    Plaintiffs                X
                             X
VS.               X CIVIL ACTION NO. B-03-104
                             X
SSP PARTNERS & CITY OF        X
HARLINGEN POLICE DEPARTMENT   X
    Defendants                X

REPORTER'S CERTIFICATE TO THE ORAL DEPOSITION OF
JESUS MARIO ESQUIVEL, JR.
MARCH 8, 2004
    I, MAUREEN STINGLEY, Certified Court Reporter,
certify that the witness, JESUS MARIO ESQUIVEL, JR., was
duly sworn by me, and that the deposition is a true and
correct record of the testimony given by the witness on
MARCH 8, 2004, that the deposition was reported by me in
stenograph and was subsequently transcribed under my
supervision.
    I FURTHER CERTIFY that I am not a relative,
employee, attorney or counsel of any of the parties, nor a
relative or employee of such attorney or counsel, nor am I
financially interested in the action.

    WITNESS MY HAND on this the _____ day of
_____, 2004.

        _____
        MAUREEN STINGLEY, CSR 691
        Expiration Date: 12/31/04
        Firm Registration No. 41
        Bryant & Stingley, Inc.
        2010 East Harrison
        Harlingen, TX  78550

11 (Pages 38 to 41)

BRYANT & STINGLEY, INC.

(956)428-0755
0165704f-eb53-4c4c-baa8-3347b2957989

**STATE OF TEXAS**
**COUNTY OF CAMERON**

**BEFORE ME, the undersigned authority, a notary public in and for Cameron County, Texas on this day personally appeared _Norma Parke_ who, after by being duly sworn did depose and say:**

My name is Norma Parke and my date of birth is 4-23-73. I live at 514 S. "A" St. in Harlingen, TX. My home phone number is 789-5746. I am currently unemployed.

On Monday night, May 17, 2003, I was at home with my neighbor, Aida Velasco. We wanted to go to the Circle K and buy some more beer. My neighbor drove my Jeep and I rode in the passenger side. We pulled into the Circle K on Fillmore and Commerce Street. We parked in front of the front door to the store. My neighbor went inside the store and I stayed in the Jeep. From where I was sitting, I saw a guy at the counter wearing shorts and T-shirt and a baseball cap. I saw the guy in the shorts kind of lean over and then the clerk handed him a paper bag. The guy with the shorts then walked out of the store and I saw him fixing his shirt and I saw that he had a black gun underneath his shirt. I remembered him walking past my door and getting inside a white Ford Explorer that was parked at the gas pumps. My neighbor then came outside and said that someone had just robbed the store asked if I saw the guy. I asked if it was the guy wearing the T-shirt, shorts and a cap and she said yes. I asked where he was and I told her that he left in the Explorer. My neighbor then went back in the store and came outside again and that's when I memorized the license plates of the white Explorer as it left the parking lot. The Explorer peeled out as it drove off on Fillmore St.

I was asked to come to the Harlingen Police Station by Sgt. Means regarding this incident. When I came into his office, I saw a picture on his desk which I immediately recognized as the one who I saw leave the store with the paper bag. I have signed the picture and dated it. When I first spoke to Sgt. Means he asked what I saw and I remembered the man walking past my door and getting inside the Ford Explorer. I then watched the video and saw that he did not walk past my door, but it looked like he walked out of store to the right. I now know that he did not walk past my door but I'm sure I saw him get inside the Ford Explorer. I had three beers to drink that night and I was feeling "buzzed" at the time that I witnessed the robbery.

RUBEN CONTRERAS, ''
MY COMMISSION EXPIRES
February 4, 2006

**SWORN AND SUBSCRIBED TO BEFORE ME, on this** _78_ **day of** _May_ **20** _03_

**Notary Public in and for Cameron County Texas**

_Ruben Contreras II_          _Feb 4, 2006_

**Name (printed or typed)   Commission Expires**

# EXHIBIT 4

## DEPOSITION EXCERPTS
## OF
## THOMAS HUSHEN

Taken on March 17, 2004

Deposition pg. 15-16

Deposition pg. 16 ln 17-25

Deposition pg. 19 ln 1-9

Deposition pgs. 22-23

Deposition pg. 23 ln 20-25

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

BROWNSVILLE DIVISION

ORELIA ESQUIVEL,                ) (

INDIVIDUALLY AND A/N/F          ) (

JESUS ESQUIVEL, JR.             ) (

      Plaintiffs                ) (

                       ) (

VS.                             ) (CIVAL ACTION NO. B-03-104

                       ) (

SSP PARTNERS & CITY OF      ) (

HARLINGEN POLICE DEPARTMENT ) (

      Defendants                ) (

---

ORAL DEPOSITION OF

THOMAS HUSHEN

MARCH 17, 2004

---

    ORAL DEPOSITION OF THOMAS HUSHEN, produced as a
witness at the instance of the PLAINTIFFS, taken in the
above styled and numbered cause on MARCH 17, 2004,
reported by SHELLEY STINGLEY, Certified Court Reporter

No. 5725, in and for the State of Texas, at the offices

of Adams & Graham, L.L.P., 222 East Van Buren,

Harlingen, Texas, pursuant to the Federal Rules of

Civil Procedures.

RECEIVED

MAR 2 5 2004

Page 2

APPEARANCES

COUNSEL FOR PLAINTIFFS:

RUBEN PENA
LAW OFFICE OF RUBEN R. PENA, P.C.
222 West Harrison Street
Harlingen, Texas 78550

COUNSEL FOR CITY OF HARLINGEN POLICE DEPARTMENT:

ROGER W. HUGHES
ADAMS & GRAHAM, L.L.P.
222 East Van Buren Street
West Tower
Harlingen, Texas 78550

INDEX

|  | PAGE |
|---|---|
| Appearances | 2 |
| THOMAS HUSHEN | |
| Examination by Mr. Pena | 3 |
| Examination by Mr. Hughes | 31 |
| Examination by Mr. Pena | 31 |
| Errata Sheet/Signature Page | 33 |
| Reporter's Certificate | 34 |

EXHIBITS

EXHIBIT
NUMBER   DESCRIPTION                          MARKED

1    Affidavit of Thomas Hushen (Signed)....    9

2    Affidavit of Thomas Hushen (Unsigned)     9

Page 3

1
2          THOMAS HUSHEN,
3    having been duly sworn, testified as follows:
4          EXAMINATION
5    BY MR. PENA:
6      Q. Would you tell us your name for the record,
7    please?
8      A. Thomas Hushen.
9      Q. And, Mr. Hushen, what do you do for a living?
10     A. Right now I'm the chief emergency officer for
11   Cameron County.
12     Q. And how long have you been the chief emergency
13   officer for Cameron County?
14     A. Since October.
15     Q. October 2003?
16     A. Yes.
17     Q. Prior to that, were you employed by the
18   Harlingen Police Department?
19     A. Yes.
20     Q. And how long were you employed by them?
21     A. 15 years.
22     Q. What was the highest rank you obtained in
23   Harlingen PD?
24     A. Lieutenant.
25     Q. And have you ever had your deposition taken

Page 4

1    before?
2      A. Yes, I have had a deposition taken.
3      Q. Have you had an opportunity to visit with
4    Mr. Hughes today or some other time about what we're
5    doing here today?
6      A. Yes.
7      Q. You understand this is a case involving Orelia
8    Esquivel and her son Jesus Esquivel?
9      A. Yes.
10     Q. And it arises out of the investigation -- and
11   their subsequent arrest -- of an armed robbery at a
12   Circle K at commerce and fill more. Do you remember
13   that?
14     A. Yes.
15     Q. Okay. Would you tell us a little bit about
16   your background? Where were you born?
17     A. Born in San Benito.
18     Q. Okay. And what is your date of birth?
19     A. 2-17-65.
20     Q. And did you obtain a college degree or college
21   hours?
22     A. I have about 64 hours of college.
23     Q. Where were those at?
24     A. At Brownsville and in Harlingen.
25     Q. TSTC?

Page 5

1      A. Yes.
2      Q. And is there a major in those 64 hours?
3      A. Secondary education.
4      Q. And you mentioned that you had been working for
5    the Harlingen PD for 15 years prior to going to chief
6    emergency officer at Cameron County, correct?
7      A. Right, yes.
8      Q. What did you do before you were employed for
9    the Harlingen Police Department?
10     A. I worked for L. L. Harris.
11     Q. L. L. Harris?
12     A. Yes.
13     Q. And what is --
14     A. It's a distribution company out of Corpus.
15     Q. And what did L. L. Harris distribute?
16     A. Grocery supplies.
17     Q. And how long did you work for them?
18     A. About six months.
19     Q. And I assume that you went to an academy to get
20   your certification?
21     A. Yes.
22     Q. Where was that at?
23     A. In San Benito, the Lower Rio Grande Valley
24   Regional Police Academy.
25     Q. And when did you complete the academy? Do you

2 (Pages 2 to 5)

Page 6

1  recall?
2      A. It was right -- oh, gosh -- when I got hired so
3  it was 1987 or '88.
4      Q. Okay, close enough. And would you tell me the
5  -- are you married?
6      A. Yes.
7      Q. And what is your wife's name?
8      A. Bobbie, B-o-b-b-i-e, Jo.
9      Q. Okay. And do you have any children over the
10  age of 18?
11      A. No.
12      Q. Do your parents live in San Benito or --
13      A. My father is deceased and my mother lives next
14  door to me.
15      Q. Okay. Do you have any siblings?
16      A. I have two sisters and a brother.
17      Q. Do they live in Cameron County?
18      A. One sister does.
19      Q. Okay. And what is her name?
20      A. Arlene.
21      Q. And her last name?
22      A. Printy.
23      Q. P-r-i-n --
24      A. P-r-i-n-t-y.
25      Q. -- t-y. And where does she live?

Page 7

1      A. She lives over on Susan Street.
2      Q. In Harlingen, as well?
3      A. Yes.
4      Q. Okay. Other than going to the academy, have
5  you received any other training from the Harlingen
6  Police Department dealing with investigation or any
7  other kind of training for police work?
8      A. Yes, over the career there's been a lot of
9  training.
10      Q. Give me an example.
11      A. Well, I'm -- as far as just investigation or
12  just training in general?
13      Q. Let's stick with investigation.
14      A. We went through an investigation that everybody
15  has to go through. I can't remember the TCLEOSE number
16  on it, but it's a mandatory class.
17      Q. By TCLEOSE?
18      A. Yes.
19      Q. And did you do any FBI academies or anything
20  like that?
21      A. No.
22      Q. No?
23      A. No.
24      Q. Okay. And do you recall any other
25  investigative training that you may have had over the

Page 8

1  15 years?
2      A. Oh, gosh, there was accident training. There
3  was all kinds of trainings.
4      Q. Okay. Do you have any specific training
5  dealing with robberies or armed robberies?
6      A. I know that they are included in our initial
7  investigation courses.
8      Q. Okay. Back in May of 2003, you were employed
9  as a lieutenant with the City of Harlingen Police
10  Department; is that correct?
11      A. Yes.
12      Q. Okay. You are looking at the statement that
13  you -- is that a statement that you prepared?
14      A. Yes.
15      Q. Okay. Let me show you what I have marked as
16  Hushen Exhibit No. 1. Is that the same exhibit that
17  you're looking at, same document that you're looking
18  at?
19      A. Yes.
20      Q. Okay. Now let me show you what I have marked
21  as Hushen Exhibit No. 2. Is that an identical copy of
22  the same document with the exception of your signature
23  and notarization?
24      A. Yes.
25      Q. Okay. Exhibit No. 2 is the one that was

Page 9

1  provided to me by the City of Harlingen. This morning
2  they provided me with a copy of Exhibit No. 1, which is
3  your executed and notarized statement. Can you explain
4  to me or the members of the jury why the unexecuted
5  copy would have been contained in the file?
6      A. I have no idea.
7      Q. Okay. Who was the lead investigator in this
8  case? Do you know?
9      A. No.
10      Q. Is there a lead investigator in cases like
11  this?
12      A. Depending on who is assigned the case.
13      Q. Okay. All right, let me ask you in a different
14  way. Would there, in your experience with the
15  Harlingen Police Department, would there be somebody
16  assigned as a lead investigator in an armed robbery?
17      A. Yes.
18      Q. Okay. Do you recall who that would have been
19  in this case?
20      A. No.
21      Q. Okay. Is there a document that would tell me
22  who the lead investigator would be?
23      A. You would have to look into the file that was
24  sent up to the district attorney's office, and in that
25  file it should have who the lead investigator was.

3 (Pages 6 to 9)

Page 10

1    Q.  Okay, we'll take a look at that in just a
2  second.  The Exhibit No. 1, which is your executed
3  statement, was notarized by Ruben Contreras, III.  Do
4  you see that?
5    A.  Yes.
6    Q.  And Ruben Contreras, III, is also a police
7  officer with the city of Harlingen; is that correct?
8    A.  Yes.
9    Q.  Now, it says -- is that your signature --
10    A.  Yes.
11    Q.  -- on Exhibit No. 1?  Correct?
12    A.  Yes.
13    Q.  Okay.  And it says that you signed this on May
14  18, 2003, correct?
15    A.  Probably when I finished all this writing it
16  was the 18th.
17    Q.  All right.  Would there have been a reason that
18  it wouldn't have been signed on the 18th --
19    A.  No.
20    Q.  -- or on another date other than the 18th?
21    A.  No.
22    Q.  Okay.  Let's go through your statement
23  initially here.  You note that on May the 17th at
24  10:20 p.m. you responded to the aggravated robbery at
25  705 South Congress, correct?

Page 11

1    A.  Correct.
2    Q.  And were you on duty at that time?
3    A.  Yes.
4    Q.  Was that your normal shift?
5    A.  Yes.
6    Q.  Okay.  And what happened when -- when it says
7  you responded to an aggravated robbery at 705 South
8  Congress, what does that mean?
9    A.  That means that we went towards the area of
10  705 South Congress in reference to an aggravated
11  robbery that just occurred.
12    Q.  Okay.  And did you arrive at the 705 South
13  Congress Circle K?
14    A.  Eventually, I did.
15    Q.  Okay.  When you say eventually, what does that
16  mean?
17    A.  What we usually do on robberies is we saturate
18  the area.  One unit responds -- the designated unit
19  responds directly to the store.  Other units saturate
20  the area, seeing if there's any vehicles leaving,
21  driving erratically.  If we have descriptions, we're
22  looking for the vehicle that was given on the
23  description.
24    Q.  Okay.  And so when you were responding, what
25  happened at that point?

Page 12

1    A.  Well, I responded out there.  I heard -- they
2  gave out license plates to the vehicle and a
3  description of the vehicle from a witness.  Officer
4  Salinas observed a vehicle matching the description,
5  ran the license plate.  They matched.  And he said it
6  was over on -- it was Filmore Street, I believe, around
7  that area.
8    Q.  Well, let me ask you this, Mr. Hushen:  Do you
9  recall this -- because you have the statement here in
10  front of you and you seem to be reading it.  Do you
11  recall this separate and apart from the statement
12  itself?
13    A.  Yes, I remember the call-in.
14    Q.  Okay.  So tell me, did you hear Officer Salinas
15  saying that he had spotted the suspect vehicle?
16    A.  Uh-huh, I believe his words were, "I've got the
17  vehicle in front of me.  These are the license plates,"
18  and they matched.
19    Q.  What did you do then?
20    A.  I told him to wait for backup, keep an eye on
21  it, and then I think another unit finally arrived and
22  he lit them up and pulled them over.
23    Q.  And where were you at that time?
24    A.  I was en route to that area where he was.
25    Q.  And so did you get there after he had made the

Page 13

1  stop?
2    A.  Yes.
3    Q.  Did you go to the stop before you went to the
4  Circle K?
5    A.  Yes.
6    Q.  All right.  And then -- so what happened when
7  you arrived?
8    A.  When I arrived, they had -- we separated the
9  two individuals that were in the vehicle.
10    Q.  Now, were they separated before you arrived or
11  were they separated --
12    A.  When I got there, they were pulling them out,
13  and I told them to separate them.
14    Q.  Do you recall who the other officer was?
15    A.  I know Salinas was there.
16    Q.  Is there a Fincher or --
17    A.  Fechner.
18    Q.  Fechner.  Is he still with the department?
19    A.  Yes.
20    Q.  Is that who the other police officer was?
21    A.  Yes, but I can't remember which one because
22  they are twins.
23    Q.  Are they identical twins?
24    A.  Yes.  And I'm thinking -- they are either Brad
25  or Bill and I can't --

4 (Pages 10 to 13)

Page 14

```
1    Q. Okay. All right, so do you recall who Officer
2  Salinas was with?
3    A. Salinas was with the mother.
4    Q. Okay. And the other officer was with the son?
5    A. Yes.
6    Q. Okay. When you arrived, were they handcuffed?
7    A. No.
8    Q. Okay. At the time that you were there did you
9  witness them being handcuffed or not?
10    A. While I was there?
11    Q. Yes.
12    A. When I told them to make the arrest.
13    Q. Okay. So you told them to make the arrest
14  while you were present?
15    A. No.
16    Q. No?
17    A. No, I'm sorry. I take that back. I did tell
18  them to make the arrest from the radio.
19    Q. Well, where were you?
20    A. I went back to the Circle K to get the hundred
21  percent sure from the witness.
22    Q. All right, so let me see if I understand this.
23  So you arrived --
24    A. Okay, hold on. Let me remember correctly.
25    Q. Okay.
```

Page 15

```
1    A. Because it is a while back. I can't remember
2  if they handcuffed them while I was there. I did tell
3  them, "Detain them. I will be right back." And I went
4  back to the Circle K.
5    Q. How long did it take you to get to the
6  Circle K?
7    A. Oh, a couple of minutes. It's right down the
8  street.
9    Q. Exactly. We're talking a few blocks from the
10  stop to the Circle K, correct?
11    A. Uh-huh.
12    Q. Did you interrogate Mrs. Esquivel?
13    A. I asked her some questions.
14    Q. What kinds of questions did you ask? You can
15  look at the statement.
16    A. Thank you. I asked her if she was all right
17  and what happened at the Circle K. She advised that
18  nothing happened, that she was only getting gas. Then
19  I went and spoke to the passenger.
20    Q. You went and spoke to the son?
21    A. Yes.
22    Q. Other than asking her if she was all right and
23  what happened at the Circle K, do you recall asking her
24  anything else?
25    A. I don't recall asking her anything else.
```

Page 16

```
1    Q. Why would you ask her if she was all right?
2    A. There was a robbery. Her vehicle was seen. I
3  don't know what happened to her. I don't know if she
4  was a victim or if she was involved. I want to make
5  sure she was all right and that's usually the question
6  I ask everybody, making sure they are all right and are
7  safe.
8    Q. All right. So then you went over and talked to
9  her son, right?
10    A. Yes.
11    Q. And what happened then?
12    A. I asked him if he was all right and if they had
13  given a ride to anyone.
14    Q. And what did he say?
15    A. He said no.
16    Q. Okay. And anything else that you recall?
17    A. Yes, I informed them of what happened at the
18  Circle K and that witnesses had seen a suspect enter
19  their car and if he had seen anything, and then of
20  course I asked if they were threatened or anything like
21  that because at that moment in time I didn't know what
22  was going on. They could have been threatened.
23        He then advised me that it was his uncle
24  Luis Ovalle that was with them -- or was there in the
25  Circle K and that he had done the robbery.
```

Page 17

```
1    Q. Okay. We now know that that isn't true,
2  correct?
3    A. Well, when I left, it was still under
4  investigation so --
5    Q. No, I said, "We now know." Now, today.
6    A. Today, yes.
7    Q. That that wasn't true, that Luis Ovalle had not
8  robbed the Circle K?
9    A. Apparently he hadn't.
10    Q. Well, are you sitting here today under oath
11  knowing that Mr. Galipp, who was subsequently arrested,
12  didn't rob the store?
13    A. No.
14    Q. Okay. And I'm talking about today, not the day
15  you made the stop, because I understand at that point
16  you were investigating the crime trying to find out
17  what was going on.
18    A. Uh-huh.
19    Q. So it's your testimony that Jesus admitted that
20  his uncle had robbed the store?
21    A. Yes.
22    Q. Okay. Why would he admit to that if it wasn't
23  his uncle that robbed the store?
24    A. I have no idea.
25    Q. Has it been your experience, Mr. Hushen, that
```

5 (Pages 14 to 17)

Page 18

1 people voluntarily admit to things that aren't true
2 when they are being questioned by the police?
3    A. Yes.
4    Q. They do?
5    A. Uh-huh.
6    Q. And why do they do that?
7    A. I have no idea.
8    Q. Okay. So did you believe him at the time that
9 he was voluntarily saying that his uncle had robbed the
10 store?
11    A. Yes.
12    Q. Okay. Did you know Luis Ovalle?
13    A. Do I know him? No.
14    Q. Yeah, that's -- was he a known --
15    A. No.
16    Q. -- individual to you at that time?
17    A. No.
18    Q. Okay. Did you then ask Jesus or his mother
19 where you could make contact with Luis Ovalle?
20    A. When did you want me -- or when did I ask him
21 that question?
22    Q. No, not when. I asked --
23    A. Did I eventually ask him that question?
24    Q. No, that's not my question.
25    A. Okay.

Page 19

1    Q. My question is, at the time that you were
2 getting this statement from Jesus saying that it was
3 his uncle that committed the robbery, did you ask him
4 or his mother where you could locate Luis?
5    A. I don't remember when I asked him that
6 question.
7    Q. Okay. You don't know if you asked him that at
8 that --
9    A. No, I don't remember when.
10    Q. Okay, well, that's what I'm saying. You don't
11 remember if you asked him at that point or some other
12 time?
13    A. Right.
14    Q. Did you ever ask him?
15    A. Yes.
16    Q. Okay. But you just don't remember when?
17    A. I don't remember exactly when, but I did ask
18 him that question.
19    Q. Is there somewhere that I could see that there
20 were notes or another report that would show that you
21 had obtained this information?
22    A. You may be able to find that in the log records
23 because the address that was given to me, an officer
24 was dispatched -- or an officer went out to that
25 location to look for the suspect.

Page

1    Q. Okay.
2    A. And that should be on the logs because he did
3 check out, because I remember when he checked out I
4 said, "I hope backup is en route with him," so he did
5 make an effort to locate him.
6    Q. So the log records would reflect that?
7    A. Yes.
8    Q. And you don't remember what officer went?
9    A. No.
10    Q. I wouldn't expect that. You weren't the
11 officer that went?
12    A. No.
13    Q. And you didn't direct somebody specifically to
14 go out to this address and see if they could locate
15 Luis Ovalle?
16    A. No.
17    Q. You don't -- okay. Now, so it's your testimony
18 that in your 15 years of experience when you stop
19 suspects or you have someone in custody that they will
20 lie about an event, correct?
21    A. Not all the time.
22    Q. Well, not all the time but it's not --
23    A. It's not unheard of.
24    Q. Okay.
25    A. But it's also not unheard of for them to say

Page 21

1 the truth.
2    Q. So you weren't surprised then when it didn't
3 turn out to be Luis Ovalle that committed the robbery?
4    A. No, I was surprised.
5    Q. You were surprised?
6    A. Uh-huh.
7    Q. Okay. Now, let's go to your statement and in
8 kind of the middle of the page, let's go there. Now,
9 apparently, when you told, I guess, Jesus that you had
10 information that someone had entered the car, that a
11 witness had seen the suspect enter the car, and you
12 asked if he had seen anything and that's when he -- you
13 asked if he had been threatened to give a ride or
14 something.
15    A. Right.
16    Q. And then you state, "Jesus then advised that
17 his uncle Luis Ovalle was the one in Circle K that had
18 done the robbery, but he was not involved," right?
19    A. Right.
20    Q. Okay. Was that close to what his actual words
21 were?
22    A. Pretty close.
23    Q. Then you said, "I terminated the interview and
24 drove back to the Circle K to interview the witness."
25    A. Right.

6 (Pages 18 to 21)

**Page 22**

1  Q. Norma Parke. Okay, and "I asked her if she was
2  a hundred percent sure that she saw the suspect,"
3  correct?
4  A. Uh-huh.
5  Q. Correct?
6  A. Yes.
7  Q. So you talked to Norma Parke?
8  A. Yes, I did.
9  Q. When you interviewed her, where did you
10 interview her?
11 A. Right in front of the doors of the Circle K.
12 She was sitting in her vehicle.
13 Q. And when you interviewed her, was she in her
14 vehicle?
15 A. Yes.
16 Q. Okay, you didn't ask her to step out or go
17 somewhere else?
18 A. No.
19 Q. Okay. What do you remember about Norma Parke?
20 A. I remember the location where she was sitting
21 and I remember saying that that was a perfect viewpoint
22 to see what was going on in there.
23     I asked her if she was sure of what she
24 had seen. She explained it to me one more time, what
25 she had seen, and that she saw the suspect get into the

**Page 23**

1  vehicle and then drive off.
2  Q. Anything else you remember about it?
3  A. No, not really.
4  Q. Okay. Did you smell any alcohol on her breath?
5  A. No.
6  Q. None?
7  A. Huh-uh.
8  Q. Do you remember seeing her statement where she
9  said that she and her friend were buzzed?
10 A. No.
11 Q. Okay. You didn't see that statement?
12 A. No.
13 Q. Okay. Did you see the beer cans in the car
14 that they had just bought a short time before the --
15 or, actually, a short time right after the robbery?
16 A. No.
17 Q. All right, now, after you spoke to Norma Parke,
18 you note here that she described him, right?
19 A. Right.
20 Q. All right. And then, after that, you looked at
21 the surveillance tape, correct?
22 A. Yes.
23 Q. And did the surveillance tape match the
24 description that she gave?
25 A. Yes.

**Page 24**

1  Q. And you sent that out in this particular -- in
2  this statement that you made, correct?
3  A. Yes.
4  Q. And then you said you advised to arrest the two
5  subjects in the Explorer?
6  A. Right.
7  Q. Because, at that point, the story that Norma
8  Parke was giving you matched with the description of
9  the suspect, correct?
10 A. Uh-huh.
11 Q. All right. The next statement that you have
12 there is that you checked the vehicle and you found a
13 Jack-In-The-Box bag and that it contained three
14 hamburgers.
15 A. Right.
16 Q. Did that confirm your suspicion that there were
17 three people in the vehicle?
18 A. No.
19 Q. Just confirmed that there were three
20 hamburgers?
21 A. That there were three hamburgers.
22 Q. And then, "The receipt stated that they were
23 purchased at 10:23"?
24 A. Yes.
25 Q. You then contacted management at

**Page 25**

1  Jack-In-The-Box, right?
2  A. Right.
3  Q. Did you go over there yourself?
4  A. Yes.
5  Q. You spoke to Lori Trevino?
6  A. I spoke to the manager who gave me the name of
7  the person that was there, home phone number, called
8  her up and asked her.
9  Q. And she remembered the vehicle?
10 A. Yes.
11 Q. And she told you that she remembered that there
12 were three individuals in the vehicle, correct?
13 A. Yes.
14 Q. Is that correct?
15 A. Yes.
16 Q. Did you ever get a written statement from Lori
17 Trevino?
18 A. No.
19 Q. Is there any particular reason why we didn't do
20 that?
21 A. I don't know what the investigators did after
22 that after I gave them the information.
23 Q. All right. What else did you have to do with
24 the investigation of this particular case?
25 A. Just checked over the reports, did our

Page 26

1  statements, turned them in, and that was about it.
2     Q.  Now, in the log records, will we also find the
3  various officers that were at the --
4     A.  You should, yes.
5     Q.  Let me finish my question.
6     A.  I'm sorry.  Forgive me.
7     Q.  It's all right.  She just can't get us both
8  down.
9     A.  She warned me about that, too.
10    Q.  Yeah, and it's not a real hard question.  In
11 the log records we'll find the officers that responded
12 to Officer Salinas's stop, correct?
13    A.  Yes.
14    Q.  And we'll also find in the log, I assume,
15 something indicating that you were on the scene, as
16 well, correct?
17    A.  Yes.
18    Q.  Okay.  And the same thing of the officers
19 responding to the Circle K?
20    A.  Yes.
21    Q.  Okay.  We have found that a person by the name
22 of Galipp or Galipp is the one who was eventually
23 arrested for this -- Joe Wayne Galipp was eventually
24 arrested for this robbery, correct?  Do you know that
25 or not?

Page 27

1     A.  I know somebody was arrested.  I don't remember
2  who it was.
3     Q.  Did you have anything to do with the arrest?
4     A.  No.
5     Q.  Okay.  Did you have anything to do with the
6  release of Ms. Esquivel and her son?
7     A.  No.
8     Q.  Okay.  Do you know when the Harlingen Police
9  Department determined that, in fact, the Esquivels were
10 not involved in the robbery?
11    A.  I was told the next day by David Means.
12    Q.  Okay.  Did you ever go back and talk to Norma
13 Parke about her statement --
14    A.  No.
15    Q.  -- implicating my clients in the robbery?
16    A.  No.  Once I finished up, I'm done with the case
17 pretty much.  Detectives handle it.
18    Q.  Okay.  And, at that time, were you a patrol
19 officer or what were -- you were a lieutenant but
20 what --
21    A.  On patrol.
22    Q.  On patrol.  So, after the arrest, the
23 detectives take over?
24    A.  Yes.
25    Q.  And it's up to them to make the determination

Page 28

1  of who actually committed the robbery or whatever the
2  crime is?
3     A.  Based on the evidence that we give them.
4     Q.  During the time that you were interrogating
5  Mrs. Esquivel and her son, did you read them their
6  Miranda warnings?
7     A.  Well, it wasn't an interrogation.  It was
8  questioning.
9     Q.  I'm sorry, the questioning.
10    A.  And, no, did not read them the Miranda
11 warnings.
12    Q.  Did anyone, while you were present, threaten
13 them in any way?
14    A.  No.
15    Q.  And by threaten, I don't mean with bodily harm.
16 I mean any other types of threat that may imply that
17 they would be arrested if they didn't tell the truth or
18 that they would be deported or that they wouldn't ever
19 be able to get out of jail, anything like that?
20    A.  No, not to my knowledge.
21    Q.  Have you ever heard that they were, that they
22 were threatened in that manner?
23    A.  No.
24    Q.  Okay.  And if a police officer were to do that,
25 would that be a violation of a policy of the City or

Page 29

1  would that be something that you sometimes, you know,
2  try to get people to tell you, you know, the truth so
3  maybe they will know what the consequences might be?
4     A.  When you question a person, you can tell them
5  the consequences of the action that was done.
6     Q.  Okay.
7     A.  Some people may perceive that as a threat.  If
8  I tell them, you know, "If you are convicted of this
9  robbery, you can serve so much time in jail."  They may
10 perceive that as a threat, but it is basically what
11 will happen if they are convicted.
12    Q.  Okay.
13    A.  And it's not in a threatening manner.  It's
14 just the truth as to what may go on.
15    Q.  What the consequences of a crime might be?
16    A.  Yes, exactly.
17    Q.  And I'm assuming that, since you're telling me
18 that, that you have informed people of that in the
19 past?
20    A.  I have informed people of that in the past.
21    Q.  Have you understood my questions, Mr. Hushen?
22 Is that a yes?
23    A.  It's -- yes, I understood them.
24    Q.  You will have an opportunity to review your
25 deposition so if there's anything in there that I

8 (Pages 26 to 29)

BRYANT & STINGLEY, INC.

(956)428-0755

---

**Page 30**

1 wasn't clear on, you will have an opportunity to clear
2 that up, okay?
3    A. Okay.
4        MR. PENA: I'll pass the witness.
5        MR. HUGHES: Just a couple of questions.
6            EXAMINATION
7 BY MR. HUGHES:
8    Q. Did you dispatch any patrolmen to look for
9 Mr. Ovalle?
10    A. I don't remember if I dispatched them, but I
11 did hear them going out to look for him, on the radio.
12    Q. Okay. And over the course of the evening, did
13 you gain some understanding as to whether their efforts
14 were successful or not?
15    A. They were not successful. They went to the
16 residence that was given to them and there was nobody
17 around. Windows were locked. Doors were locked.
18        MR. HUGHES: No further questions.
19            EXAMINATION
20 BY MR. PENA:
21    Q. Do you know if there were any other efforts to
22 find Mr. Ovalle?
23    A. I don't know what happened the next day. But I
24 know that night, when they went out there, they did
25 search the area. We searched the whole area looking

---

**Page 31**

1 for a person on foot and then went to the residence.
2    Q. Oh, okay. When you say "searched the area,"
3 you're talking Circle K or --
4    A. Around the Filmore area, we had everybody
5 saturating that area looking for this guy.
6    Q. Okay. Do you recall where it was that
7 Mr. Ovalle was supposed to live?
8    A. I wish I could. I don't.
9    Q. That's okay. We'll find it, I'm sure.
10        MR. PENA: No more questions.
11        (Deposition concluded)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**Page 32**

ERRATA SHEET/SIGNATURE PAGE

PAGE LINE  CHANGE                    REASON

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

I, THOMAS HUSHEN, have read the foregoing transcript
and hereby affix my signature that same is true and
correct, except as noted above.

_____
THOMAS HUSHEN

THE STATE OF TEXAS
COUNTY OF COUNTY
        SUBSCRIBED AND SWORN TO BEFORE ME, the
undersigned authority on this the _____ day of
_____, 2004.

_____
Notary Public in and for
The State of Texas

---

**Page 33**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ORELIA ESQUIVEL,          )(
INDIVIDUALLY AND A/N/F    )(
JESUS ESQUIVEL, JR.       )(
    Plaintiffs            )(
                          )(
VS.                       )(CIVIL ACTION NO. B-03-104
                          )(
SSP PARTNERS & CITY OF    )(
HARLINGEN POLICE DEPARTMENT )(
    Defendants            )(

REPORTER'S CERTIFICATE TO THE ORAL DEPOSITION OF
THOMAS HUSHEN
MARCH 17, 2004

I, SHELLEY STINGLEY, Certified Court Reporter,
certify that the witness, THOMAS HUSHEN, was duly sworn
by me, and that the deposition is a true and correct
record of the testimony given by the witness on MARCH
17, 2004, that the deposition was reported by me in
stenograph and was subsequently transcribed under my
supervision.
    I FURTHER CERTIFY that I am not a
relative, employee, attorney or counsel of any of the
parties, nor a relative or employee of such attorney or
counsel, nor am I financially interested in the action.

    WITNESS MY HAND on this the _____ day of
_____, 2004.

_____
SHELLEY STINGLEY, CSR NO. 5725
Firm Registration No. 41
Bryant & Stingley, Inc.
2010 East Harrison
Harlingen, TX 78550

9 (Pages 30 to 33)

# EXHIBIT 5

## <u>DEPOSITION EXCERPTS</u>
## <u>OF</u>
## <u>JORGE SALINAS</u>

Taken on March 9, 2004

Deposition pg. 26-29

Deposition pg.28 ln18-pg. 29 ln 12

Deposition pg.26-30

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

BROWNSVILLE DIVISION

ORELIA ESQUIVEL,              ) (

INDIVIDUALLY AND A/N/F        ) (

JESUS ESQUIVEL, JR.           ) (

     Plaintiffs               ) (

                              ) (

VS.                           ) (CIVAL ACTION NO. B-03-104

                              ) (

SSP PARTNERS & CITY OF        ) (

HARLINGEN POLICE DEPARTMENT ) (

     Defendants               ) (

---

ORAL AND VIDEOTAPED DEPOSITION OF

JORGE SALINAS

MARCH 9, 2004

---

ORAL AND VIDEOTAPED DEPOSITION OF JORGE SALINAS, produced as a witness at the instance of the PLAINTIFFS, taken in the above styled and numbered cause on MARCH 9, 2004, reported by SHELLEY STINGLEY,

Certified Court Reporter No. 5725, in and for the State

of Texas, at the offices of Adams & Graham, L.L.P., 222

East Van Buren, Harlingen, Texas, pursuant to the

Federal Rules of Civil Procedures.

Page 2

APPEARANCES

COUNSEL FOR PLAINTIFFS:

RUBEN PENA
LAW OFFICE OF RUBEN R. PENA, P.C.
222 West Harrison Street
Harlingen, Texas  78550

COUNSEL FOR CITY OF HARLINGEN POLICE DEPARTMENT:

ROGER W. HUGHES
ADAMS & GRAHAM, L.L.P.
222 East Van Buren Street
West Tower
Harlingen, Texas  78550

INDEX

PAGE

Appearances ..................................... 2

JORGE SALINAS

Examination by Mr. Pena ........................ 4

Errata Sheet/Signature Page ................... 44

Reporter's Certificate ......................... 45

Page 3

EXHIBITS

EXHIBIT
NUMBER   DESCRIPTION                    MARKED

1   Cross-Notice for Deposition of
    Jorge Salinas .......................... 4

2   Arrest Report .......................... 31

3   Drawing by Jorge Salinas .............. 36

4   Harlingen Detention Center Intake
    Screening Form ........................ 36

5   Investigator's Report ................. --

6   Affidavit of Julio Gonzalez ........... --

7   Affidavit of Norma Parke .............. --

8   Affidavit of Thomas Hushen ............ --

Page 4

1           JORGE SALINAS,
2   having been duly sworn, testified as follows:
3           EXAMINATION
4   BY MR. PENA:
5       Q.  Would you tell us your name for the record?
6       A.  My name is Jorge Salinas.
7       Q.  And, Mr. Salinas, what do you do for a living?
8       A.  I'm a police officer for the City of Harlingen.
9       Q.  And how long have you been a police officer for
10  the City of Harlingen, sir?
11      A.  Approximately four years.
12      Q.  Okay.  Let me show you what I have marked as
13  Exhibit No. 1, Officer Salinas, and ask you if you have
14  seen that before.
15      A.  No, I haven't, sir.
16      Q.  Okay, that's a notice for you to appear here
17  today for your deposition.  If you will turn the page
18  and go on to the third page, there is a list of items
19  there that I have requested that you produce.  Have you
20  brought any documents with you today?
21      A.  No, I haven't, sir.
22      Q.  Okay.
23          MR. PENA:  Mr. Hughes --
24          MR. HUGHES:  I served objections to you on
25  last Friday.  I trust that you received them.  If not,

Page 5

1   I'll go and get another copy for you.  Item one, the
2   investigative file has already been produced.
3           MR. PENA:  Okay.  Is there anything that
4   hasn't been produced?  I believe you mentioned to me
5   off the record that --
6           MR. HUGHES:  I produced the investigative
7   file concerning this case as best I know it exists and
8   everything else on the list I objected to.
9           MR. PENA:  Okay.
10          MR. HUGHES:  Hold on.  I'm sorry.  I
11  forgot.  The DA last week authorized me to release some
12  other documents.  Can we take a break and let me copy
13  them for you?
14          MR. PENA:  Certainly.
15          MR. HUGHES:  Back in a moment.
16          (Brief recess)
17      Q.  Okay, Officer Salinas --
18          MR. PENA:  Well, actually, Mr. Hughes, you
19  have handed me a number of documents here this morning.
20  You have informed me that these all deal with Joe Wayne
21  Galipp; is that correct?
22          MR. HUGHES:  That was the suspect and
23  those reports are listed as that.
24          MR. PENA:  All right.  I'll look at those
25  in a minute.

BRYANT & STINGLEY, INC.

(956)428-0755

fec128b0-05ce-4dc8-94f4-437199e3202e

Page 6

1    Q. Officer Salinas, have you ever had your
2    deposition taken before, sir?
3    A. Yes, I have, sir.
4    Q. Okay, how many times?
5    A. Probably twice.
6    Q. Okay. What kind of cases were those in?
7    A. DWI cases, sir.
8    Q. You gave depositions in DWI cases?
9    A. Yes, sir.
10    Q. Okay, and you were sitting in a conference room
11    like we're doing here today?
12    A. It was court, a courtroom.
13    Q. All right. So it was courtroom testimony?
14    A. I believe it was a deposition. I believe it
15    was.
16    Q. Okay, were you at the courthouse?
17    A. I was at the courthouse.
18    Q. Okay, were you in front of a judge?
19    A. Yes, sir.
20    Q. And the DA was there?
21    A. Just the DA and the judge.
22    Q. And the judge and yourself and the defense
23    attorney were present?
24    A. Yes, sir.
25    Q. Okay. Were you testifying in the prosecution

Page 7

1    of that case?
2    A. I believe so.
3    Q. Okay. In other words, it was a trial?
4    A. I thought it was a deposition. There was no --
5    I believe there was no judge, either. I'm sorry.
6    Q. You don't think there was a judge, either.
7    A. No jury or judge.
8    Q. Okay. And did you ever get your deposition
9    back to review it?
10    A. I don't remember, sir.
11    Q. Okay.
12    A. It was a while back.
13    Q. All right. And how long ago was that?
14    A. Maybe a year, year and a half ago, sir.
15    Q. Okay, about a year, year and a half ago. What
16    is your date of birth, Officer?
17    A. 9-23-70.
18    Q. And can you tell me when you went to high
19    school?
20    A. Graduated in '89.
21    Q. Okay. And where did you graduate from?
22    A. From Sharyland High School.
23    Q. Okay. And did you have any college education?
24    A. Yes, sir, I attended UT Pan Am for about two
25    and a half years.

Page 8

1    Q. Okay. Did you major in anything in particular?
2    A. Criminal justice, police administration.
3    Q. Okay. Did you get a degree or any kind of
4    associate degree?
5    A. No, sir.
6    Q. Okay. How many hours did you complete?
7    A. 64.
8    Q. Have you gone back to complete your
9    undergraduate degree?
10    A. No, sir.
11    Q. Okay. Are you currently attending any
12    undergraduate courses?
13    A. No, sir.
14    Q. When did you first get into law enforcement?
15    A. 2000.
16    Q. Okay. And where did you start?
17    A. Here in Harlingen.
18    Q. Can you tell the members of the jury a little
19    bit about what you had to do to -- I guess to become --
20    are you a certified police officer?
21    A. Yes, I am, sir.
22    Q. Okay. And can you tell the members of the jury
23    what it is you need to do to become a certified police
24    officer?
25    A. Attend an academy.

Page 9

1    Q. And where is that academy?
2    A. Here in Harlingen.
3    Q. Okay. And how long is the academy?
4    A. Three and a half months, sir.
5    Q. Okay. And what kind of classes do you take?
6    A. Pretty much penal code, criminal code of
7    procedures, traffic law, along with others.
8    Q. Okay. Do you take an examination at the
9    completion of your academy?
10    A. Yes, sir.
11    Q. Okay. And I assume you successfully completed
12    the courses and the examination?
13    A. Yes, sir.
14    Q. Okay. What did you do before you started the
15    academy?
16    A. I was in the Marines.
17    Q. Okay. How long were you in the Marines?
18    A. Five years.
19    Q. And what did you do as a marine?
20    A. I was an electronic technician.
21    Q. Did you get honorably discharged?
22    A. Yes, sir, I did.
23    Q. Okay. Did you do any service overseas?
24    A. Yes, I did, sir.
25    Q. Where at?

3 (Pages 6 to 9)

Page 10

1    A. The Gulf.
2    Q. Gulf?
3    A. Persian Gulf.
4    Q. In the Persian Gulf?
5    A. Yes, sir.
6    Q. Okay. Did you see any action?
7    A. Almost.
8    Q. Almost?
9    A. Almost.
10   Q. Okay. Where were you stationed?
11   A. I was stationed in Yuma, Arizona.
12   Q. And when you went overseas, where did you go?
13   Were you on a ship or were you --
14   A. Yes, sir, I was on a ship. Hawaii, Guam,
15   Australia, Thailand.
16   Q. Okay.
17   A. Kuwait.
18   Q. Kuwait, all right. Did you -- before joining
19   the Marines, what did you do?
20   A. I was a truck driver.
21   Q. Okay. How long were you a truck driver for?
22   A. About two years, sir.
23   Q. Okay. Who did you drive for?
24   A. L. D. Brinkman.
25   Q. I'm sorry?

Page 11

1    A. L. D. Brinkman.
2    Q. L. D.?
3    A. Yes, sir, Brinkman.
4    Q. And what kind of truck driving is that?
5    A. Carpet distributor.
6    Q. Carpet distributor?
7    A. Yes, sir, and flooring.
8    Q. Okay. And where are they located?
9    A. They were located in Pharr, but it's gone now.
10   Q. It closed down?
11   A. Yes, sir.
12   Q. Are you married?
13   A. No, sir.
14   Q. Okay. Do you have -- are your parents still
15   alive?
16   A. Yes, sir.
17   Q. Do they live in Hidalgo County?
18   A. Yes, sir, they do.
19   Q. Okay. Do you have any brothers or sisters that
20   live in Cameron County?
21   A. No, I don't, sir.
22   Q. Do you have any other relatives that are in law
23   enforcement?
24   A. Yes, sir.
25   Q. And who are they?

Page 12

1    A. Two cousins of mine.
2    Q. Okay, and where are they at?
3    A. One is in McAllen and one in Pharr.
4    Q. Did you -- I assume you -- when you started
5    working for the Harlingen PD, that was the first law
6    enforcement agency that you worked for; is that
7    correct?
8    A. Yes, sir, that's the first one I worked for. I
9    had attended an academy in Hidalgo County, the
10   sheriff's department. I had completed that academy and
11   never got hired.
12   Q. Okay. Have you been continuously employed by
13   Harlingen PD since you started?
14   A. Yes, sir.
15   Q. Have you had any complaints lodged against you?
16   A. Yes, I have.
17   Q. Okay. What kind of complaints?
18   A. One was excessive force.
19   Q. Okay. And was that resolved?
20   A. Yes, sir, it was resolved.
21   Q. Okay. Did you receive any kind of negative
22   warnings or any kind of reprimand as a result?
23   A. No, I didn't.
24   Q. Was that resolved in your favor?
25   A. Yes, sir, it was.

Page 13

1    Q. Any other complaints other than that one?
2    A. That's the only one, sir.
3    Q. Okay. When did you -- when you first started
4    working for the Harlingen Police Department, were you
5    on a probationary period?
6    A. Yes, sir.
7    Q. Okay. How long was that probationary period?
8    A. One year.
9    Q. Okay. And during that one year of probationary
10   employment with the City of Harlingen, what was your
11   job assignment?
12   A. I was a patrol officer.
13   Q. And during that first year of probationary as a
14   patrol officer, did you drive by yourself or did you
15   have a partner?
16   A. I had a partner for the first eight weeks and
17   then I went on my own.
18   Q. Where do you live?
19   A. In Mission.
20   Q. In Mission. So you commute every day?
21   A. Yes, sir.
22   Q. Bad traffic.
23   A. Oh, yeah.
24       MR. HUGHES: He almost didn't make it this
25   morning.

4 (Pages 10 to 13)

Page 14

1      MR. PENA: You should have told him.
2  Lawyers are always late.
3      MR. HUGHES: I couldn't tell him about
4  that.
5      Q. So for the first eight weeks you had a partner.
6  Who was your partner?
7      A. I had three partners, Art Martinez, J. D.
8  Cavazos and J. L. Garcia.
9      Q. J. L.?
10     A. Yes, sir.
11     Q. Okay. And during the eight weeks -- those
12  first eight weeks, what was your schedule, your time,
13  that you were on patrol?
14     A. During the day, sir.
15     Q. Okay.
16     A. From about 7:00 to 3:00.
17     Q. So you had the day shift?
18     A. Pretty much for a month. Then we rotate to
19  mids and then graveyard.
20     Q. So you would rotate -- did you rotate, in those
21  eight weeks, all three of those shifts?
22     A. Yes, sir, I did.
23     Q. And during those first eight weeks, did you
24  make any arrests?
25     A. Yes, sir.

Page 15

1      Q. Okay. Do you recall your first arrest?
2      A. Probably for PI.
3      Q. Probably PI, okay.
4      A. That's the most common.
5      Q. And where -- do you recall where the PI was?
6      A. I don't recall, sir. It's probably at La
7  Plazita.
8      Q. La Plazita, over by my office, okay. Other
9  than PI, do you recall any other specific arrests that
10  you have made?
11     A. During the training?
12     Q. Yes, sir.
13     A. Probably family violence.
14     Q. Family violence.
15     A. Family violence situations.
16     Q. Did you get quite a number of family violence
17  calls during your first eight weeks of probation?
18     A. Pretty much. It's pretty much an everyday
19  thing.
20     Q. During this first eight weeks, did you ever get
21  any -- did you ever make any arrests for robberies?
22     A. I don't remember, sir.
23     Q. Okay. After your probation, do you recall
24  making any -- other than the incident which we're here
25  about today, do you recall making any arrests for

Page 16

1  robberies?
2      A. Robberies?
3      Q. Uh-huh.
4      A. I don't recall, sir.
5      Q. Do you recall making any arrests for aggravated
6  robbery?
7      A. No, sir.
8      Q. Okay.
9      A. I don't remember.
10     Q. All right. Do you know the difference between
11  the definition of an aggravated robbery and a robbery?
12     A. Yes, sir.
13     Q. Okay. What is that?
14     A. A robbery, there's no weapon involved.
15  Aggravated robbery, there's some type of weapon or an
16  injury involved.
17     Q. And that's typically the distinction between
18  the two, a weapon involved in one and not in the other?
19     A. Yes, sir, an injury, also.
20     Q. Or an injury. Can you tell the members of the
21  jury what your understanding is of probable cause, how
22  that is defined?
23     A. Probable cause, it's a reasonable belief that
24  somebody has committed some type of crime and you have
25  a belief that he's involved in that crime.

Page 17

1      Q. Okay. And is that something that you have been
2  trained at the academy and they taught you at the
3  academy?
4      A. Yes, sir, probable cause.
5      Q. Okay. All right, have you had an opportunity
6  to visit with Mr. Hughes about what we're doing here
7  today?
8      A. Yes, sir.
9      Q. Okay. You understand that you're under oath?
10     A. Yes, sir.
11     Q. Okay. You understand that when your testimony
12  has been completed, it will be made into a booklet form
13  and you will have an opportunity to review that? Do
14  you understand that?
15     A. Yes, sir.
16     Q. During this time I'm going to be asking you
17  questions -- and you have been doing a great job of
18  letting me finish my question, and I'll do you the
19  courtesy of letting you finish your response, as well,
20  all right?
21     A. Yes, sir.
22     Q. If during the deposition I ask you a question
23  that's unclear, you don't understand, is confusing, I
24  don't make any sense whatsoever, just tell me to repeat
25  it and I'll try to rephrase it, okay?

5 (Pages 14 to 17)

Page 18

1    A. Yeah.
2    Q. What do you recall about the arrest on May the
3  17th, 2003 of Jorge Luis -- I'm sorry of Orelia Perez
4  Esquivel and her son Jesus?
5    A. We were given a call at Circle K on Commerce.
6    Q. Okay.
7    A. About an aggravated robbery. A witness saw the
8  vehicle, a white Ford explorer, gave the license
9  plates, which I don't recall at this time. I went
10  ahead and responded as a back-up officer and --
11    Q. I'm sorry. You did what, now?
12    A. I responded as a back-up officer. Supposedly
13  the vehicle had left the scene so we were out there
14  looking for the vehicle.
15    Q. Okay.
16    A. I spotted a vehicle matching the description on
17  13th and Tyler. I turned around and read the plates
18  and dispatch confirmed that those were the plates for
19  the suspect involved in the aggravated robbery,
20  according to the witness.
21    Q. Okay.
22    A. I conducted a traffic stop as soon as I had
23  additional units as backup, pulled them over about 9th
24  and Filmore. I recall that the driver was a female and
25  there was a passenger. I didn't approach the vehicle.

Page 19

1  Pretty much we had them exit the vehicle and I
2  remember --
3    Q. Why would you do that?
4    A. The situation, a felony stop, so we're trained
5  not to approach the vehicle.
6    Q. Were you advised that the robbery -- or the
7  witness or the victim had indicated a gun had been used
8  in the robbery?
9    A. Yes, sir.
10    Q. Okay. And that would have been sufficient
11  reason for you to protect yourself and your fellow
12  officers and not approach the vehicle?
13    A. Yes, sir.
14    Q. Is that the training and the -- I guess the --
15  the training that you go through in the academy or --
16    A. Yes, sir, the training plus the experience.
17    Q. Okay. So what happened next?
18    A. I was yelling to the driver to exit the vehicle
19  in English, and she kind of hesitated so I switched
20  from English to Spanish.
21    Q. Okay.
22    A. And finally I guess she understood Spanish so
23  she started getting off the vehicle, and I signaled and
24  verbally commanded her to come closer to me, closer to
25  the unit. And the other gentleman was asked to exit

Page 20

1  the vehicle, also, by another officer.
2    Q. Who was the other officer?
3    A. Charles Fechner.
4    Q. Charles?
5    A. Charles Fechner.
6    Q. Fechner, F --
7    A. Yes, sir, F-e-c-h-n-e-r.
8    Q. Okay.
9    A. And I had contact with the lady only, as far as
10  at that time, and the other officer took the other --
11  the passenger and checked the vehicle for additional
12  passengers.
13    Q. And there weren't any other passengers?
14    A. No, sir.
15    Q. Okay. Was -- at the time that you made the
16  stop, had you been given a description of the
17  individual who had allegedly robbed the Circle K store?
18    A. Not really.
19    Q. Okay.
20    A. Just the vehicle description.
21    Q. Okay, just the vehicle description. All right,
22  you said that the first time that you had contact with
23  the vehicle was at 13th and Tyler?
24    A. Yes, sir.
25    Q. Okay. And Tyler is -- is Tyler a one-way

Page 21

1  street?
2    A. Yes, sir, it's a one-way street.
3    Q. So where on 13th Street were you when you first
4  spotted the vehicle?
5    A. I was stopped at a red light going north on
6  13th and that vehicle was directly in front of me going
7  south on 13th. When the light turned green, both of us
8  proceeded and I noticed the vehicle but I was turning
9  to the right on Tyler. So I went into a parking space
10  and had to go against traffic to avoid losing the
11  suspect vehicle.
12    Q. Okay.
13    A. And there was kind of a timeframe where I
14  didn't have a visual on the vehicle at all times.
15    Q. Okay. I'm going to give you just a rough
16  sketch of 13th and Tyler. 13th runs north and south,
17  correct?
18    A. Yes, sir.
19    Q. Okay. And Tyler runs east and west but it's
20  one-way going east, correct?
21    A. That's correct, sir.
22    Q. All right. Going west?
23    A. Going east.
24    Q. Going east, I'm sorry. Yeah, Harrison is the
25  other one. That's right. Okay, going east. Can you

6 (Pages 18 to 21)

BRYANT & STINGLEY, INC.

(956)428-0755
fec128b0-05ce-4dc8-94f4-437199e3202e

Page 22

1   show me where you were at the time that you first
2   spotted the suspect vehicle?
3       A. I was right here, sir, going north. The
4   vehicle was right here. And I was in the process of
5   making a turn when I saw the vehicle so I went over
6   here into a parking space to do a U-turn.
7       Q. Okay.
8       A. And kind of went against traffic since it was
9   late at night pretty much.
10      Q. There wasn't very much traffic?
11      A. Not very much, so I came down here and
12  proceeded to follow the vehicle.
13      Q. Label your vehicle No. 1, will you please, and
14  the other one No. 2?
15      A. (The witness complied)
16      Q. Okay, now, 13th and Tyler -- and that's when
17  you first spotted the suspect vehicle; is that right?
18      A. Yes, sir.
19      Q. How far -- let me strike that. How long did
20  you follow the vehicle?
21      A. From this point to about 9th.
22      Q. 9th Street?
23      A. 9th and Filmore.
24      Q. And how long did it take you to get to 9th and
25  Filmore?

Page 23

1       A. Probably a couple of minutes.
2       Q. A couple of minutes?
3       A. Right.
4       Q. Was there very much traffic at all?
5       A. No, sir.
6       Q. Okay, do you recall what time of the evening it
7   was?
8       A. About 10:30, 11:00.
9       Q. Okay. During the time that you were following
10  this vehicle, did the driver in any way attempt to take
11  any kind of evasive action?
12      A. No, sir.
13      Q. Did she speed up?
14      A. No, sir.
15      Q. Okay. When you were following her, did you
16  have your overhead lights on or not?
17      A. At first I didn't have my overheads because I
18  was waiting for additional units.
19      Q. Okay.
20      A. And at around 10th Street, that's when I
21  initiated the traffic stop.
22      Q. Okay.
23      A. And she kind of rolled for about a block and
24  then pulled over.
25      Q. Okay. And during the time that you were

Page 24

1   following this vehicle, did anybody get out of the
2   vehicle --
3       A. No, sir.
4       Q. -- before the stop?
5       A. No, sir.
6       Q. All right, now, how many officers ended up
7   arriving at the scene when you made the stop?
8       A. I believe there was two more officers.
9       Q. Two more officers, okay. Now, walk me through
10  the procedure that you used when you -- you turned your
11  overheads on, Ms. Esquivel pulled over, and you stopped
12  behind her, correct?
13      A. Yes, sir.
14      Q. How far behind her were you?
15      A. About two or three car lengths.
16      Q. Okay, two or three car lengths. And did you
17  get out of your vehicle?
18      A. Yes, sir, I got off and stood by the door.
19      Q. Okay, and you stood by your door. Were you
20  behind the door or had you closed the door?
21      A. I was behind the door.
22      Q. And at that time I guess you would have had to
23  have yelled at her, correct?
24      A. Yes, sir.
25      Q. And that's when you said that you're not sure

Page 25

1   she understood English, correct?
2       A. Right.
3       Q. So then you switched over to Spanish, correct?
4       A. That's correct.
5       Q. And she got out of the vehicle. When she got
6   out of the vehicle, can you describe her demeanor to
7   me?
8       A. She kind of looked nervous.
9       Q. Okay.
10      A. Scared. She didn't know what was going on.
11      Q. Okay. Did you have your gun drawn?
12      A. No, I didn't, sir.
13      Q. Okay. Did any of the other officers have their
14  guns drawn?
15      A. I don't know, sir.
16      Q. Okay. Did you have your gun unholstered?
17      A. No, sir, it was in the holster.
18      Q. Okay. Weren't you concerned that someone else
19  had a weapon that could harm you or your fellow
20  officers?
21      A. Yes, sir.
22      Q. Okay. Is there a procedure that you follow
23  that -- I guess my question is when you would determine
24  to, you know, pull your weapon out and not pull your
25  weapon out.

7 (Pages 22 to 25)

Page 26

1   A. Yes, sir.
2   Q. Okay, and what is that procedure?
3   A. Well, it's up to the officer.
4   Q. Okay, so it's up to your discretion?
5   A. Yes, sir.
6   Q. So when Ms. Esquivel got out of the vehicle,
7   what did you tell her?
8   A. I told her, "Walk towards me."
9   Q. Okay. And did she do that?
10  A. Yes, sir.
11  Q. Okay. And when she walked towards you, how far
12  did she come to you?
13  A. Close enough to pretty much make contact, about
14  from me to where you're at.
15  Q. Okay, so two or three feet?
16  A. Yes, sir.
17  Q. Okay. And at the time, the other individual
18  that was in the vehicle, where was he?
19  A. He was being asked, also, to exit the vehicle.
20  Q. Okay.
21  A. But that was another officer.
22  Q. Okay, and was that the other officer that you
23  mentioned?
24  A. Yes, sir, Charles.
25  Q. Charles Fechner?

Page 27

1   A. Fechner.
2   Q. Fechner. Is Officer Fechner still with the
3   Harlingen Police Department?
4   A. Yes, sir.
5   Q. All right, and when Ms. Esquivel approached
6   you, what happened?
7   A. I just told her to step back to the rear of the
8   vehicle, my vehicle.
9   Q. Okay.
10  A. And I began to ask her questions regarding the
11  incident that had occurred.
12  Q. Okay.
13  A. And I explained to her why she had been pulled
14  over and stuff like that.
15  Q. Okay. And what did you ask her?
16  A. I asked her first the initial questions, "Where
17  are you coming from?"
18  Q. And did she tell you?
19  A. Yes.
20  Q. What did she tell you?
21  A. At first she said she was coming from
22  Jack-In-The-Box. Then I asked her, "Were you at
23  Circle K on Commerce?" And she said she was prior to
24  going to Jack-In-The-Box.
25  Q. And what happened after that?

Page 28

1   A. I just continued questioning her as far as what
2   she was doing at Circle K, what she was doing at
3   Jack-In-The-Box and stuff like that, asking her about
4   the incident.
5   Q. Okay. Did you ask her if she had been involved
6   in the robbery?
7   A. Yes, sir, I asked her if she had anything to do
8   -- pretty much I explained the situation, "We had an
9   aggravated robbery. There was a witness giving this
10  description as to where the suspect fled and in this
11  vehicle and that's why we're questioning you."
12  Q. And what did she say? How did she respond?
13  A. She said she was at the Circle K but she had
14  nothing to do with the robbery.
15  Q. Okay.
16  A. She just kept saying she had nothing to do with
17  the robbery.
18  Q. Okay. And what did you do after you asked her
19  if she had anything to do with the robbery?
20  A. Pretty much I just stood there for a while
21  while the other officer tried to get the other
22  passenger -- come to find out their stories weren't
23  matching.
24  Q. Okay.
25  A. I don't know exactly what their stories were at

Page 29

1   this point, but the questions I was asking her, the
2   other gentleman was answering with a different
3   response.
4   Q. Okay. But you don't know what his responses
5   were?
6   A. No, sir.
7   Q. Okay. Now, how do you know that their stories
8   weren't matching?
9   A. Because I was talking to the officer and I was
10  telling him, "I asked her this," and he was asking the
11  same questions and he told him this and she told me
12  this.
13  Q. And at some point you made a determination to
14  go ahead and arrest her, correct?
15  A. No, sir. I was given information from the
16  actual scene from my supervisor.
17  Q. Who is your supervisor?
18  A. Lieutenant Hushen, Tom Hushen.
19  Q. Okay.
20  A. They were the ones investigating what was going
21  on, and at that point we had detained both of them and
22  were just waiting to see what was evolving over there
23  at the scene.
24  Q. So your testimony is that Mr. Hushen, a captain
25  or lieutenant -- or what was his position?

8 (Pages 26 to 29)

Page 30

1    A. Lieutenant Tom Hushen.
2    Q. Okay, and when you say he was investigating
3  over at the scene, are you saying he was at the
4  Circle K?
5    A. That's correct.
6    Q. Okay, how do you know he was at the Circle K?
7    A. Via we were talking to each other on the phone
8  -- the radio.
9    Q. Okay, and he was telling you he was at the
10  Circle K?
11    A. Yes, sir.
12    Q. And do you recall what time that was?
13    A. 10:30, 11:00. I don't know. Around there.
14    Q. In the same --
15    A. It was the same timeframe.
16    Q. Okay. How long a period of time were you there
17  at the stop with Ms. Esquivel?
18    A. I'm not sure, sir.
19    Q. Okay. And you said that you stood around
20  waiting to get instructions from Lieutenant Hushen; is
21  that correct?
22    A. That's correct.
23    Q. And, ultimately, did he give you any
24  instructions, eventually?
25    A. Yes, he said to 95 both of them.

Page 31

1    Q. 95 means what?
2    A. Arrest them, sir.
3    Q. Arrest them, okay.
4    A. Yes.
5    Q. See, I don't know 95s from 130s.
6    A. Sorry.
7    Q. That's okay. So is your testimony is that
8  Lieutenant Hushen gave you the instructions to arrest
9  both of them?
10    A. Yes, sir.
11    Q. And do you know what time that was?
12    A. No, sir.
13    Q. Can you estimate how long you were at the stop
14  with Ms. Esquivel and her son before you arrested them?
15    A. Probably about 20 minutes, 30 minutes.
16    Q. Okay, all right. And did Lieutenant Hushen
17  tell you why he wanted you to go ahead and arrest
18  Ms. Esquivel and her son?
19    A. No, sir.
20    Q. Let me show you what I have marked as
21  Exhibit 2, which is the arrest report in this case.
22  And if we could kind of go through it, the first page,
23  which is page 1 of 3 -- do you see that?
24    A. Yes, sir.
25    Q. And let's start at the top. Can you explain to

Page 32

1  me what that -- first of all, is that your handwriting
2  on the top?
3    A. No, sir, it's not.
4    Q. Do you know whose handwriting that is?
5    A. Probably a detective's handwriting. I don't
6  know, sir.
7    Q. You don't know, okay. And is that mug number
8  03022618?
9    A. Yes, sir.
10    Q. Okay, and what does that signify? What does
11  that tell me?
12    A. I don't know, sir.
13    Q. You don't know what that means?
14    A. I just know the mug is a picture of the
15  arrestee.
16    Q. All right.
17    A. But I don't know too much about jail
18  procedures.
19    Q. And then above below that it says "Processed"?
20    A. Yes, sir.
21    Q. And you don't know what any of that -- I mean
22  you can pretty much guess that mug and the number means
23  the mug shot?
24    A. Yes, sir.
25    Q. Do you know what F1 means that's written over

Page 33

1  here on the right-hand side?
2    A. No, sir.
3    Q. Under arresting officer it's got your name,
4  correct?
5    A. Yes, sir.
6    Q. And it has the time -- the date is May 17th at
7  22:49. Do you see that?
8    A. Yes, sir.
9    Q. Now, is that the actual arrest time or is that
10  the time that you made this report out?
11    A. That's the arrest time.
12    Q. Okay. Now, how does that get logged in,
13  Officer Salinas?
14    A. By dispatch.
15    Q. Dispatch?
16    A. Yes, sir.
17    Q. Okay. And 22:49, for lay people, that means
18  10:49?
19    A. 10:49, yes, sir.
20    Q. Do you recall what time the robbery actually
21  occurred?
22    A. No, sir.
23    Q. Okay. All right, let's go through -- is this
24  information that you would have inputted into the
25  computer? By "this," I mean the information that's on

BRYANT & STINGLEY, INC.                    (956)428-0755
fec128b0-05ce-4dc8-94f4-437199e3202e

Page 34

1  this form, the rest of this, under Persons Involved,
2  Offenses, Names?
3      A. If I did this?
4      Q. Yes, sir.
5      A. No, sir, I believe Jorge Moreno --
6      Q. Okay.
7      A. -- did the arrest report.
8      Q. So the other arresting officer that's noted
9  here, your understanding, inputted the rest of this
10 information; is that right?
11     A. Yes, sir.
12     Q. Now, this is a computer-generated report,
13 right?
14     A. Yes, sir.
15     Q. So do you-all have computers you just go in and
16 you fill in the blanks in the different spaces and then
17 the computer will print out the report?
18     A. Yes, sir.
19     Q. Okay. Now, on this first page there's some
20 other -- in the middle of it, some handwritten
21 notations. Do you see those?
22     A. Yes, sir.
23     Q. Okay. Is that your handwriting?
24     A. No, sir.
25     Q. Okay. Do you know who wrote this on there?

Page 35

1      A. No, I don't, sir.
2      Q. Okay. Do you recognize the signature on the
3  right-hand side right above "5-18-03"?
4      A. I think it reads D Means.
5      Q. Okay. Would that be Detective Means?
6      A. I believe his first name is David.
7      Q. Okay.
8      A. David Means.
9      Q. All right. And then -- all right, since you
10 didn't do any -- let's go on to page 3 of that report,
11 which is a narrative. Do you see that?
12     A. Yes, sir.
13     Q. Okay. Did you have anything to do with filling
14 that narrative out?
15     A. No, sir.
16     Q. Okay. Do you know who did?
17     A. Officer Moreno.
18     Q. Moreno did?
19     A. Yes, sir.
20     Q. Okay. Let me ask you, when -- other than
21 interrogating Ms. Esquivel at the stop, did you ever
22 talk to her after that?
23     A. No, sir.
24     Q. Okay. Did you ask her if she knew who had
25 committed the robbery?

Page 36

1      A. No, sir.
2      Q. Okay. Did you have anything to -- any contact
3  with any of the other witnesses to the robbery?
4      A. No, sir.
5      Q. Other than the stop that you did of
6  Ms. Esquivel, did you ever see her after that?
7      A. No, sir.
8      Q. Okay. Let's -- okay, you have seen that one?
9          MR. PENA: That was 2, right?
10         MR. HUGHES: Uh-huh.
11         MR. PENA: Let me mark our little map here
12 as Exhibit No. 3.
13     Q. Would you mind just going ahead and initialing
14 that for me, Officer Salinas?
15     A. (The witness complied)
16     Q. Thank you, sir. Let me show you what has been
17 marked as Exhibit No. 4. If you will, take a look at
18 that. It's another document that's been provided to me
19 by the City of Harlingen. And at the top it says
20 Harlingen Detention Center Intake Screening Form,
21 right?
22     A. Yes, sir.
23     Q. Did you fill this one in?
24     A. Yes, sir.
25     Q. All right. And it says the time that you

Page 37

1  filled that out was 11:02 p.m., correct?
2      A. Yes, sir.
3      Q. Okay. Where did you fill this document out?
4      A. At the city jail.
5      Q. Okay. When you took Mrs. Esquivel into
6  custody, did you handcuff her?
7      A. Yes, sir.
8      Q. Okay. And did you put her in your squad car?
9      A. Yes, sir.
10     Q. Okay. Was there anybody else in the squad car
11 with you at the time?
12     A. No, sir.
13     Q. Did Ms. Esquivel say anything about her being
14 arrested to you?
15     A. No, sir.
16     Q. Okay. Did she understand why she was being
17 arrested?
18     A. We advised her. I don't know if she understood
19 or agreed.
20     Q. Okay.
21     A. I'm sure she understood, but I don't know if
22 she agreed.
23     Q. Okay. And when you say you advised her, what
24 did you advise her of?
25     A. We advised her she was under arrest for

10 (Pages 34 to 37)

1  aggravated robbery.
2  Q. Okay. Now, did you ever go to the Circle K
3  yourself?
4  A. No, sir.
5  Q. Okay. Now, let's go ahead and go back to this
6  Exhibit No. 4. Did you make all those check marks on
7  there?
8  A. Yes, sir.
9  Q. Okay. Kind of towards the middle on the first
10 part, all are marked "No" except one and it says "Yes"
11 where it says "Appears excessively worried about some
12 situation other than the immediate legal problem." Do
13 you see that?
14 A. Yes, sir.
15 Q. What made you write that down or check "Yes"
16 instead of "No"?
17 A. She just seemed worried about something. I
18 don't know --
19 Q. Did she say what she was worried about?
20 A. No, sir.
21 Q. Had you become aware at the time of the arrest
22 or any time that she was in your custody that
23 Ms. Esquivel was not an American citizen?
24 A. No, sir.
25 Q. Now, when you took Ms. Esquivel, where did you

1  take her?
2  A. To the police department, to the jail section.
3  Q. In Harlingen?
4  A. Yes, sir.
5  Q. Okay, and were you present when she was
6  processed?
7  A. Yes, sir.
8  Q. Okay. When you got to the Harlingen jail, were
9  her handcuffs removed or did she remain --
10 A. Yes, sir, her handcuffs were removed.
11 Q. And were her fingerprints taken at that time?
12 A. I don't recall, sir.
13 Q. Okay. Was that something that you would not
14 have been involved with?
15 A. Yes, that's correct. We don't fingerprint.
16 Q. Okay. So kind of tell me a little bit about
17 what happens. You get to the police station, you've
18 got a suspect in custody, and they are in handcuffs.
19 Do you go in through the front door, back door?
20 A. No, we'll go to the sally port entrance, the
21 back door, sally port. We go in there, and there's one
22 or two jailers. We usually remove all their property
23 or ask them to remove all their property. We fill in
24 the appropriate forms, which is the intake screening
25 form, get her personal information for the actual

1  report, and then we'll leave her in the custody of the
2  jailer. They are the ones that will eventually do the
3  fingerprints and booking and all that stuff.
4  Q. And do you go fill out reports?
5  A. Yes, sir, once I get the information I need,
6  I'll go type up the report in the other room, computer
7  room.
8  Q. And in this instance, you didn't do the report.
9  The officer did, correct?
10 A. Yes, sir.
11 Q. Now, during all this time, did you ever talk to
12 Jesus Esquivel?
13 A. No, sir.
14 Q. Okay. You didn't interrogate him or ask him
15 any questions?
16 A. No, sir.
17 Q. After you left Mrs. Esquivel with the -- I
18 guess the jailer to get processed, did you have any
19 other occasion to interrogate her after that?
20 A. No, sir.
21 Q. Okay. Did you ever see her after that?
22 A. No, sir.
23 Q. Okay. Have you ever seen her since then?
24 A. No, sir, I haven't.
25 Q. Okay. Do you know if Mrs. Esquivel has a

1  criminal record history?
2  A. No, sir.
3  Q. Okay. Did you run the license plates when you
4  made the stop to see if there were any outstanding
5  warrants or anything like that?
6  A. The license plate, it will only show if the
7  vehicle is stolen, sir.
8  Q. I'm sorry?
9  A. It will only show if the vehicle is stolen, the
10 owner of the vehicle, the owner and address. It
11 doesn't show the criminal record of the owner.
12 Q. Okay, fair enough. Did you do that? Did you
13 check --
14 A. Yes, I ran the 28s.
15 Q. The 28s?
16 A. The license plates. I'm sorry.
17 Q. That's okay. I'll get educated here. All
18 right, so correct me if I'm wrong, then, Officer
19 Salinas. You're testifying to the Court and to the
20 jury that the decision to arrest Ms. Esquivel and her
21 son was a decision that was made by someone other than
22 yourself, correct?
23 A. That's correct, sir.
24 Q. All right. And you have told us today that
25 Lieutenant Hushen advised you to go ahead and arrest

BRYANT & STINGLEY, INC.

Page 42

1  them while you had them, I guess, under your custody at
2  the time, correct?
3  　　A.  That's correct.
4  　　Q.  When Officer Hushen called you --
5  　　　　MR. HUGHES:  Just a second.  It's Hushen,
6  H-u-s-s -- or I mean H-u-s-h-e-n.
7  　　　　MR. PENA:  Hushen?
8  　　　　MR. HUGHES:  Hushen.  It's just we're
9  mispronouncing it and I know we can all clean this up
10  later but --
11  　　　　MR. PENA:  Hushen, thank you.
12  　　Q.  See, this is what he does.  He does these
13  little things to get me off track so I forget my
14  question.  He plays these tricks on me all the time.
15  　　　　Officer Salinas, at the time that
16  Ms. Esquivel was standing -- I guess standing next to
17  you and you were waiting for Officer Hushen to get back
18  to you, was she handcuffed?
19  　　A.  No, sir, she was sitting in the back of my
20  unit.
21  　　Q.  And where was her son?
22  　　A.  Her son was on the front yard to this other
23  residence where she had pulled over with the other
24  officer.
25  　　Q.  He was in the front yard?

Page 43

1  　　A.  Yes, sir, to the house that she pulled over,
2  the front yard of that residence.  I don't recall the
3  address.  But the other officer was talking to him
4  pretty much by their vehicle and in the front yard.
5  　　Q.  Do you know if he was handcuffed?
6  　　A.  No, he wasn't handcuffed.  When we were talking
7  to them, they weren't handcuffed at all.
8  　　Q.  They didn't get handcuffed until you got the
9  word to arrest them?
10  　　A.  Yes, sir, that's correct.
11  　　Q.  Have you understood my questions here today?
12  　　A.  Yes, sir.
13  　　　　MR. PENA:  That's all the questions I
14  have.  Thank you very much.  Pass the witness.
15  　　　　MR. HUGHES:  I have no questions.  You're
16  free to go.
17  　　　　(Deposition concluded)
18
19
20
21
22
23
24
25

Page 44

ERRATA SHEET/SIGNATURE PAGE

PAGE LINE CHANGE　　　　　　　　　REASON

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

I, JORGE SALINAS, have read the foregoing transcript
and hereby affix my signature that same is true and
correct, except as noted above.

　　　　　　_____
　　　　　　JORGE SALINAS

THE STATE OF TEXAS
COUNTY OF COUNTY
　　　SUBSCRIBED AND SWORN TO BEFORE ME, the
undersigned authority on this the _____ day of
_____, 2004.

　　　　　　_____
　　　　　　Notary Public in and for
　　　　　　The State of Texas

Page 45

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION
ORELIA ESQUIVEL,　　　　)(
INDIVIDUALLY AND A/N/F  )(
JESUS ESQUIVEL, JR.　　 )(
　　Plaintiffs　　　　　 )(
　　　　　　　　　　　　 )(
VS　　　　　　　　　　　 )(CIVIL ACTION NO. B-03-104
　　　　　　　　　　　　 )(
SSP PARTNERS & CITY OF  )(
HARLINGEN POLICE DEPARTMENT )(
　　Defendants　　　　　 )(

REPORTER'S CERTIFICATE TO THE ORAL DEPOSITION OF
JORGE SALINAS
MARCH 9, 2004
　　I, SHELLEY STINGLEY, Certified Court Reporter,
certify that the witness, JORGE SALINAS, was duly sworn
by me, and that the deposition is a true and correct
record of the testimony given by the witness on MARCH
9, 2004, that the deposition was reported by me in
stenograph and was subsequently transcribed under my
supervision.
　　I FURTHER CERTIFY that I am not a
relative, employee, attorney or counsel of any of the
parties, nor a relative or employee of such attorney or
counsel, nor am I financially interested in the action.

　　WITNESS MY HAND on this the _____ day of
_____, 2004.

　　　　_____
　　　　SHELLEY STINGLEY, CSR NO. 5725
　　　　Firm Registration No. 41
　　　　Bryant & Stingley, Inc.
　　　　2010 East Harrison
　　　　Harlingen, TX  78550

12 (Pages 42 to 45)



STATE OF TEXAS
COUNTY OF CAMERON

BEFORE ME, the undersigned authority, a notary public in and for Cameron County,
Texas on this day personally appeared Thomas Hushen            who, after by being duly
sworn did depose and say:

My Name is Thomas D. Hushen I am employed by the City of Harlingen, I am the
Lieutenant assigned to the C-shift. On 5-17-03 at 10:20 pm I responded to an aggravated
robbery at 705 So. Commerce.  Dispatch advised via radio, that a witness had observed the
suspect involved get in a white ford explorer Texas License Plates R53-LGR and head east
on Fillmore.  Officer J. Salinas observed a white Explorer with the same plates heading
west on Fillmore around the 1300 block.  He initiated a traffic stop at 8th and Fillmore.  The
driver was identified as Orelia Esquivel dob-11-06-68.  I asked if she was alright and what
had happened at the Circle K.  She advised me that nothing had happened she was only
getting gas.  I then spoke to the passenger in the vehicle identified as Jesus Esquivel dob 10-
24-87 I asked him if he was alright and if they had given a ride to anyone, He advised no.  I
then informed him of what had happened at the Circle K and that witnesses had seen the
suspect enter the car, and if he had seen anything.  I asked if the suspect had threatened
him to give him a ride or something. Jesus than advised that his uncle Luis Ovalle was the
one in Circle K that had done the robbery, but he was not involved.  I terminated the
interview and drove back to the Circle K to interview the witness.  I spoke to Norma Park I
asked her if she was 100% sure that she saw the suspect enter the vehicle in question she
stated that she was.  I then asked her to describe the suspect.  She described him as having
a light complection, Heavy set, wearing a green cap, shorts, and he had a moustache.  I
observed the surveillance tape and the description she gave matched the suspect on the
tape.  I advised to arrest the two subjects that were in the Explorer.  During a check of the
vehicle a Jack in the Box bag was found containing three hamburgers.  The receipt stated
that they were purchased at 10:23pm I contacted The management at the Jack in the Box
at 77/Tyler I was advised that the clerk that handled that was Lori Trevino.  Lori Trevino
was contacted and asked if she remembered that vehicle.  She advised that she did, because
she had a hard time understanding the female driver because she only spoke Spanish, and
when the vehicle got to the window she saw the driver, the passenger, and another subject
in the vehicle.



RUBEN CONTRERAS, III
MY COMMISSION EXPIRES
February 4, 2008

SWORN AND SUBSCRIBED TO BEFORE ME, on this  18  day of  may     20 03

Notary Public in and for Cameron County Texas
Ruben Contreras III       feb 4, 2008
Name (printed of typed)    Commission Expires

Printed by: eorozco
Printed date/time:  5/18/03 1:11

# Arrest Report

**HARLINGEN POLICE DEPT**

**Arrest Number: ARR030517006105**

| | |
|---|---|
| Arrest Date/Time:    05/17/2003 22:49 | Arresting Officer 1:   SALINAS, JORGE A |
| Arresting Officer 2:   MORENO, JORGE LUIS | Arrest Location:   FILMORE AND 9 |

## Narratives

| | |
|---|---|
| Entered Date/Time:    05/18/2003 00:37 | Narrative Type:   PRIMARY NARRATIVE |
| Subject:    AGGRAVATED ROBBERY | Author:    MORENO, JORGE LUIS |

On or at 22:23 hours on 05/17/2003 Reporting party advised that a male subject entered the store and displayed a gun and demanded money from the cashier's drawer. The subject was handed a small brown bag with $5.00 and $1.00 dollar bills and he also took a lighter without consent. The witness said the subject with the gun exited the store and got into the passenger side  of a white Ford Explorer displaying Texas license plates R53LGR. The vehicle was spotted by Officer J. Salinas and he initiated a traffic stop on or at Filmore and 9th Street  The subject with the gun was not located in the vehicle, however Arrestee Orelia and Jesus are related to the subject. The subject, Luis Ovalle is Orelia's brother-in-law. The surveillance video was seized and tagged as evidence  It shows Arrestee Jesus standing next to his uncle, Luis Ovalle. Shortly after Jesus exits the store, Luis Ovalle picks up his shirt to display the weapon and demand the cash from the drawer. The witness Norma Park was positive when she advised that she observed the robbery and observed the suspect enter the described vehicle.  Witness was parked infront of the two glass doors and from her vantage point she could observe everything. Her discription of the suspect matched what was seen on the video tape. In the front seat of the vehicle that was stoppe were three hot burgers from Jack in The Box.  The receipt stated that they had been there at aprox. 10:23pm Clerk from Jack in the box (Lori Trevino)  was contacted and she advised that she remembered the white explorer and saw a female driver and a young man and another subject in the vehicle.

## Officers

| Event Association | Emp# | Badge# | Name | Squad# |
|---|---|---|---|---|
| PRIMARY OFFICER | 3330 | 3330 | MORENO, JORGE LUIS | |
| ARRESTING OFFICER | 3213 | 3213 | SALINAS, JORGE A. | |

## Signatures

*Orelia Esquivel*
_____
Arrestee

_____
Arresting Officer

_____
Booking Officer / Jail Supervisor

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| **ORELIA ESQUIVEL, INDIVIDUALLY** | § | |
| **AND A/N/F JESUS ESQUIVEL, JR.** | § | |
| | § | |
| **VS.** | § | **Civil Action No. B-03-104** |
| | § | |
| **CIRCLE K. STORES AND CITY OF** | § | |
| **HARLINGEN POLICE DEPARTMENT,** | § | |

## DECLARATION OF RUBEN R. PENA

My name is Ruben R. Peña. I am the attorney of record for the plaintiffs in the above entitled and numbered cause. I am over the age of 21 and of sound mind. I understand that this document is given under oath, and I have personal knowledge of the facts set forth in this declaration. In the course of my investigation of the underlying facts, I determined that the testimony of the witness Lori Trevino, who purportedly gave a statement to the Harlingen Police Department on or about May 17, 2003 and implicating the Plaintiffs in a robbery was an important part of the investigation. However, upon inquiry to the Jack in the Box in Harlingen, Texas where the witness was employed at the time of the incident, it was determined that she was no longer employed by Jack in the Box. Plaintiffs and their attorney are seeking to find the location of the witness.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this 18th day of May, 2004.

_____
Ruben R. Peña

RRP:nez
esquivel\orelia\Int.Report
RESPONSE TO SUMMARY JUDGMENT